E-filing

FILED

08 MAY 2... PM 3: 05

1  **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2  Name _OPALEC, Roderick_

       (Last)       (First)      (Initial)

3  Prisoner Number _H-33214_

4  Institutional Address _CTF, P.O. Box 689/ East Dorm 64-Low_

5  _Soledad, CA. 93960-0689_

6

7  ## UNITED STATES DISTRICT COURT
   ## NORTHERN DISTRICT OF CALIFORNIA

8  RODERICK OPALEC

  (Enter the full name of plaintiff in this action.)

9                                  )

10            vs.            )  Case No. _____

                           )  (To be provided by the clerk of court)

11 Ben Curry, Warden     )  **PETITION FOR A WRIT**

                           )  **OF HABEAS CORPUS**

12

13

14 (Enter the full name of respondent(s) or jailor in this action)

15

16                   **Read Comments Carefully Before Filling In**

17 **When and Where to File**

18       You should file in the Northern District if you were convicted and sentenced in one of these

19 counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21 this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23       If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

24 one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 District Court for the district in which the state court that convicted and sentenced you is located. If

26 you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 your petition will likely be transferred to the district court for the district that includes the institution

28 where you are confined. Habeas L.R. 2254-3(b).

1  Who to Name as Respondent

2         You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6         If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now and the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11     1. What sentence are you challenging in this petition?

12         (a)    Name and location of court that imposed sentence (for example; Alameda

13                County Superior Court, Oakland):

14     Los Angeles Co. Sup. Ct.      Los Angeles, CA.

15                Court                        Location

16         (b)    Case number, if known  TA009295

17         (c)    Date and terms of sentence Life w/Poss. of Parole + 3yrs.

18         (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                parole or probation, etc.)            Yes XXX      No _____

20                Where?

21                Name of Institution: Correctional Training Facility

22                Address: P.O. Box 689 , Soledad, CA. 93960-0689

23     2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26     Attempted Murder, 1st, P.C. §664/187(a), Use of Firearm,

27     12022.5(a)

28     _____

3.  Did you have any of the following?

    Arraignment:                      Yes _XX_     No _____

    Preliminary Hearing:         Yes _XX_     No _____

    Motion to Suppress:          Yes _____     No _____

4.  How did you plead?

    Guilty _XX_    Not Guilty _____    Nolo Contendere _____

    Any other plea (specify) _____

5.  If you went to trial, what kind of trial did you have?

    Jury _____    Judge alone_____    Judge alone on a transcript _____

6.  Did you testify at your trial?         Yes _____     No _____

7.  Did you have an attorney at the following proceedings:

    (a)    Arraignment         Yes _XX_     No _____

    (b)    Preliminary hearing     Yes _XX_     No _____

    (c)    Time of plea          Yes _XX_     No _____

    (d)    Trial               Yes _____     No _____

    (e)    Sentencing          Yes _xx_     No _____

    (f)    Appeal             Yes _____     No _XX_

    (g)    Other post-conviction proceeding    Yes _____     No _XX_

8.  Did you appeal your conviction?         Yes _____     No _XX_

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal         Yes _____     No _____

        Year: _____    Result:_____

        Supreme Court of California    Yes _____     No _____

        Year: _____    Result:_____

        Any other court         Yes _____     No _____

        Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

1    petition?                                    Yes _____    No_____

2    (c)    Was there an opinion?                Yes _____    No_____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                Yes _____    No_____

5           If you did, give the name of the court and the result:

6           _____

7           _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?          Yes _XX_    No_____

10           [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition. You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15    U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17           questions for each proceeding. Attach extra paper if you need more space.

18    I.    Name of Court: _U.S. District Ct., Northern Dist.Cal._

19          Type of Proceeding: _Petition for Writ of Habeas Corpus_

20          Grounds raised (Be brief but specific):

21          a._Due Process Violation by Board of Parole Hrgs._

22          b._____

23          c._____

24          d._____

25          Result: _ORDER GRANTING PETITION_ Date of Result: _03/20/08_

26    II.   Name of Court: _____

27          Type of Proceeding: _____

28          Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS         - 4 -

1       a._____

2       b._____

3       c._____

4       d._____

5       Result: _____Date of Result:_____

6    III.    Name of Court: _____

7            Type of Proceeding: _____

8            Grounds raised (Be brief but specific):

9       a._____

10      b._____

11      c._____

12      d._____

13      Result: _____Date of Result:_____

14   IV.     Name of Court: _____

15           Type of Proceeding: _____

16           Grounds raised (Be brief but specific):

17      a._____

18      b._____

19      c._____

20      d._____

21      Result: _____Date of Result:_____

22   (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                      Yes XX__    No_____

24          Name and location of court: _____

25  B. GROUNDS FOR RELIEF

26          State briefly every reason that you believe you are being confined unlawfully.  Give facts to

27  support each claim.  For example, what legal right or privilege were you denied?  What happened?

28  Who made the error?  Avoid legal arguments with numerous case citations.  Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS          - 5 -

1  need more space.  Answer the same questions for each claim.

2     [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3  petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5     Claim One:  SEE ATTACHED WRIT OF HABEAS CORPUS

6

7     Supporting Facts:  SEE ATTACHED WRIT OF HABEAS CORPUS.

8

9

10

11     Claim Two:  SEE ATTACHED WRIT OF HABEAS CORPUS

12

13     Supporting Facts:  SEE ATTACHED WRIT OF HABEAS CORPUS

14

15

16

17     Claim Three:  SEE ATTACHED WRIT OF HABEAS CORPUS

18

19     Supporting Facts:  SEE ATTACHED WRIT OF HABEAS CORPUS

20

21

22

23     If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS      - 6 -

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

4    Roderick Opalec v. Ben Curry, Case No. CV06-06459 MHP.

5    _____

6    _____

7    Do you have an attorney for this petition?                    Yes_____        No_____

8    If you do, give the name and address of your attorney:

9    _____

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on __5/18/08__

14                Date                                    Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

1

**TABLE OF CONTENTS**

2

<u>Topic</u>                                                                      Pages

3

Index .................................i,ii

4

Points and Authorities ......................iii,iv,v,vi

5

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

6

PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONALLY
AND STATUTORILY PROTECTED RIGHT TO THE LIBERTY
INTEREST IN THE EXPECTATION OF PAROLE UNDER
7
PENAL CODE §3041(b) WHICH ATTACHED AT THE TIME
OF INCARCERATION.

8
.................................1

9
A. EXISTENCE OF A LIBERTY INTEREST

.................................1
10
B. PROCEDURES WHICH LED TO DEPRIVATION OF LIBERTY

.................................4

11

<u>GROUND ONE:</u>

12

THE BOARD'S DECISION TO DENY PAROLE IS OTHERWISE
ARBITRARY AND IS NOT SUPPORTED BY "SOME
13
EVIDENCE" CONTAINING AN INDICIA OF RELIABILITY.
.................................5

14

<u>GROUND TWO:</u>

15

THE BOARD'S FINDING OF UNSUITABILITY AND REFUSAL
OF THE GRANTING OF PAROLE VIOLATED THE
16
PETITIONER'S RIGHT TO DUE PROCESS AND DEPRIVED
HIM OF HIS FEDERALLY PROTECTED LIBERTY INTEREST
17
WHEN THE BOARD DENIED PETITIONER A PAROLE GRANT
WITHOUT ANY RELIABLE EVIDENCE OR "SOME EVIDENCE"
18
IN VIOLATION OF THE 5TH AND 14TH AMENDMENTS OF
THE UNITED STATES CONSTITUTION.
19
.................................8

20

A. THE BOARD DID NOT MEET THE BURDEN OF PROOF THAT
PETITIONER POSES AN "UNREASONABLE RISK" OF
21
THREAT TO PUBLIC SAFETY IF RELEASED ON PAROLE.
THE DECISION WAS WITHOUT EVIDENCE AND WAS ARBI-
22
TRARY AND CAPRICIOUS, VIOLATING FUNDAMENTAL
DUE PROCESS.
23
.................................11

24

B. THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT
PROHIBITS STATE ACTION THAT DEPRIVES A PERSON
25
OF LIFE, LIBERTY OR PROPERTY WITHOUT DUE PROCESS
OF LAW.
26
.................................15

<u>GROUND THREE:</u>

27

THE BOARD VIOLATES DUE PROCESS BY REPEATEDLY
RELYING ON THE UNCHANGING FACTS OF THE CRIME IN
28
THE FACE OF CLEAR EVIDENCE OF REHABILITATION,

# TABLE OF CONTENTS (continued)

Topic                                                                    Pages

(GROUND THREE cont.)
        AND BY MAKING RECOMMENDATIONS OF WHAT TO DO TO
        BE FOUND SUITABLE AT EACH HEARING. A FINDING OF
        EGREGIOUSNESS IS BARRED BY THE INMATES
        COMPLIANCE WITH THOSE AGREED TERMS.
                          ............................16

    A. CONTINUED RELIANCE ON THE UNCHANGING FACTS OF
       THE CRIME VIOLATES DUE PROCESS.
                          ............................18

    B. CONTINUED RELIANCE UPON FACTS OF THE CRIME
       VIOLATES DUE PROCESS.
                          ............................22

    C. JUDICIAL OVERSIGHT IS CRITICAL TO SAFEGUARD THE
       UNDERLYING PURPOSE OF CALIFORNIA'S PAROLE SYSTEM
       AND THE LIBERTY INTERESTS OF INMATES. THE ESSENCE
       OF THE PAROLE SYSTEM IS THE RE-ENTRY OF PRISONERS
       WHO NO LONGER POSE A PUBLIC DANGER.
                          ............................25

    D. PRISONERS HAVE A CONSTITUTIONAL LIBERTY INTEREST
       N PAROLE DECISIONS.
                          ............................27

    E. STANDARD OF REVIEW REQUIRES AN EVIDENTIARY
       HEARING.
                          ............................28

CONCLUSION

PRAYER FOR RELIEF

1          **POINTS AND AUTHORITIES**

2     Name/Title

3     In re Bramble
      (1947) 31 Cal.2d 43, 51 [6] P.2d 411

4
      People v. Stuart
5     (1956) 47 Cal.2d 167, 175 [7] 302 P.2d 5, 55 A.L.R.2d 705

6     People v. Smith
      (1955) 44 Cal.2d 77, 79 [2] 279 P.2d 33

7
      In re McVickers
8     (1946) 29 Cal.2d 264, 278, 176 P.2d 40

9     People v. Valentine
      (1946) 28 Cal.2d 121, 143 [20] 159 P.2d 1

10
      People v. Ralph
11    (1944) Cal.2d 575, 581 [2] 150 P.2d 401

12    Biggs v. Terhune
      (9th Cir. 2003) 334 F.3d 910, 914, 915,916

13
      In re Ramirez
14    (2001) 94 Cal.App.4th 549, 564-565, 571

15    Edward v. Balisok
      (1997) 520 U.S 541, 648

16
      In re Caswell
17    92 Cal.App.4th 1017, 1029

18    People v. Dubon
      90 Cal.App.4th 949, 952, (2001)

19
      Charlton v. Federal Trade Comm.
20    543 F.2d 903-907, 908 (D.C. Cir. 1976)

21    McQuillion v. Duncan
      306 F.3d 901-910, (9th Cir. 2002)

22
      In re Smith
23    109 Cal.App.4th 489 (2003)

24    Kentucky Dept of Corrections v. Thompson
      490 U.S. 454, 459-460 (1989)

25
      Board of Pardons v. Allen
26    (1987) 482 U.S. 369, 376-78

27    Greenholtz v. Inmates of Neb. Penal & Corr. Complex
      (1979) 442 U.S. 1, 11-12

28
                              -iii-

1          **POINTS AND AUTHORITIES (continued)**

2    Name/Title

3    U.S. v. Guagliardo
     275 F.3d 868-872, (9th Cir. 2002)
4
     Graynet v. City of Rockford
5    408 U.S. 104, 108-109 (1972)

6    Irons v. Warden
     358 F.Supp.2d 936 (E.D. Cal. 2005)
7
     In re Scott
8    34 Cal.Rptr.3d at 919-920, 133 Cal.App.4th at 594-595

9    Shaputis
     37 Cal.Rptr.3d at 335
10
     In re Rosenkrantz
11   29 Cal.4th at 654-661

12   In re Smith
     114 Cal.App.4th 343, 370,372
13
     Caswell v. Calderon
14   363 F.3d 832, 389 (9th Cir. 2004)

15   Scott
     119 Cal.4th at 899
16
     Scott
17   133 Cal.App.4th at 595, 34 Cal.Rptr.3d at 919-920

18   Superintendent v. Hill
     472 U.S 445, 455-457 (1985)
19
     In re Minnis
20   (1972) 7 Cal.3d 639, 643, n.2

21   People v. Morse
     (1964) 60 Cal.2d 631, 643, n.8
22
     Masoner
23   2004 WL1090177 *1-2

24   Bair
     2005 WL2219220 *12 n.3
25
     Williams v. State of New York
26   (1949) 337 U.S. 241, 247

27   Sass v. Calif. Board of Prison Terms
     376 F.Supp.2d (E.D. Cal. 2005)
28

                                    -iv-

1

## POINTS AND AUTHORITIES (continued)

2  Title/Name

3  In re Lee
   49 Cal.Rptr.3d 931

4
   In re Elkins
5  50 Cal.Rptr.3d 503

6  Rosenkrantz v. Marshall
   774 F.Supp.2d, 1063 (C.D. Cal. 2006)

7
   Blankenship v. Kane,
8  2006 WL5215627 *3 (N.D. Cal. 2006)

9  Murille v. Perez
   2005 L2592420 *3n.1. (C.D. Cal. 2005)

10
   Siafullah v. Carey
11 2005 WL1555389 *8 (E.D. Cal. 2005)

12 Superintendent Steve Lomas Hill
   472 U.S. at 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985)

13
   Rojas v. Neilson
14 428 F.3d 1229, 1232, (9th Cir. 2005)

15 Sanchez v. Kane,
   444 F.Supp.2d 1049 (C.D.Cal. 2006)

16
   Delgado v. Lewis
17 233 F.3d 976, 982 (9th Cir. 2000)

18 Pham v. Terhune
   400 F.3d 740, 742 (9th Cir. 2005)

19
   Hines v. Thompson
20 336 F.3d 848, 853 (9th Cir. 2003)

21 Pirtle v. Morgan
   313 F.3d 1160 , 1167 (9th Cir. 2002)

22
   Powell v. Gomez
23 33 F.3d 39, 40

24 Earp v. Oronski
   (9th Cir. 2003) 372 U.S. 293 (1963)

25
   Keeney v. Tamaya-Reyes
26 504 U.S. 1, 5 1992

27 Taylor v. Maddox
   (9th Cir. 2004) 336 F.3d 992, 1001.

28

1    ## POINTS AND AUTHORITIES (continued)

2    <u>Title/Name</u>

3    In re Lawrence
     (May 22, 2007) Cal.Rptr.3d WL1475283

4

     In re Elkins
5    (2006) 144 Cal.App.4th 475, 487

6    In re Lee
     (2006) 143 Cal.App.4th 1400, 1408
7

     In re Barker
8    May 29, 2007, DJDAR 7548

9    Martin v. Marshall
     431 F.Supp.2d at p.1047
10

     CCR, Title 15, Division 2
11        §2000(b)(49)
          §2000(b)(62)(90)
12        §2402
          §2402(a)(b)
13

     Penal Codes
14        §3041
          §3041(a)
15        §3041(b)

16   Evidence Code
          §115
17

     California Constitution, Article V
18        §8(b)

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

**PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONALLY AND STATUTORILY PROTECTED RIGHT TO THE LIBERTY INTEREST IN THE EXPECTATION OF PAROLE UNDER PENAL CODE §3041(b) WHICH ATTACHED AT THE TIME OF INCARCERATION.**

The due process clause of the 5th and 14th Amendment prohibits a state action that deprives a person of life, liberty or property without due process.

However, a person alleging such a violation must establish that (a), he had protection; (b) that he was deprived of such a protection; and, (c) that the procedure which led to the deprivation was constitutionally deficient. Kentucky Dept. of Corrections v. Thomas, 490 U.S 459-460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002).

### A. EXISTENCE OF A LIBERTY INTEREST.

The Supreme Court held in 1979, and reiterated in 1987 that, "a state's statutory scheme, if it uses mandatory language, creates a presumption that parole release will be granted when or unless certain designated findings are made, and then, thereby, gives rise to a constitutionally protected 'Liberty Interest'". McQuillion v. Duncan, supra, 306 F.3d at 901, (citing Greenholtz v. Nebraska Penal Institute, 442 U.S. I, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) and Board of Pardons v. Allen, 482 U.S. 369, 373, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987).

Recently, our Ninth Circuit has "held" that California's parole scheme created such a liberty interest because Penal Code §3041 uses mandatory language and is similar to the Nebraska and Montana statues addressed in Greenholtz, supra, and

1    Allen, supra. (See McQuillion, supra, 306 F.3d at 901-901).

2    Not only did the Ninth Circuit hold that "Section 3041 of

3    the Penal Code creates in every inmate a cognizable liberty

4    interest in parole which is protected by the procedural

5    safeguards of the due process clause," but further held that

6    "the interest arises upon the incarceration of the inmate."

7    Biggs v. Terhune, 334 F.3d 910, 914-915 (9th Cir. 2003).

8    Two United States Supreme Court decisions, Greenholtz v.

9    Inmates of Nebraska Penal and Correctional Complex, (1979) 442

10    U.S. 1, 12, decided in 1979 and Board of Pardons v. Allen,

11    (1987) 482 U.S. 369, 381, decided in 1987, held the Federal Due

12    Process Clause creates a constitutional liberty interest for

13    convicted persons in certain jurisdictions. The existence of

14    this right depends on whether the state employs "mandatory

15    language" indicating parole will be granted if certain findings

16    are made, Board of Pardons v. Allen, supra, 482 U.S. at pages

17    377-381. In 2002 the Ninth Circuit examined the California

18    parole scheme in MQuillion v. Duncan, (9th Cir. 2002) 306 F.3d

19    895 and found it "uses mandatory language and is largely

20    parallel to the schemes found in Greenholtz and Allen,"

21    McQuillion v. Duncan, supra, 306 F.3d at page 901. Accordingly,

22    the McQullion court found a "liberty interest" was created under

23    the federal constitution for state prisoners in California,

24    McQullion v. Duncan, supra, 306 F.3d at page 901.

25    While it is true post McQuillion, the California Supreme

26    Court had occasion to visit and decide in In re Dannenberg that

27    "life" prisoners did not have a liberty interest in the

28    expectation that the Board of Parole Hearings would engage in

-2-

1  "uniform term" analysis under Penal Code §3041(a) if it

2  demonstrated that public safety warranted denial of parole under

3  §3041(b). That court did not hold, however, that there is no

4  protected liberty interest in parole whatsoever. Indeed,

5  California courts have continued to analyze such claims. See In

6  re Shaputis, 135 Cal. App. 4th, 217, 224, 231-232, Cal.Rptr.3d

7  324 (citing Dannenberg); In re Scott, 133 Cal.App.4th 573, 34

8  Cal.Rptr.3d 905 (2005); In re Lee, 49 Cal.Rptr.3d 931; In re

9  Elkins, 50 Cal.Rptr.3d 503; In re Lawrence, (May 22, 2007),

10  Cal.Rptr.3d WL1475283. Post Dannenberg, even federal courts have

11  uniformly, save one District court decision (Eastern District of

12  California), which seemingly reversed itself in its very next

13  case, [see Sass v. California Board of Prison Terms, 376

14  F.Supp.2d, 975, 982 (E.D. Cal. 2005), which was recently

15  overrulled by the Ninth Circuit in Sass v. Board of Prison Terms

16  376 F.Supp.2d, 975, 982, (9th Cir. 2006), and is currently under

17  appeal. (See and compare Sass, supra, to Bair v. Folsom State

18  Prison, 2005 WL2219110 fn.3 (E.D. Cal. 2005), Report and

19  Recommendations adopted by 2005 WL3081634 fn.1 (E.D. Cal.

20  2005).], have followed the reasoning in McQuillion, supra,

21  establishing a liberty interest. Because the Ninth Circuit

22  analyzed the liberty interest which arose from California's

23  Penal Code §3041(a), Dannenberg does not undermine the Ninth

24  Circuit decision in McQuillion. Therefore, McQuillion v. Duncan

25  holds that the mandatory language of Penal Code §3041(b)

26  creating a liberty interest in parole remains controlling

27  precedent. [See Rosenkrantz v. Marshall, 774 F.Supp.2d 1063

28  (C.D. Cal. 2006); Blankenship v. Kane, 2006 WL5215627 *3 (N.D.

1  Cal. 2006); <u>Murille v. Perez</u>, 2005 W.2592420 *3 N.1 (C.D. Cal.

2  2005); <u>Saifullah v. Carey</u>, 2005 WL1555389 *8 (E.D. Cal. 2005)].

3      Thus, petitioner has clearly established not only that he

4  has a constitutionally protected liberty interest but that he

5  was denied this liberty by the denial of parole by the Board of

6  Parole Hearings on July 12   , 2006.

7      **B. PROCEDURES WHICH LED TO DEPRIVATION OF LIBERTY.**

8      It is established principles of due process that a prisoner

9  must provided <u>notice</u> of the hearings; and <u>opportunity</u> to be

10 heard; and, <u>statement of reasons</u>, for denial of parole.

11     Petitioner agrees that he was provided each of these

12 protections. However, the United States Supreme Court has

13 expanded these protections to include:

14         "In a variety of contexts, the court has
           recognized decisions resulting in a loss of an
15         important liberty interest violates due process
           if the decision is not supported by some
16         evidence." <u>Superintendent v. Hill</u>, 472 U.S. at
           455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356
17         (1985): <u>Rosenkrantz v. Marshall</u>, 444 F.Supp.2d
           1063 (C.D. Cal. 2006) fn. 13: <u>Rojas v. Neilson</u>,
18         428 F.3d 1229, 1232 (9th Cir. 2005)[Per curiam]

19 The court further held:

20         "Although '[T]he some evidence standard is
           minimally stringent', <u>Powell v. Gomez</u>, 33 F.3d
21         39, 40, the evidence underlying the
           [Governor's] decision must have some indicia of
22         reliability." <u>Hill</u>, <u>supra</u>, 472 U.S. at 455-56,
           105 S.Ct. at 2774; See also <u>Sanchez v. Kane</u>,
23         444 F.Supp.2d 1049 (C.D. Cal. 2006).

24     As an additional matter the <u>Hill</u> court concluded that the

25 decision to deny parole must not be "otherwise arbitrary." <u>Hill</u>,

26 <u>supra</u>, at 547.

27     Clearly then, the <u>Hill</u> analysis determined that due process

28 requires much more than notice, opportunity to be heard and

1  statement of reason. It also requires (A). evidence which

2  supports the conclusion; (B). the evidence to be reliably

3  related to the issue of present dangerousness (CCR Title 15,

4  §2402(a)); In re Scott, supra, 1373 Cal.App.4th 593, 34

5  Cal.Rptr.3d 905; In re Elkins, 50 Cal.Rptr.3d 503; In re Lee, 49

6  Cal.Rptr.3d 931; (C). the evidence must be truthful and (D). the

7  decision must not be arbitrary or capricious. Sanchez v. Kane,

8  444 F.Supp.2d 1049 (C.D. Cal. 2006).

9  GROUND ONE:

10      THE BOARD'S DECISION TO DENY PAROLE IS
        OTHERWISE ARBITRARY AND IS NOT SUPPORTED BY
11      "SOME EVIDENCE" CONTAINING AN INDICIA OF
        RELIABILITY.
12

13  In combining the California and federal standards of

14  review, as they have been articulated thus far by the California

15  Supreme Court and the Ninth Circuit, respectively, the

16  commitment crime can lack the power to supply "some evidence"

17  supporting a denial of parole because of the interplay between

18  two factors – the nature of that crime and the passage of time

19  since its commission. That is, the fact there is "some evidence"

20  the crime was committed and committed a certain way at a certain

21  time does not mean that crime necessarily represents "some

22  evidence", that petitioner's release on parole will pose an

23  unreasonable risk of danger to the public safety at the present

24  time. Whether it possesses the necessary predictive value

25  depends both on the nature of the crime  and how long ago it

26  happened. Petitioner's commitment offense, now over 16 years in

27  the past does not provide "some evidence" his present release

28  would represent an "unreasonable risk" of danger to the

-5-

1  community.

2      It is worth noting that the issue before this court is

3  whether petitioner is suitable for parole, not when he should be

4  released under the California parole system. The Board's initial

5  task with respect to any inmate serving an indeterminate

6  sentence is to determine whether the prisoner is suitable for

7  parole. That is whether the prisoner "pose[s] an unreasonable

8  risk of danger to society if released from prison. CCR, Title 15

9  §2402." Only after the Board deems an inmate suitable is a

10  release date set. CCR, Title 15, §2282; See also Dannenberg, 34

11  Cal.4th 1061, 1071 (2005). ("[A] determination of individual

12  suitability must proceed the setting of a ... parole release

13  date.") The actual parole release date may well be (in some

14  cases) a number of years into the future, under the Board

15  regulations, the release date is established using a matrix that

16  takes into account the inmate's offense of imprisonment and the

17  circumstances in which it was committed. CCR, Title 15, §2282.

18      Supreme Court law clearly established a parole decision,

19  like a prison disciplinary decision, deprives a prisoner of due

20  process if it is not uspported by "some evidence" or is

21  "otherwise arbitrary." Hill, supra, at 457; McQuillion v. Duncan

22  306 F.3d 895, 904 (9th Cir. 2002).

23      However, that evidence "must have some indicia of

24  reliability," Scott I, supra, 119 Cal.App.4th at p.899) and

25  "suitability determinations must have some rational basis in

26  fact. (In re Elkins, 144 Cal.App.4th at p.489).

27      As our Supreme Court has summarized it, "the judicial

28  branch is authorized to review the factual basis of a decision

                              -6-

1  of the board denying parole in order to ensure that the decision

2  comports with the requirements of due process of law, but ... in

3  conducting such review, the court may inquire only whether "some

4  evidence" in the record before the board supports the decision

5  to deny parole, based upon factors specified by statute and

6  regulation. If the decision's consideration of the specified

7  factors is not supported by "some evidence" in the record and

8  thus is devoid of a factual basis, the court should grant the

9  prisoner's petition for writ of habeas corpus and should order

10 the board to vacate its decision denying parole and thereafter

11 to proceed in accordance with due process of law. (Rosenkrantz,

12 supra, 29 Cal.4th at p.658, underline added). Finally, as has

13 been recently stated, because the overarching consideration is

14 public safety, the test in reviewing the board's decision

15 denying parole "is not whether some evidence supports the

16 reasons [the board] cites for denying parole, but whether some

17 evidence indicates a parolee's release unreasonably endangers

18 public safety.[Citations]. Some evidence of the existence of a

19 particular factor does not necessarily equate to some evidence

20 the parolee's release unreasonably endangers public safety." (In

21 re Lee, 143 Cal.App.4th at p.1408)(In re Barker, May 29, 2007),

22 DJDAR  7548)(In  re  Lawrence,  (May  22,  2007)  Cal.Rptr.3d

23 WL1475283)(In re Rosenkrantz, (2002) 29 Cal.4th 616, 665)(In re

24 Dannenberg, (2005) 34 Cal.4th 1061, 1100).

25     Merely to pick pieces from evidence to create one's version

26 sufficient  to  justify  an  action  is  not  "some  evidence"

27 reasonably  related  to  the  circumstances  sufficient  to  deny

28 parole. Superintendent  v.  Hill,  requires  more.  The  Hill

1  requirement mandates that the evidence relied upon possess not
2  only an "indicia of reliability" but that is is "reasonably"
3  related to the circumstances so as to constitute some evidence
4  that the crime was 'particularly egregious'". (i.e. "reasonably"
5  sufficient to support the decision made). See Hill, 472 U.S.
6  445, 455-56, (1985). Accordingly, to recite in rote,
7  circumstances of the crime sufficient under different
8  circumstances (for instance as one would apply to first degree
9  murder) and proclaim that sufficient under these circumstances,
10 does not constitute "some evidence" justifying denial of parole
11 or establish a current danger to the public. The decision of the
12 board is unreasonable in light of the volumes of evidence
13 showing suitability. Furthermore, since the evidence clearly
14 does not support the board's conclusion, the"conclusion" does
15 not possess any "indicia of reliability" and is patently
16 arbitrary and capricious, denying petitioner his liberty
17 interest in parole. It is clear that the board's finding amounts
18 to an "unreasonable" determination of the facts in light of the
19 evidence available to the board at the hearing. Only by
20 examination may the court determine whether the board's decision
21 was in fact "unreasonable" or "objectively unreasonable."
22 Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000); Pham v.
23 Terhune 400 F.3d 740, 742 (9th Cir. 2005); Hines v. Thompson,
24 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d
25 1160, 1167 (9th Cir. 2002).

26 **GROUND TWO:**

27 **THE BOARD FINDING OF UNSUITABILITY AND REFUSAL**
   **OF THE GRANTING OF PAROLE VIOLATED THE**
28 **PETITIONER'S RIGHT TO DUE PROCESS AND DEPRIVED**

-8-

**HIM OF HIS FEDERALLY PROTECTED LIBERTY INTEREST WHEN THE BOARD DENIED PETITIONER A PAROLE GRANT WITHOUT ANY RELIABLE EVIDENCE OR "SOME EVIDENCE," IN VIOLATION OF THE 5TH AND 14TH AMENDMENT OF THE UNITED STATES CONSTITUTION.**

Section 3041 of the California Penal Code creates substantial presumption that a parole release date shall be set at the initial parole hearing, and in a manner that is uniform to other similar offenses. Subdivision (a) and (b), of §3041 mandates that a parole release date "shall" be set "unless" the board finds that the gravity of the commitment offense or offenses, or the timing and gravity of past convicted offenses are such that a consideration of the public safety warrant not setting a release date at that hearing. "Furthermore, if there be any reasonable doubt as to identity of offense we are bound to resolve that doubt in favor of petitioner." (In re Bramble, 1947, 31 Cal.2d 43, 51, [6], 187 P.2d 411). Moreover, the rule is established that when language which is reasonably susceptible of two constructions is used in a penal law, ordinarily that construction which is more favorable to the offender will be adopted. The defendant is entitled to the benefit of every reasonable doubt, whether it arises out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute. (People v. Stuart, (1956), 47 Cal.2d 167, 175, [7], 302 P.2d 5, 55 A.L.R.2d 705; People v. Smith, (1955) 44 Cal.2d 77, 79 [2], 279 P.2d 33; In re Bramble, (1947) supra, 31 Cal.2d 43, 51 [6,7], 187 P.2d 441; In re McVickers, (1946) 29 Cal.2d 264, 278, 176 P.2d 40; People v. Valentine, (1946 28 Cal.2d 121, 143 [20], 159 P.2d 1; People v. Ralph, (1944), 24 Cal.2d 575, 581 [2], 150 P.2d 401).

-9-

1   There is no other criteria in the statute for denying parole to

2   a prisoner. It appears from the language that "consideration of

3   the public safety" is nonetheless limited to the gravity of the

4   offense and/or the timing and gravity of any past "convicted"

5   offense or offenses. The statute does not encompass or authorize

6   some of the criteria set forth by the California Code of

7   Regulations, Title 15, §2402. It does appear that the statute

8   has been enlarged to include additional criteria not expressly

9   authorized by the statute.

10      Nothwithstanding, the argument set forth in the petition is

11  not merely an argument about a state law violation. The

12  presumption vested by the statue is substantial, while the

13  statutory criteria the board must meet in order to deny parole

14  is limited to criminal conduct at the time of the offense. For

15  the board to interpret the statute in such a manner as to deny

16  parole solely on the commitment offense after the board had

17  denied petitioner on the exact same point two times, deprives

18  petitioner of a substantial liberty interest protected by

19  federal due process. (See Biggs at 334 F.3d 917). The effect of

20  such an interpretation, established by practice, is to subject

21  all prisoners to pro forma decisions, where the board goes

22  through the motion of due processs review, citing post hoc

23  rationalizations to justify the parole denial, that is now

24  always the result. This is little different that a decision to

25  deny parole made without any evidence to support it. Thus, by

26  misinterpretation, whether inadvertently or intentionally, the

27  result is not merely a violation because it is an action the

28  board is simply not authorized to take by the enabling statute

-10-

1  that  impinges  on  federally  protected  liberty  interests.

2  Petitioner relies on this claim which is now brought before the

3  state court.

> A. THE BOARD DID NOT MEET THE BURDEN OF PROOF THAT
> PETITIONER POSES AN "UNREASONABLE RISK" OF
> THREAT TO PUBLIC SAFETY IF RELEASED ON PAROLE.
> THE DECISION WAS WITHOUT EVIDENCE AND WAS
> ARBITRARY AND CAPRICIOUS, VIOLATING FUNDAMENTAL
> DUE PROCESS.

8      The regulatory law requires the board to set a release date

9  unless it finds that the prisoner poses an "unreasonable risk"

10 to public safety if released at that time. (15 CCR, §2402). This

11 is consistent with the enabling state which requires the setting

12 of a release date.

13     If the preponderate record before the board demonstrates

14 that petitioner does not post the "unreasonable risk" (which the

15 record shows that he does not, from petitioner's last two parole

16 hearings), a release date must be set.

17     If the board denies petitioner parole without making this

18 requisite finding based on relevant and credible facts in the

19 record, then this is not merely a state law violation, but a

20 deprivation of the substantial liberty interest he has in

21 obtaining a release date. Failure of the board to act in accord

22 with the regulations, in such situations, constitutes a

23 substantive due process violation because it constitutes an

24 abuse of discretion that unfairly and inaccurately deprives the

25 prisoner of his right to that federally protected liberty

26 interest. The board needs more than "some evidence" to arrive at

27 their decision, even though once the decision is made, the

28 reviewing court needs only to find "some evidence" to support

-11-

1  the decision or findings that were made. As petitioner will
2  point out, the "some evidence" standard is not a "burden of
3  proof" - although the board and the governor seems to think it
4  is. Petitioner will demonstrate by clear and convincing facts
5  that the board's burden of proof is the "preponderance of
6  evidence" standard, but they totally ignore this in arriving at
7  their post hoc rationalization to deny parole in nearly every
8  case. There must be a weighing and balancing process according
9  to a burden of proof.

10  Thus, petitioner alleges that the board's decision in his
11  case exceeded the bounds of "review" and was made without the
12  procedural safeguards required by the Constitution, and without
13  applying the proper proof necessary to overcome the presumptive
14  right to release delineated in Penal Code §3041.

15  Statutory law in California applies the "rock bottom"
16  burden of proof in judicatory proceedings at the "preponderance
17  of evidence" level. (Evidence Code §115). The board lists under
18  "good cause," the preponderance evidence (15 CCR, Division 2,
19  §2001(b)(49), and also lists "relevant" and "material" evidence
20  as the standard for being valid "evidence." (15 CCR, Div. 2,
21  §2000(b)(62)(material evidence), and (90)(relevant evidence).
22  The "good cause" provision is a requirement for decision making
23  that applise to all substantive decisions. These regulatory and
24  statutory provisions initiate the weighing and balancing process
25  of evidence at parole hearings. A responsibility the board must
26  undertake. The board cannot apply the "some evidence" standard
27  because it is not a burden of proof. (In re Ramirez, (2001) 94
28  Cal.App.4th 549 at 564-565; Edwards v. Balisok, (1997) 520 U.S.

1  641, at 648). The "some evidence" applies only to questions of

2  evidentiary sufficiency as an "additional requirement of due

3  process, not substituted for other due process requirements."

4  (Ibid.) The "some evidence" standard is applied only by the

5  reviewing court to determine if the board's (governor's)

6  decision is supported by "some evidence," if the court finds the

7  board complied with all other requisite due process

8  requirements. If the board failed to apply a critical element in

9  the weighng and balancing of evidence, such as a burden of

10 proof, then the court cannot deny the petition because there

11 isn't "some evidence" in the record to support the decision.

12 (Scott I, supra, 119 Cal.App.4th at p.899, In re Elkins, supra,

13 144 Cal.App.4th at 489). As the Appellate Court in In re Caswell

14 92 Cal.App.4th 1017, 1029, pointed out, there is always some

15 evidence in the record of unsuitability of parole, which if

16 invoked, would subject every consideration of parole to an

17 arbitrary standard or political whim, but for a burden of proof,

18 and the burden of producing evidence, is clearly in California

19 law, e.g. People v. Dubon, 90 Cal.App.4th 949, 952, (2001), and

20 applies to all state agencies.

21      Here, where the statute presumes that a parole date "shall

22 normally" be set, the board must, in their weighing and

23 balancing of all relevant, material and reliable evidence,

24 present by a preponderance of that evidence, a "rational

25 connection" between the basic facts the board is asserting as

26 sufficient to deny parole, and the ultimate fact statutorily

27 presumed, i.e., that the prisoner is more than likely not

28 "suitable" for setting a parole release date.

1   Petitioner submits that the board and the governor have
2   broad discretion in parole matter, but the requirement of
3   procedural due process embodied in the California Constitution
4   places some limitations upon these discretionary powers.

5   As heretofore shown, the board's burden of proof is the
6   preponderance of relevant and material evidence standard. This
7   is the "rock bottom" standard allowed by California law.
8   (Evidence Code §115; see e.g. Charlton v. Federal Trade Comm.,
9   543 F.2d, 903-907, 908, (D.C. Cir. 1976)(speaking to this
10  standard as being "rock bottom" burden of proof). "Good Cause"
11  is defined in the BPT's regulations as "a finding by the board
12  based upon a preponderance of the (material and relevant)
13  evidence that there is a factual basis and good reason for the
14  decision made." (Ibid. 2000). Here, in petitioner's case, the
15  board, based on the "material and relevant" evidence found
16  petitioner unsuitable for parole on the basis of the commitment
17  offense which petitioner has been denied two times base
18  primarily on the same issues, i.e., unchanging factors. This is
19  a clear due process violation and especially where the relevant
20  and reliable evidence concerning public safety that was
21  presented at petitioner's subsequent parole consideration
22  hearings that show that petitioner does not pose an
23  "unreasonable risk to the public if released at this time.

24  The mandatory language in §3041 of the Penal Code
25  established a rebuttable presumption affecting the board's
26  burden of producing evidence and the burden of proof
27  implementing public policy regarding the parole of "term to
28  life" prisoners.

1      Petitioner asserts that the ultimate facts sought is a
2  determination whether the prisoner is currently in "<u>unreasonable</u>
3  <u>risk</u>" of danger to the public safety if released on parole.
4  (Subd. (b), Penal code §3041; 15 CCR. §2402(a)).

5      The presumption created by mandatory language in both
6  subdivision (a)  and (b) of P.C. §3041 is that the petitioner
7  "shall normally" have a parole release date set "unless" the
8  presumption is overcome by the board which carries the burden of
9  proof as to the existence of the presumed fact. <u>McQuillion v.</u>
10 <u>Duncan</u>, 306 F.3d, 901-902, (9th Cir. 2002): <u>Biggs v. Terhune</u>,
11 334 F.3d 910, 916-917 (9th Cir. 2003)(regarding the presumption
12 in Penal Code §3041). If the board cannot produce the evidence
13 according to the burden of proof required, then the presumption
14 stands, and the court is obliged to uphold the presumption, and
15 under <u>In re Smith</u>, 109 Cal.App.4th 489 (2003), must order
16 petitioner released from custody.

17     B. THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT
          PROHIBITS STATE ACTION THAT DEPRIVES A PERSON
18        OF LIFE, LIBERTY, OR PROPERTY, WITHOUT DUE
          PROCESS OF LAW.
19

20     The due process clause of the 14th Amendment prohibits
21 state action that deprives a person of life, liberty, or
22 property, without due process of law, A person alleging a due
23 process violation must first demonstrate that he or she was
24 deprived of liberty or property interest protected by the due
25 process clause, and then show that the procedures that led to
26 the deprivation were constitutionally insufficient. <u>Kentucky</u>
27 <u>Dept. of Corrections v. Thompson</u>, 490 U.S. 454, 459-460 (1989);
28 <u>McQuillion v. Duncan</u>, 306 F.3d, 895, 900 (9th Cir. 2002).

1  In the parole context, a prisoner alleging a due process

2  claim must demonstrate the existence of a protected liberty

3  interest in parole, and the denial of one or more of the

4  procedural protections that must be afforded when a prisoner has

5  a liberty interest in parole. The Supreme Court held in 1979,

6  and reiterated in 1987, that "a state's statutory scheme, if it

7  uses mandatory language, creates a presumption that parole

8  release will be granted when or unless certain designated

9  findings are made, and thereby gives rise to a constitutional

10  liberty interest." McQuillion, supra, 306 F.3d, 16, 901 (citing

11  Greenholtz v. Inmates of Nebraska Penal, 442 U.S. 1, 7 (1979)

12  and Board of Pardon v. Allen, 482 U.S. 369, 373 (1987).

13  The Ninth Circuit has held that California's parole scheme

14  creates a cognizable liberty interest in release on parole

15  because Penal Code §3041 uses mandatory language and is similar

16  to the Nebraska and Montana statutes addressed in Greenholtz and

17  Allen, respectively. McQuillion, 306 F.3d 15, 901-902. As the

18  Ninth Circuit has explained, "§3041 of the California Penal Code

19  creates in every inmate a cognizable interest in parole which is

20  protected by the procedural safeguards of the due process

21  clause," and that interest arises "upon the incarceration of the

22  inmate." Biggs v. Terhune, 334 F.3d 910, 914-915 (9th Cir.

23  2003).

24  GROUND THREE:

25  **THE BOARD VIOLATES DUE PROCESS BY REPEATEDLY
   RELYING ON THE UNCHANGING FACTS OF THE CRIME IN
26  THE FACE OF CLEAR EVIDENCE OF REHABILITATION
   AND BY MAKING RECOMMENDATIONS OF WHAT TO DO TO
27  BE FOUND SUITABLE AT EACH HEARING. A FINDING OF
   EGREGIOUSNESS IS BARRED BY THE INMATE'S
28  COMPLIANCE WITH THOSE AGREED TERMS.**

-16-

1    When the board repeatedly relies on the unchanging facts of
2    the crime to deny parole, in the face of clear evidence that the
3    inmate has been rehabilitated, due process is violated. Biggs v.
4    Terhune, supra, at 915-916, Ramirez, supra, at 571). However,
5    here, the board goes a step further. At the conclusion of each
6    hearing attended by petitioner, the board gave him a series of
7    what to do to be found suitable for parole. If the crime was
8    going to continue to be an impediment to parole, then what
9    difference would it make whether petitioner followed those
10   recommendations, since parole would be denied in any event as
11   the crime will never change? How could the board make those
12   recommendations in good faith if the crime was such that parole
13   was not going to occur no matter how well petitioner programs?
14   Even worse, if he complies with those recommendations and the
15   board gives him a parole date, if the governor is permitted to
16   effectively negate this whole process unilaterally taking that
17   parole date away, then the recommendations and compliances are
18   rendered useless acts.

19   The board has a duty to make all recommendations
20   "sufficiently clear" to inform petitioner what conduct will
21   result in a grant of parole. (U.S. v. Guagliardo, 278 F.3d
22   868-872, (9th Cir. 2002)[citing Graynet v. City of Rockford, 408
23   U.S. 104, 108-109, (1972]). "A prisoner's due process rights are
24   violated if parole conditions are not made 'sufficiently clear'
25   so as to inform him of what conduct will result in his being
26   returned to prison. Likewise, the Board of Prison Terms has a
27   duty to make recommendations for parole eligibility
28   'sufficiently clear' so as to inform the inmate of conduct that

-17-

will warrant a finding of suitability." <u>U.S. V. Guagliardo</u>, <u>supra</u>, 278 F.3d 868. Thus, the onus is on the board to clearly and specifically stated what conduct will warrant a finding of suitability. Therefore, it follows that there is only one way to interpret the recommendatins given to petitioner at the Documentation hearing and at each of the Subsequent parole hearings. They constitute the board's "sufficiently clear" instructions as to what petitioner must do to be found suitable. As stated, it is indisputable but that petitioner has complied with every single one of the board's directives to him, and thus, the board must finally find petitioner suitable for release. If the board's directions to the inmate are not acknowledged as sincere offers providing legitimate goals for achieving a status of parole suitability, then they are mere "hoops" designated to support elaborate ruse and a further affront to the due process rights of all prisoners who rely upon them.

As noted, petitioner sincerely relied upon the recommendations of the prior board panels, and he partook to fulfill each one. Petitioner's fulfillment may be recognized through his educational and vocational accomplishments and gains, his ongoing self-help work and his crime free behavior throughout his nearly 16 years of incarceration. Petitioner has complied with those directives following each and every hearing, and the board should finally recognize his compliance by granting parole.

A. CONTINUED RELIANCE ON THE UNCHANGING FACTS OF THE CRIME VIOLATES DUE PROCESS.

-18-

1    In Biggs v. Terhune, the 9th Circuit held that even if the

2  commitment offense(s) are sufficient to support a denial of

3  parole based upon considerations of due process. Biggs v.

4  Terhune, supra, 334 ⨍F.3d at 916. The Ramirez court also

5  acknowledged that there will always be "some evidence" to

6  support a finding that a prisoner committed the underlying

7  offense. Those facts alone, however, do not justify the denial

8  of parole. Thus, while concluding that there was factual support

9  for the findings as to the crime and priors, the Ramirez, court

10  still found the board's decision arbitrary since there had been

11  7 hearings at that point, 9 years had passed beyond the minimum

12  term and it was 17 years after entering prison, and all evidence

13  showed rehabilitation.(Id. at 571). Likewise, as the Biggs court

14  more recently said, despite the fact that there may remain

15  evidence to support a finding of egregiousness of the crime:

16          "A continued reliance in the future on an
            unchanging factor, the circumstances of the
17          offense and conduct prior to imprisonment,
            runs contrary to the rehabilitative goals
18          espoused by the prison system and could result
            in a due process violation." (Biggs, supra, at
19          916-917).

20    In the published case of Irons v. Warden, 358 F.Supp.2d 936

21  (E.D. Cal. 2005), the federal court found that the board

22  violated the prisoner's due process by continuing to rely on the

23  immutable factors. (e.g. the commitment offense and history

24  prior to incarceration) to support the denial of parole. In

25  doing so, the federal judge there ruled that continuing to rely

26  on those factors that can never change, such as the commitment

27  offense, or history prior to imprisonment, where there is no

28  proof of continuing bad conduct to support a finding of current

1  threat to the public, offends due process.

2      In interpreting the rule set forth in Biggs, and the plain
3  language of Penal Code §3041, it is clear that even if the crime
4  may be considered egregious, under federal due process
5  priciples, the denial of parole based on the immutable facts of
6  the crime is only authorized at the first parole consideration
7  hearing. The provisions of Penal Code §3041 only talk of the use
8  of the crime to defer setting of a date at the initial hearing.
9  (Penal Code §3041(a)). After that, to give the statute a
10  constitutional interpretation that is not unreasonably vague,
11  further denials would have to be based on some facts arising
12  subsequent to the crime that show a continued propensity for
13  violence, making the inmate a danger to the public. (Biggs v.
14  Terhune, supra, 334 F.3d at 914-915). To rule otherwise would
15  put petitioner in an impossible situation, where no matter what
16  he shows in terms of positive behavior, reformation,, self-help,
17  work skills, parole plans, or just rehabilitation in general, he
18  would never be able to overcome the unchanging facts of the
19  crime. The only logical application of Constitutionaly Due
20  Process dictates what the court in Irons held, i.e., that any
21  subsequent denial requires the presence of some in-prison
22  behavior showing that the inmate currently presents an
23  unreasonable risk of danger if paroled.

24      Here, the facts of the crime have been used as the real
25  reason for denying parole on 2 separate occasions, yet, those
26  facts have never been tied to current behaviors showing
27  petitioner still presents an unreasonable risk of danger to the
28  public at this time. A rule requiring the presence of in-prison,

-20-

1   adverse behavior to justify further denial based on the crime,
2   simply recognizes what the 9th Circuit in Biggs alluded to when
3   it talked of the rehabilitative goals of the system, and, the
4   need to take into consideration that a person can change. At
5   this point, petitioner has been incarcerated for 16 years,
6   eligible for parole for more than five of those years. His
7   programming clearly shows his full rehabilitation. In drawing
8   the line as to when further denials become arbitrary, it is
9   obvious that the line has clearly been crossed in this case, and
10  in fact, was crossed as soon as the crime was used in the second
11  parole hearing without the presence of facts showing a continued
12  risk of danger based on how petitioner was programming in
13  prison. To the contrary, the in-prison facts are exclusively
14  positive.

15      As the Ramirez court noted, the paroling authority must do
16  more than merely commend petitioner for the hard work done to
17  rehabilitate himself while in prison. They must actually
18  consider these factors "as...circumstance[s] tending to show his
19  suitability for parole." Ramirez, supra, 94 Cal.App.4th at
20  571-572 [emphasis original]. Of course, all the board did with
21  petitioner's extensive accomplishments was to brush them aside
22  with several terse lines, and issue superficial compliments. The
23  Biggs rule is clear that if an inmate continue[s] to demonstrate
24  exemplary behavior and evidence of rehabilitation, denying him a
25  parole date simply because of the nature of his offense and
26  prior conduct would raise serious questions involving his
27  liberty interest in parole. Biggs v. Terhune, supra, 334 F.3d at
28  916. Here, the evidence of rehabilitation is beyond dispute.

-21-

1    In comparing the present case with <u>Biggs</u>, it is undeniably
2    clear that the board lacks any justification whatsoever to
3    continue to deny petitioner a parole date. In <u>Biggs</u>, the inmate
4    was convicted of the premeditated and deliberate First Degree
5    Murder of a witness in a major theft case against the
6    defendants, and yet, the court was quick to caution the board
7    that it could not continue to solely rely on the commitment
8    offense to deny the inmate parole, even though it was only his
9    initial hearing at that point. Yet, petitioner has been denied
10   parole on 2 separate occasions, each time effectively relying
11   virtually exclusively upon the unchanging facts of his
12   commitment offense. The continued reliance upon the commitment
13   offense is simply arbitrary, particularly in the fact of the
14   board's acknowledgements of petitioner's model behavior in
15   prison and extensive accomplishments, all of which are conceded
16   by the statement of decision. Therefore, as the court states in
17   <u>Biggs</u>, denying him a parole date simply because of the nature of
18   the offense, not only raises serious questions involving his
19   liberty interest in parole, but blatantly violates due process.
20   (See <u>Biggs v. Terhune</u>, <u>supra</u>, 334 F.3d at 915-916; <u>Irons</u>,
21   <u>supra</u>).

22       B. CONTINUED RELIANCE UPON FACTS OF THE CRIME VIOLATES
            DUE PROCESS.

23       First, continued reliance upon these unchanging factors
24   makes a sham of California's parole system and amounts to an
25   arbitrary denial of petitioner's "liberty interest in release on
26   parole," and his "presumption that a parole release date will be
27   granted." (See <u>McQuillion v. Duncan</u>, 306 F.3d 895, 902 (9th Cir.
28   2002), <u>Biggs</u>, 334 F.3d at 9144-915, <u>Rosenkrantz</u>, 29 Cal.4th at

                                -22-

654, 661). Petitioner has been denied parole on ~~two~~ *TWO* different occasions. continued reliance upon these unchanging factors amounts to converting petitioner's offense to a term of life without the possibility of parole. (See Irons, 358 F.Supp.2d at 947 ["continuous reliance on the unchanging circumstances transforms an offense into a de facto life imprisonment without the possibility of parole"]; Scott, 34 Cal.Rptr.3d at 919-920, 133 Cal.App.4th at 594-595; Shaputis, 37 Cal.Rptr.3d at 335). Second, the circumstances of the crime and petitioner's conduct prior to imprisonment do not amount to some evidence supporting the conclusion that petitioner "currently" (underline added) poses an unreasonable risk of danger if released at this time."] In re Shaputis, (2006) 37 Cal.Rptr.3d 324, 334-335). In the parole context, the requirments of due process can only be met if "some evidence" supports the decision and the evidence underlying the decision is supported by "some indicia of reliability." Biggs, 334 F.3d at 914; Caswell v. Calderon, 353 F.3d 832, 839 (9th Cir. 2004); Scott, 119 Cal.4th at 899; Superintendent v. Hill, 472 U.S. 445, 455-457 (1985); McQuillion v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002).

Petitioner presents a stronger case than Biggs for several reasons. First petitioner's commitment offense was less serious than the petitioner in Biggs. The Biggs petitioner was involved in a violent, manipulative and premeditated murder, the petitioner here has a much lesser serious offense than petitioner Biggs. Second, the Biggs petitioner had not yet served the full terms of his sentence, while petitioner here has exceeded his sentence by approximately nine years. Finally,

1  petitioner here has demonstrated exemplary behavior and evidence
2  of rehabilitation; as required by Biggs court, for a significant
3  period of time. Therefore, the sole reliance on petitioner's
4  commitment offense in denying him parole impinges on
5  petitioner's constitutional liberty interest in parole. (Martin
6  v. Marshall, supra, 431 F.Supp.2d at p.1047). (In re Lawrence,
7  (May 22, 2007), Cal.Rptr.3d WL1475283 (Cal.App.2d Dist.).

8       While it may have been reasonable to rely on petitioner's
9  offense and conduct prior to imprisonment as an indicator of
10 dangerousness for some period of time, continued reliance on
11 such unchanging circumstances after 16  years of incarceration
12 and two  parole suitability hearings, violates due process
13 because these factors now lack predictive value with regards to
14 petitioner's present and future dangerousness. After  16  years
15 of rehabilitation in which petitioner's eligible parole date for
16 release was passed on October 10, 1999 , (Exhibit "E" , Initial
17 M.E.P.D.), the ability to predict petitioner's future
18 dangerousness based simply on the circumstances of the crime is
19 nil. (See Irons, 358 F.Supp.2d at 947 n.2 ["four prior times in
20 finding [Irons] unsuitable for parole" and "after 15 years" of
21 imprisonment, ability to assess dangerousness "is near zero."];
22 Scott, 133 Cal.App.4th at 595, 34 Cal.Rptr.3d at 919-920 ["the
23 predictive value of the commitment offense may be very
24 questionable after a long period of time."].

25      Petitioner's record is replete with evidence  of
26 petitioner's rehabilitation, which was expressed by the board,
27 including Psychological Reports, Correctional Counselor's
28 Reports, extensive self-improvement through vocational,

-24-

1  educational, self-help therapy and disciplinary free
2  incarceration for the past 16 years. (See Exhibit "E").

3       While the board may initially have been entitled to rely
4  upon the commitment offense and petitioner's conduct prior to
5  imprisonment to find petitioner unsuitable for parole, under
6  these circumstances, petitioner submits that the continued
7  reliance and sole reliance of the convicted offense do not now
8  constitute "some evidence" with "some indicia of reliability" of
9  petitioner's current dangerousness. (See Hill, 472 U.S. at 445;
10 Biggs, 334 F.3d at 917; Irons, 358 F.Supp.2d at 947; Masoner,
11 2004 WL1090188 *1-2; Bair, 2005 WL2219220, *12 n.3; Scott, 133
12 Cal.App.4th at 594-595, 34 Cal.Rptr.3d at 919-920; Rosenkrantz,
13 2002 29 Cal.4th 616, 665; Dannenberg, (2005) 34 Cal.4th 1061,
14 1100; In re Lee, (2006) 143 Cal.App.4th 1400, 1408; In re
15 Lawrence, (2007) Cal.Rptr.3d WL1475283; In re Barker, (2007)
16 DJDAR 7548).

17          C. JUDICIAL OVERSIGHT IS CRITICAL TO SAFEGUARD THE
             UNDERLYING PURPOSE OF CALIFORNIA'S PAROLE SYSTEM
18           AND THE LIBERTY INTERESTS OF INMATES. THE
             ESSENCE OF THE PAROLE SYSTEM IS THE RE-ENTRY OF
19           PRISONERS WHO NO LONGER POSE A PUBLIC THREAT.

20      Parole, the release of the imprisoned before they have
21 served the maximum time set by their sentence, has long been
22 part of the California penal system. The Indeterminate
23 Sentencing Law, requiring the trial judge to set a minimum but
24 not a maximum sentence was enacted in 1971. In re Minnis, (1972)
25 7 Cal.3d 639, 643, n.2 ("the court in imposing the sentence
26 shall not fix the term or duration of the period of
27 imprisonment")(citation and internal quotations omitteds). The
28 goal of indeterminate sentences and the California parole system

1  is not only to punish but also to provide for reformation and

2  rehabilitation:

3          "The belief no longer prevails that every
           offense in a like legal category calls for an
4          identical punishment without regard to the
           past life and habits of a particular offender
5          ... retribution is no longer the dominant
           objective of the criminal law. Reformation and
6          rehabilitation of offenders have become
           important goals of criminal jurisprudence."

7  People v. Morse, (1964) 60 Cal.2d 631, 643, n.8 (quoting

8  Williams v. State of New York, (1949) 337 U.S. 241, 247). In a

9  lengthy discussion of this topic, the California Supreme Court

10  states as follows:

11          [T]he purpose of the indeterminate sentence
           law, like other modern laws in relation to the
12          administration of the criminal law, is to
           mitigate the punishment which would otherwise
13          be imposed upon the offender. These laws place
           emphasis upon the reformation of the offender.
14          They seek to make the punishment fit the
           criminal rather than the the crime. The
15          endeavor to put before the prisoner great
           incentive to well-doing, in order that his
16          will to do well would be strengthened and
           confirmed by the habit of well-doing.

17
           [...]
18
           [T]he interests of society require that under
19          prison discipline every effort should be made
           to produce a reformation of the prisoner ...
20          The Legislative policy [was to provide a
           system whereby] a hope was to be held out to
21          prisoners that through good conduct in prison
           and a disposition shown toward reformation,
22          they might be permitted a conditional liberty
           upon restraint under which they might be
23          restored again to society...

24          [...]

25          Although good conduct while incarcerated and
           potential for reform are not the only relevant
26          factors, the court has acknowledged their
           significance. Furthermore, authority has
27          declared that these factors are among those of
           "paramount importance."

28  In re Minnis, Cal.3d at 644-645. The Rosenkrantz court, citing

1  <u>Minnis</u>, reaffirmed the principles. "[E]ven before factors

2  relevant to parole decisions had been set forth expressly by

3  state statute and by regulations, we concluded that [a]ny

4  official or board with discretion, is under obligation to

5  consider all relevant factors [citations], and the [official or

6  board] cannot, consistently with its obligation, ignore post

7  conviction factors unless directed to do so by Legislature." <u>In</u>

8  <u>re Rosenkrantz</u>, (2002) 29 Cal.4th 515, 656 (quoting <u>Minnis</u>, 7

9  Cal.3d at 645).

10       D. PRISONERS HAVE A CONSTITUTIONAL LIBERTY INTEREST
            IN PAROLE DECISIONS.

11       "[P]arole applicants in California have an expectation that

12  they will granted parole unless the board finds, in the exercise

13  of its discretion, that they are unsuitable for parole in light

14  of the circumstances specified by statute and by regulation."

15  <u>Rosenkrantz</u>, 29 Cal.4th at 659-61 (holding that the California

16  Constitution, Article V, §8(b) and the California Penal Code

17  §3041, "give rise to a protected liberty interest in that "a

18  prisoner granted parole by the board has an expectation that the

19  governor's decision to affirm, modify, or reverse, the board's

20  determination will be based upon the same factors the board is

21  required to consider," and that "liberty interest underlying a

22  governor's parole review decision is protected by due process of

23  law.").

24       Federal courts have also unequivocally held that

25  California's parole system gives rise to a liberty interest

26  constitutionally protected by due process. (See <u>Board of Pardons</u>

27  <u>v. Allen</u>, (1987) 482 U.S. 369, 376-78; <u>Greenholtz v. Inmates of</u>

28  <u>Neb. Penal & Correctional Complex</u>, (1979) 442 U.S. 1, 11-12,

-27-

1   (holding a state's statutory parole scheme that uses mandatory

2   language may create a presumption that parole release will be

3   granted upon certain circumstances or findings, thus giving rise

4   to a constitutionally protected liberty interest); McQuillion v.

5   Duncan, (9th Cir. 2002) 306 F.3d 896, 902-903, n.1, 903 (holding

6   that because California's parole scheme uses mandatory language

7   and is largely parallel to the schemes found in Allen and

8   Greenholtz, that give rise to a protected liberty interest in

9   release on parole, "California's parole scheme gives rise to a

10  cognizable liberty interest in release on parole"). Biggs v.

11  Terhune, (9th Cir. 2003) 334 F.3d 910, 915-916.

12      E. STANDARD OF REVIEW REQUIRES AN EVIDENTIARY HEARING.

13      On habeas corpus, a petitioner is entitled to an

14  evidentiary hearing where the petitioner has established a

15  "colorable" claim for relief and where the petitioner has never

16  been accorded a state or federal hearing on his claim. Earp v.

17  Oronski, (9th Cir. 2003) 372 U.S 293 (1963) and Keeney v.

18  Tamaya-Reyes, 504 U.S. 1, 5 (1992). In stating a "colorable"

19  claim, a petitioner is merely required to allege specific facts

20  which, if true, would entitle him to relief. (Ibid.). Granted,

21  under AEDPA, a federal court is not required to order a hearing

22  where petitioner failed to develope the facts in state court. In

23  such cases, the federal court accords a presumption of

24  correctness to the facts found by the state court and need not

25  hold a evidentiary hearing, unless those facts are rebutted by

26  clear and convincing evidence. On the other hand, no deference

27  is due where state had made an unreasonable determination of the

28  facts and where a state court makes evidentiary finding without

-28-

1  holding a hearing and giving petitioner an opportunity to

2  present evidence. Such findings clearly result in an

3  "unreasonable determination" of the facts. <u>Taylor v. Maddox</u>,

4  (9th Cir. 2004) 336 F.3d 992, 1001.

5      In summation, an evidentiary hearing is required under the

6  AEDPA and the Appellate court will remand for a hearing if the

7  District Court rules without granting one, "where petitioner

8  establishes a colorable claim for relief and has never been

9  accorded a state or federal hearing on his claim." <u>Earp</u>, <u>supra</u>,

10  at 1167.

11      Here, petitioner requests an evidentiary hearing at every

12  level of the state's habeas proceedings and each of the court's

13  to which he appealed who rule without granting him an evidentiary

14  hearing. As a result, (1) petitioner is entitled to an

15  evidentiary hearing in this court before the court can make any

16  credibility determination of the facts alleged in the petition

17  and supporting exhibits; (2) any contrived facts found by the

18  state court while denying a request for an evidentiary hearing

19  necessarily resulting from an "unreasonable determination" of

20  the facts and hence are <u>not</u> entitled to any presumption of

21  correctness. (<u>Earp</u>, <u>supra</u>, at 1167; <u>Taylor</u>, <u>supra</u>, at

22  1101)["when state court's legal error infects the fact finding

23  process, thus resulting in factual determinations will be

24  unreasonable and no presumption of correctness can attach to

25  it"].

26

27

28

## CONCLUSION

All criminal convictions represent the basest form of human behavior. Our laws however, provide mechanisms by which even some murderers are entitled to be paroled. The judiciary has an obligation to faithfully execute those laws. The record establishes that petitioner does not pose an unreasonable risk to public safety. Any contrary conclusion lacks any evidentiary support. As the record is void of any evidence to substantiate a claim of "present danger" and allows only for a contrary conclusion, it (justice) can only be served by an order from this court directing an evidentiary hearing; and because there is nothing which, either singly or in conjunction with other evidence that could support any decision other than parole suitable, the board's decision should be vacated; the petition issued; the petitioner remanded back to the board with directions to find petitioner suitable; set a parole release date within 30 days; and/or petitioner ordered released. Only in this way can the liberty interest petitioner continues to be denied be restored.

///

///

-30-

1              **PRAYER FOR RELIEF**

2      Petitioner   is   without   remedy   save   for   Habeas   Corpus.

3    Accordingly, petitioner requests that the court:

4           1. Issue a Writ of Habeas Corpus granting petitioner's

5              Due Process violation claims;

6           2. Issue an Order to Show Cause;

7           3. Declare the rights of petitioner;

8           4. Appoint counsel to represent petitioner;

9           5. Issue an Order directing an Evidentiary Hearing;

10          6. Issue an Order releasing petitioner based on

11             supporting evidence;

12          7. Grant any and all relief found necessary or

13             appropriate.

14

15   Dated this 10th day of January , 2008.

16                              Respectfully submitted,

17

18                              _____

19                              Roderic Opalec

20                              Petitioner in Pro Per

21   ///

22   ///

23

24

25

26

27

28
                                -31-

# EXHIBIT "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )        CDC Number H-33214
                          )
RODERIC OPALEC            )
                          )
_____ )

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JULY 12, 2006

PANEL PRESENT:

Mr. James Davis, Presiding Commissioner
Mr. Dennis Smith, Deputy Commissioner

OTHERS PRESENT:

Mr. Roderic Opalec, Inmate
Ms. Katera E. Rutledge, Attorney for Inmate
Mr. Paul Turley, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum

**Sue Gerdes, Northern California Court Reporters**

ii

## INDEX

PAGE

Proceedings ............................................... 1

Case Factors .............................................. 9

Pre-Commitment Factors .................................. 10

Post-Commitment Factors ................................. 20

Parole Plans ............................................ 26

Closing Statements ...................................... 38

Recess .................................................. 45

Decision ................................................ 46

Adjournment ............................................. 49

Transcriber Certification ............................... 50

--oOo--

1

1           **P R O C E E D I N G S**

2           **DEPUTY COMMISSIONER SMITH:**  We're on the record.

3           **PRESIDING COMMISSIONER DAVIS:**  This is a

4    Subsequent Parole Consideration Hearing for Roderic

5    Opalec.  Is that correct?

6           **INMATE OPALEC:**  Opalec.

7           **PRESIDING COMMISSIONER DAVIS:**  Opalec?

8           **INMATE OPALEC:**  Yes.

9           **PRESIDING COMMISSIONER DAVIS:**  Opalec.  Okay.

10   CDC number H-33214.  Today's date is July 12th, 2006.

11   We are located at Correctional Training Facility.  The

12   inmate was received on May 1st, 1992 from Los Angeles

13   County.  The life term began on October 10th, 1992.  The

14   minimum eligible parole date was October 10th, 1999. The

15   controlling offense for which the inmate was committed

16   is murder -- is attempted murder with a firearm case

17   number TA009295.  Count one Penal Code Section

18   6645/187/12022.5.  The inmate received a term of seven

19   years to life plus three.  This hearing is being tape

20   recorded and for the purposes of voice identification,

21   we will each state our first and last name, spelling

22   our last name.  And when it reaches you Mr. Opalec is

23   you will also give us your CDC please.  I will start

24   and move to my left, James Davis D-A-V-I-S.

25           **DEPUTY COMMISSIONER SMITH:**  Dennis Smith S-M-I-

26   T-H, Deputy Commissioner.

27           **DEPUTY DISTRICT ATTORNEY TURLEY:**  Paul Turley T-

1    U-R-L-E-Y, Deputy DA Los Angeles County.

2        **ATTORNEY RUTLEDGE:**  Katera E. Rutledge R-U-T-L-

3    E-D-G-E, Attorney for Mr. Opalec.

4        **INMATE OPALEC:**  Roderic Opalec O-P-A-L-E-C, H-

5    33214.

6        **PRESIDING COMMISSIONER DAVIS:**  All right.  Mr.

7    Opalec in front of you is a laminated piece of paper.

8    Would you read the contents of that please aloud?

9        **INMATE OPALEC:**  "The Americans with

10           Disabilities Act.  The Americans with

11           Disabilities Act is a law to help people with

12           disabilities.    Disabilities are problems that

13           make it harder for some people to see, hear,

14           breathe, talk, walk, learn, think, work or take

15           care of themselves than it is for others.  No

16           one can be kept out of public places or

17           activities because of disabilities.  If you have

18           a disability, you have the right to ask for help

19           to get ready for your BPT Hearing, get to the

20           hearing, talk, read forms and papers and

21           understand the hearing process.  BPT will look

22           at what you ask for to make sure that you have a

23           disability that is covered by the ADA and that

24           you have asked for the right kind of help.  If

25           you do not get help or is you don't think you

26           got the kind of help you need ask for a BPT 1074

27           Grievance form.  You can also get help filling

3

1          it out."

2          **PRESIDING COMMISSIONER DAVIS:**  Well thank you.

3     And according to our records on September 8th, 2005,

4     together with staff at the institution, you reviewed

5     and signed the BPT form 1073 indicating that you do not

6     have any disabilities that would qualify under the

7     Americans with Disabilities Act.  Is that correct sir?

8          **INMATE OPALEC:**  That's correct.

9          **PRESIDING COMMISSIONER DAVIS:**  All right.  You

10    were able to read that without glasses today.

11         **INMATE OPALEC:**  Yes.

12         **PRESIDING COMMISSIONER DAVIS:**  Do you normally

13    wear glasses?

14         **INMATE OPALEC:**  No I don't.

15         **PRESIDING COMMISSIONER DAVIS:**  Good for you.

16    Can you hear me all right?

17         **INMATE OPALEC:**  Yes sir.

18         **PRESIDING COMMISSIONER DAVIS:**  And you walked

19    here today under your own steam.

20         **INMATE OPALEC:**  Yes I did.

21         **PRESIDING COMMISSIONER DAVIS:**  Healthy and ready

22    to go.

23         **INMATE OPALEC:**  Yes sir.

24         **PRESIDING COMMISSIONER DAVIS:**  Good.  All right.

25    I notice that you also have a GED.  And nothing would

26    indicate that you -- or anything that would -- or is

27    there anything that would preclude you from actively

4

1  participating in this hearing today?

2       **INMATE OPALEC:**  That's correct.

3       **PRESIDING COMMISSIONER DAVIS:**  There is nothing

4  that would do that right?

5       **INMATE OPALEC:**  No.

6       **PRESIDING COMMISSIONER DAVIS:**  Okay.  Good.  All

7  right.  Counsel, you're also satisfied with that?

8       **ATTORNEY RUTLEDGE:**  Yes.

9       **PRESIDING COMMISSIONER DAVIS:**  This hearing is

10  being conducted pursuant to Penal Code Sections 3041

11  and 3042 and the rules and regulations of the Board of

12  Prison Terms governing parole consideration hearings

13  for life inmates.  The purpose of today's hearing is to

14  once again consider the number and nature of the crimes

15  for which you were committed, your prior criminal and

16  social history, and your behavior in programming since

17  your commitment.  We've had the opportunity to review

18  your Central File and your prior transcripts and you

19  will be given an opportunity to correct or clarify the

20  record as we proceed.  We will reach a decision today

21  and inform you whether or not we find you suitable for

22  parole and the reasons for our decision.  If you are

23  found suitable for parole, the length of your

24  confinement will be explained to you.  Nothing that

25  happens here today will change the findings of the

26  court.  The panel is not here to retry your case.  The

27  panel is here for the sole purpose of determining your

5

1    suitability for parole.  Do you understand that sir?

2          **INMATE OPALEC:**  Yes.

3          **PRESIDING COMMISSIONER DAVIS:**  This hearing will

4    be conducted in two phases.  First I will discuss with

5    you the crimes for which you were committed as well as

6    your prior criminal and social history.  Commissioner

7    Smith will go through your progress since your

8    commitment, your counselors report and your

9    psychological evaluation as well as your parole plans

10    and any letters of support or opposition as they may

11    exist.  Once that's concluded, the commissioners, the

12    district attorney and then your attorney will have the

13    opportunity to ask you questions.  Questions that come

14    from the district attorney will be asked through the

15    chair and then you will respond back to the panel with

16    your answer.  Next the district attorney and then your

17    attorney and then finally you will be given an

18    opportunity to make a final statement.  Your statement

19    should focus on why you believe that you are suitable

20    for parole.  The California Code of Regulations states

21    that regardless of time served a life inmate shall be

22    found unsuitable for and denied parole if in the

23    judgment of the panel the inmate would pose an

24    unreasonable risk of danger to society if released from

25    prison.  You have certain rights.  Those rights include

26    the right to a timely notice of the hearing, the right

27    to review your Central File and the right to present

6

1   relative documents.  Counsel, are you satisfied that

2   your client's rights have been met to date?

3        **ATTORNEY RUTLEDGE:**  Yes sir.

4        **PRESIDING COMMISSIONER DAVIS:**  And you have an

5   additional right to be heard by an impartial panel.

6   Now you've heard Commissioner Smith and I introduce

7   ourselves today.  Do you have any reason to believe

8   that we would not be impartial?

9        **INMATE OPALEC:**  No.

10        **PRESIDING COMMISSIONER DAVIS:**  Thank you.  You

11   will receive a written copy of our tentative decision

12   today.  That decision becomes effective within 120

13   days.  A copy of the decision and a copy of the

14   transcript will be sent to you and you will have 90

15   days from that date to appeal is you so desire.  You

16   are not required to admit your offense or discuss your

17   offense.  However, the panel does accept the findings

18   of the court to be true.  Do you understand that sir?

19        **INMATE OPALEC:**  Yes.

20        **PRESIDING COMMISSIONER DAVIS:**  The board has

21   eliminated it's appeal process.  If you disagree with

22   anything in today's hearing you have the right to go

23   directly to court with your complaint.  Commissioner

24   Smith will we be dealing with anything from the

25   confidential file today?

26        **DEPUTY COMMISSIONER SMITH:**  Not this afternoon,

27   no.

1          **PRESIDING COMMISSIONER DAVIS:**  And I am going to

2   pass this checklist of documents to both counsels.

3   Please take a look at that to make sure that we are all

4   operating off the same list of documents.

5          **DEPUTY DISTRICT ATTORNEY TURLEY:**  I have these

6   documents.   I also, in my file I want to note that

7   there is a current board report addendum that was

8   ordered June 8th, 06 but I don't believe I have that.

9          **DEPUTY COMMISSIONER SMITH:**  That is -- we have

10   not received that.

11          **DEPUTY DISTRICT ATTORNEY TURLEY:**  Okay.  Thank

12   you.

13          **PRESIDING COMMISSIONER DAVIS:**  Counsel you also

14   have these.

15          **ATTORNEY RUTLEDGE:**  Yes sir.  We have all the

16   documents.

17          **PRESIDING COMMISSIONER DAVIS:**  All right.  That

18   we'll mark Exhibit 1 then.

19          **DEPUTY COMMISSIONER SMITH:**  Just to further

20   note, the board report dated January 06' is the board

21   document that we'll be referring to.

22          **DEPUTY DISTRICT ATTORNEY TURLEY:**  Thank you.

23          **PRESIDING COMMISSIONER DAVIS:**  Counsel, any

24   preliminary objections?

25          **ATTORNEY RUTLEDGE:**  No.  We would just note that

26   the board report has not been updated and I would like

27   to ask the board what they plan to rely upon for as far

8

1    as what inmate's been doing since January.

2         **DEPUTY COMMISSIONER SMITH:**  The information in

3    the C File.

4         **ATTORNEY RUTLEDGE:**  Okay.  So you'll update us

5    all the stuff that's in the C File since January.

6    Okay.  No objections.

7         **PRESIDING COMMISSIONER DAVIS:**  All right.  You

8    have any additional documents you'd like us to consider

9    today.

10        **ATTORNEY RUTLEDGE:**  No sir.  We've submitted two

11   letters, two parole and support letters.

12        **PRESIDING COMMISSIONER DAVIS:**  All right.  And

13   will your client be speaking with us today?

14        **ATTORNEY RUTLEDGE:**  He will speak on everything

15   except the commitment offense.

16        **PRESIDING COMMISSIONER DAVIS:**  All right.  For

17   all other matters will you please raise your right hand

18   sir?  Do you solemnly swear or affirm the testimony you

19   will give at the hearing will be the truth and nothing

20   but the truth?

21        **INMATE OPALEC:**  Yes I do.

22        **PRESIDING COMMISSIONER DAVIS:**  For a summary of

23   the crime I will refer to the January 2006 board report

24   on page one, item one where it says summary of crime.

25   Where it states on 9/24/90 Opalec along with co-

26   defendants Cayamanda --

27        **INMATE OPALEC:**  Cayamanda.

1          **PRESIDING COMMISSIONER DAVIS:**   Cayamanda C-A-Y-

2     A-M-A-N-D-A, Simangun --

3          **INMATE OPALEC:**   Simangun.

4          **PRESIDING COMMISSIONER DAVIS:**   Simangun S-I-M-A-

5     N-G-U-N, and Fontilea --

6          **INMATE OPALEC:**   Fontilea.

7          **PRESIDING COMMISSIONER DAVIS:**   Fontilea F-O-N-T-

8     I-L-E-A, Obrique O-B-R-I-Q-U-E and Bato B-A-T-O, all of

9     whom were members of the Long Beach Local Boys agreed

10    to retaliate against members of the Scott Loyal

11    Brothers Gang (phonetic).   The group split up into two

12    vehicles and drove to Carson California.   Two members

13    of the Scott Loyal Brothers were fired upon at 23421

14    South Main Street in Carson California.   I will note

15    for the record the board report says Carson City but

16    it's our consensus that it's probably Carson California

17    versus Carson City California.   The two victims were

18    not killed in the drive by attack and one of the

19    victim's sustained injury.   And then go back to the

20    evaluation report done on 7/21/92 for some

21    clarification.   Where it states on page two, the

22    essence of the committing offense is that he, referring

23    to the inmate was -- and other members of the Long

24    Beach Boys Gang discussed agreed to shoot members of

25    the Scott Loyal Brothers Gang.   Subsequently they shot

26    at members of the rival gang and struck the victim

27    Emery Curmen C-U-R-M-E-N.   The inmate was apprehended

10

1    as a result of the investigation.  And counsel, as

2    always if your client would like to address anything

3    about the commitment offense he is certainly welcome to

4    do so.  However, we understand and respect that he has

5    an absolute right not to do that.

6            **ATTORNEY RUTLEDGE:**  Thank you.

7            **PRESIDING COMMISSIONER DAVIS:**  As to your

8    personal history, you -- Mr. Opalec, you are the only

9    child -- you are an only child.  You came to the United

10   States in 1987 from the Philippines.  And if I misstate

11   something or if something is incorrect please me.

12   Okay.

13           **INMATE OPALEC:**  Okay.

14           **PRESIDING COMMISSIONER DAVIS:**  We want to make

15   sure we get the record correct.  You had been living

16   with your grandparents in the United States and you

17   resided with your mother and stepfather who both worked

18   as custodians for the Long Beach Unified School

19   District at the time of your arrest.

20           **INMATE OPALEC:**  Yes.

21           **PRESIDING COMMISSIONER DAVIS:**   How old were you

22   at the time you were arrested?

23           **INMATE OPALEC:**  Twenty years old.

24           **PRESIDING COMMISSIONER DAVIS:**   Twenty?

25           **INMATE OPALEC:**  Yes.

26           **PRESIDING COMMISSIONER DAVIS:**  No other family

27   members are noted as having any trouble with the law.

1  You completed the tenth grade in the Philippines.

2       **INMATE OPALEC:**  That's correct.

3       **PRESIDING COMMISSIONER DAVIS:**  And completed six

4  months of electrical training course at the Edison

5  Technology College in Carson California.  You were laid

6  off for two months prior to the instant offense.  Where

7  were you working?

8       **INMATE OPALEC:**  At Robinson Helicopter Company.

9       **PRESIDING COMMISSIONER DAVIS:**  And what were you

10  doing for them?

11       **INMATE OPALEC:**  I was doing some electrical

12  work, doing harness installation.

13       **PRESIDING COMMISSIONER DAVIS:**  Did you complete

14  any sort of certification during your six months at the

15  Edison technician course?

16       **INMATE OPALEC:**  I didn't get to finish it.

17       **PRESIDING COMMISSIONER DAVIS:**  So you were

18  working at the Helicopter Company just with the skills

19  that you'd obtained.

20       **INMATE OPALEC:**  I had a prior experience in

21  electrics, that's why I was hired, Robinson.

22       **PRESIDING COMMISSIONER DAVIS:**  What kind of

23  prior experience did you have in electronics?

24       **INMATE OPALEC:**  Assembly, electrical assembly.

25  My first job was in Compton at Magnaspec (phonetic),

26  that's the company's name.

27       **PRESIDING COMMISSIONER DAVIS:**  What were you

12

1    doing for them?

2         **INMATE OPALEC:**  I was doing electrical assembly

3    work.

4         **PRESIDING COMMISSIONER DAVIS:**  So what kind of -

5    - what were you assembling?

6         **INMATE OPALEC:**  Component parts for rockets and

7    stuff and avionics, component parts.

8         **PRESIDING COMMISSIONER DAVIS:**  Does that require

9    any sort of a clearance on your part or drug testing or

10   anything like that?

11        **INMATE OPALEC:**  I didn't know at the time -- I

12   think we had -- it didn't require no clearance but drug

13   testing they surely did.

14        **PRESIDING COMMISSIONER DAVIS:**  As part of your

15   agreement to work there you had to drug test from time

16   to time.

17        **INMATE OPALEC:**  Yes.

18        **PRESIDING COMMISSIONER DAVIS:**  Was it random?

19        **INMATE OPALEC:**  Random, randomly.

20        **PRESIDING COMMISSIONER DAVIS:**  You were never

21   married and have no children.  Prior drug use it says

22   consists of marijuana and cocaine.  How often would you

23   use marijuana and or cocaine?

24        **INMATE OPALEC:**  I used it about three times a

25   week.

26        **PRESIDING COMMISSIONER DAVIS:**  Which one or

27   both?

13

1         **INMATE OPALEC:**  Both.

2         **PRESIDING COMMISSIONER DAVIS:**  Both?

3         **INMATE OPALEC:**  Yeah.

4         **PRESIDING COMMISSIONER DAVIS:**  Okay. On the

5    weekends, primarily or when would you do it?

6         **INMATE OPALEC:**  Primarily on the weekends when

7    I'm hanging out with some friends.

8         **PRESIDING COMMISSIONER DAVIS:**  Was this during

9    the time you were employed for the electronic assembly

10   program prior going to the helicopter company?

11        **INMATE OPALEC:**  Yeah prior to that.

12        **PRESIDING COMMISSIONER DAVIS:**  We're you

13   concerned with them showing a negative test or a

14   positive test I guess.

15        **INMATE OPALEC:**  Well I didn't thought about that

16   at the time.

17        **PRESIDING COMMISSIONER DAVIS:**  Your gang

18   affiliation is noted as Long Beach Shualas S-H-U-A-L-A-

19   S.

20        **INMATE OPALEC:**  Yes.

21        **PRESIDING COMMISSIONER DAVIS:**  Is that right?

22        **INMATE OPALEC:**  Yeah.

23        **PRESIDING COMMISSIONER DAVIS:**  And you have aka

24   of Spade S-P-A-D-E.

25        **INMATE OPALEC:**  Yes, that's correct.

26        **PRESIDING COMMISSIONER DAVIS:**  How did you get

27   the nickname?

14

1       **INMATE OPALEC:**  That was just given to me when I
2   got initiated.

3       **PRESIDING COMMISSIONER DAVIS:**  Now when you say
4   initiated what do you mean?

5       **INMATE OPALEC:**  Well you know, it's just a thing
6   that every gang goes to and they bring you in and they
7   beat you up for like ten seconds and stuff.

8       **PRESIDING COMMISSIONER DAVIS:**  What we would
9   generally call of jumping in process.

10      **INMATE OPALEC:**  Yes.

11      **PRESIDING COMMISSIONER DAVIS:**  So you were
12  jumped into the gang?

13      **INMATE OPALEC:**  Yes.

14      **PRESIDING COMMISSIONER DAVIS:**  And you have had
15  no prior criminal record prior to the instant offense.

16      **INMATE OPALEC:**  That's correct.

17      **PRESIDING COMMISSIONER DAVIS:**  So you were never
18  arrested for anything?

19      **INMATE OPALEC:**  I was arrested for burglary but
20  the charges was dropped by the district attorney.

21      **PRESIDING COMMISSIONER DAVIS:**  Okay.  And it
22  does reflect that in here as well.  That you have no
23  juvenile record but there was an arrest for burglary
24  but the case was rejected by the district attorney.  So
25  you were living with your parents.  Your home life
26  generally good?

27      **INMATE OPALEC:**  Yes.

15

1          **PRESIDING COMMISSIONER DAVIS:**  No particular

2    problems.

3          **INMATE OPALEC:**  No, I didn't have no problem.

4          **PRESIDING COMMISSIONER DAVIS:**  Sounds like you

5    didn't have any problem getting a job.  You had two of

6    them.  Now your first job, what happened with that one?

7          **INMATE OPALEC:**  I quit on that one to get the

8    helicopter company job.

9          **PRESIDING COMMISSIONER DAVIS:**  So you took a

10   better job?

11         **INMATE OPALEC:**  Yes.

12         **PRESIDING COMMISSIONER DAVIS:**  Good for you.

13   And then the helicopter company just began to

14   experience less work or something and didn't need you

15   anymore?

16         **INMATE OPALEC:**  Yeah, it was, they slowed down.

17         **PRESIDING COMMISSIONER DAVIS:**  All of the things

18   were normal; you got along with your mother and

19   stepfather?

20         **INMATE OPALEC:**  Yes.

21         **PRESIDING COMMISSIONER DAVIS:**  Did they know

22   that you were involved with gangs?

23         **INMATE OPALEC:**  Not at the time.

24         **PRESIDING COMMISSIONER DAVIS:**  When did they

25   find out?

26         **INMATE OPALEC:**  When I got arrested.

27         **PRESIDING COMMISSIONER DAVIS:**  Did you tell them

16

1    or did they just learn that as a result of the arrest?

2        **INMATE OPALEC:**  I told my mother what I was --

3    got myself involved.

4        **PRESIDING COMMISSIONER DAVIS:**  That must have

5    been difficult.

6        **INMATE OPALEC:**  Yes it was.

7        **PRESIDING COMMISSIONER DAVIS:**  Tattoos or

8    anything like that are associated with gangs?

9        **INMATE OPALEC:**  I got this one cross and that's

10   my only tattoo.

11       **PRESIDING COMMISSIONER DAVIS:**  Did all of you

12   have -- or was that associated with gang though or was

13   that just a tattoo?

14       **INMATE OPALEC:**  No, it's just a tattoo.

15       **PRESIDING COMMISSIONER DAVIS:**  Just a tattoo.

16   You continue your gang activity since you've been in

17   custody?

18       **INMATE OPALEC:**  No, no.

19       **PRESIDING COMMISSIONER DAVIS:**  How have you

20   managed to separate yourself from gangs?

21       **INMATE OPALEC:**  It's just that I didn't want to

22   do it anymore you know.  It's not -- I'm not getting

23   anything out of it.  I really found out when I got

24   arrested who my really -- my really friends are.  You

25   just -- gangs is just something I did when I was young

26   and I didn't want to do it -- I didn't want to have

27   anything to do with it anymore.

17

1          **PRESIDING COMMISSIONER DAVIS:**  By young you mean

2    up until your instant offense.

3          **INMATE OPALEC:**  Yes.

4          **PRESIDING COMMISSIONER DAVIS:**  Okay.  How long

5    had you been involved with the gangs prior to being

6    arrested?

7          **INMATE OPALEC:**  Let's see, about -- I would say

8    about two years.

9          **PRESIDING COMMISSIONER DAVIS:**  About two years.

10         **INMATE OPALEC:**  Yes.

11         **PRESIDING COMMISSIONER DAVIS:**  And is why you're

12   saying that you have said that you did not continue

13   with any gang associates when you came to prison.

14         **INMATE OPALEC:**  That's correct.

15         **PRESIDING COMMISSIONER DAVIS:**  No affiliation

16   with any other gang members?

17         **INMATE OPALEC:**  Well there's gang members over

18   here but I don't really hang around with gangs and I

19   don't participate in gang activity.  I just don't do it

20   anymore.  I don't deal with gangs.

21         **PRESIDING COMMISSIONER DAVIS:**  Is that difficult

22   for you when you came in or was there any pressure for

23   you to become involved in any gang activity?

24         **INMATE OPALEC:**  The pressure is always going to

25   be there but you just have to meet to resist that.  And

26   I think I've done a good job of resisting.

27         **PRESIDING COMMISSIONER DAVIS:**  And when did you

18

1    make that decision to do that?

2        **INMATE OPALEC:**  When I seen that my life is

3    going to have no meaning if I continue to do what I was

4    doing.  You know, if you're in a gang, the thing is

5    there is only prison, you end up in prison or dying and

6    I don't want to be that way.  I don't want to end up

7    like that.

8        **PRESIDING COMMISSIONER DAVIS:**  Can you give me

9    roughly, was that when you first came to prison or was

10   it a year or so afterwards?  When did you make that

11   decision?

12       **INMATE OPALEC:**  When it -- okay, when I got

13   sentenced to life in prison, it didn't really hit me

14   until I got to the Reception Center.  And one day I was

15   sitting in the yard and I looked around and I see all

16   of these faces you know and I said to myself, hey,

17   guess my life is over with when I got sentenced to

18   life.  You know, that day I made a decision to just

19   turn away from the gangs.

20       **PRESIDING COMMISSIONER DAVIS:**  Did you ever do

21   anything active like request to debrief or do anything

22   like that to disassociate yourself from the gangs?

23       **INMATE OPALEC:**  I'm not in some kind of

24   organized crime.  I mean, my gang is you know, it's

25   just a bunch of teenagers that probably got together.

26   You know, it's not a big mafia or anything like that.

27       **PRESIDING COMMISSIONER DAVIS:**  So you don't feel

19

1   you had anything to offer in the debrief setting?

2           **INMATE OPALEC:**  I don't think so.

3           **DEPUTY COMMISSIONER SMITH:**  Commissioner let me

4   note that the C File indicates that Mr. Opalec has been

5   a validated a gang member each year that he's been in

6   custody with the latest validation being completed in

7   July of 2005.  Under that validation is as a member not

8   an associate.

9           **INMATE OPALEC:**  What do you mean validation?

10          **ATTORNEY RUTLEDGE:**  You're C File indicates that

11  you're a gang member, that you have been every year

12  since you've been in prison.

13          **INMATE OPALEC:**  I mean, of course it's going to

14  say that because that's what I was arrested for.  My

15  case is gang affiliated.

16          **ATTORNEY RUTLEDGE:**  Well you don't need to

17  explain to me.  I'm just here.  I don't believe that

18  you're a gang member.  I think there is something wrong

19  with that process but he's just noting for the record

20  that it's -- that it is in your file.

21          **PRESIDING COMMISSIONER DAVIS:**  All right.  But

22  your testimony here today is that you're not doing

23  anything that would actively associate you as a gang

24  member?

25          **INMATE OPALEC:**  That's what I'm trying to say.

26  I mean, me being a gang member is always going to be on

27  the records, is always going to be a part of me.  But

20

1    if I don't participate then you can't believe.  You

2    know, I'm not doing anything that's negative or

3    pertains to any gang activity.

4         **PRESIDING COMMISSIONER DAVIS:**  Commissioner any

5    questions?

6         **DEPUTY COMMISSIONER SMITH:**  No I have no

7    questions.

8         **PRESIDING COMMISSIONER DAVIS:**  All right.  I'll

9    ask you to turn your attention please to Commissioner

10   Smith.

11        **DEPUTY COMMISSIONER SMITH:**  Sir, according to

12   the C File you were received by the Department of

13   Corrections on May 1st, 1992.  Received here at CTF on

14   May 17th, 2000.  You have a classification score of 19,

15   which is the lowest classification score that a life

16   inmate can attain.  Your last hearing was held on

17   January 28th, 2005.  That was your fourth Subsequent

18   Hearing and you received a one-year denial at that

19   time.  You've been completely disciplinary free since

20   your incarceration.  No 115's, no 128's and certainly

21   you are to be commended for that achievement.  That's

22   an achievement that is rarely seen and we recognize how

23   difficult it is to make that accomplishment.  You've

24   received a number of laudatory chronos.  You received

25   four dated March of 05', June of 05', January 06' and

26   April of 06' for your continued participation in

27   Narcotics Anonymous.  If you were returned to the

21

1   community would you continue to participate in

2   Narcotics Anonymous?

3         **INMATE OPALEC:**  Yes.

4         **DEPUTY COMMISSIONER SMITH:**  Why?

5         **INMATE OPALEC:**  Excuse me, can you say that

6   again?

7         **DEPUTY COMMISSIONER SMITH:**  If you received a

8   parole date, would you continue to participate in

9   Narcotics Anonymous in the community?

10        **INMATE OPALEC:**  Yes I would if it's available to

11  me.

12        **DEPUTY COMMISSIONER SMITH:**  And why?

13        **INMATE OPALEC:**  Because that's what keeps me

14  from using drugs, that's my motivation to stay sober.

15        **DEPUTY COMMISSIONER SMITH:**  You received a

16  laudatory chrono February 2006 on the 23rd for the

17  completion of the Angry Heart Video Series.  You

18  received two laudatory chronos both in April of 2006,

19  one of the 5th and the other on the 7th for your

20  participation and completion of video presentations in

21  the inmate employability program.  And then June of

22  2005 you completed the Way to Happiness course that was

23  presented by Criminon C-R-I-M-I-N-O-N.  In addition to

24  those activities you received your GED in October of

25  1997 and you completed the vocational paint and

26  decorating program in January of 2003.  You've been

27  assigned to PIA wood products for a number of years and

22

1  you're currently working as a machine operator is that

2  right?

3          **INMATE OPALEC:**  That's correct.

4          **DEPUTY COMMISSIONER SMITH:**  Okay.  And you've

5  consistently received excellent grades in that

6  assignment.  Before we go to the psychological

7  evaluation are there any other activities that you've

8  been involved with since your last hearing that I

9  haven't addressed that I should be aware of?

10         **INMATE OPALEC:**  I been attending Buddhism class,

11 a meditation class.

12         **DEPUTY COMMISSIONER SMITH:**  Okay.  Buddhism

13 meditation class.

14         **INMATE OPALEC:**  Yes.

15         **DEPUTY COMMISSIONER SMITH:**  Okay.  And how often

16 do you do that?

17         **INMATE OPALEC:**  Once a week, I attend the class

18 once a week.

19         **DEPUTY COMMISSIONER SMITH:**  And how long does

20 that go, is it an hour or two hours?

21         **INMATE OPALEC:**  An hour and a half.

22         **DEPUTY COMMISSIONER SMITH:**  An hour and a half.

23 And it's led by a Buddhist Monk or a layperson.

24         **INMATE OPALEC:**  It's a Buddhist from the

25 streets.

26         **DEPUTY COMMISSIONER SMITH:**  Okay.  From the

27 community.

23

1          **INMATE OPALEC:**  They practice Buddhism.

2          **DEPUTY COMMISSIONER SMITH:**  Okay.  And how long

3    have you been that?

4          **INMATE OPALEC:**  About, I started in 2004.

5          **DEPUTY COMMISSIONER SMITH:**  Okay.  Was it

6    addressed at your last hearing?  Do you recall?

7          **INMATE OPALEC:**  It was not.

8          **DEPUTY COMMISSIONER SMITH:**  Okay.

9          **ATTORNEY RUTLEDGE:**  There also should be in the

10   IAP, I think there's two chronos.  One's for reengaging

11   and ones for anger management.  Is that correct?

12         **DEPUTY COMMISSIONER SMITH:**  That's correct.  I

13   addressed the two laudatories for the two different

14   programs.

15         **ATTORNEY RUTLEDGE:**  Oh you did.

16         **DEPUTY COMMISSIONER SMITH:**  One April 5 and the

17   other April 7th.

18         **ATTORNEY RUTLEDGE:**  I didn't hear you say the

19   anger management one.

20         **DEPUTY COMMISSIONER SMITH:**  Yeah, I actually

21   identified there were completion of two video series

22   within that program.  I didn't specify as to what the

23   programs were.  We have a psychological evaluation

24   dated December 2004.  Prepared by Doctor Gleason G-L-E-

25   A-S-O-N.  That evaluation was used at your last

26   consideration hearing.  So I'm only going to address a

27   couple of sections of the hearing that I think are most

24

1    pertinent and then if there are any other sections or
2    any comments that either you or Ms. Rutledge would like
3    to make for the record you certainly have that
4    opportunity.  All right.  Referring to page three under
5    Axis I, II, and III indicates that there is no clinical
6    personality or physical disorder.  Under Axis IV, there
7    is stress as a result of long-term incarceration and
8    that's a standard diagnostic impression that's implied
9    to all life prisoners.  You have a Global Assessment
10   Functioning Score of 80 and Dr. Gleason wrote at the
11   time that when you're given a release date your
12   prognosis for the ability to maintain your current
13   mental status in the community upon parole was
14   excellent.  Moving to page five, under assessment of
15   dangerousness the doctor writes that since the last
16   board report you continue to be disciplinary free.  And
17   it's therefore believed that you would pose less than
18   an average risk of violence when compared to other
19   level two inmates.  And if released to the community
20   after 14 years, other clinical and historical factors
21   taken into consideration.  That your violence potential
22   would now be estimated to be no more than that of the
23   average citizen in the community and that the only risk
24   factor would be if you were to return to the use of
25   amphetamines, marijuana or any type of gang
26   affiliation.  And with that, any other sections that
27   you'd like to have noted for the record or any

1    comments?

2        **ATTORNEY RUTLEDGE:**  Yes sir.  Thank you.  I

3    would note that on page four of Doctor Gleason's report

4    under three B.  It appears that Mr. Gamard (phonetic),

5    I'm sorry, Doctor Gleason addressed several questions

6    that a previous panel had inquired about and one of

7    them was substance abuse and how it relates to the

8    commitment offense.   "And it said an estimate of the

9    prisoner's authority to refrain from the use or abuse

10   of the same when released and he answers inmate Opalec

11   has attended 12 years of Alcoholics Anonymous and

12   Narcotics Anonymous.  He has been incarcerated for 14

13   years.  He has never received so much as a 128.  He has

14   truly been a model prisoner.  The idea that he could

15   return to the use alcohol and drugs as is anybody else

16   is up to him.  However, history and length of time of

17   sobriety coupled with the lack of disciplinary or other

18   issues that would lead one to believe that this is

19   still a problem, leads this clinician to believe it is

20   a situation, which has been thoroughly thought through

21   and is no longer an issue."   I would note to that on

22   page five of Doctor Gleason's report under three E he

23   says on the need for further therapy programs while

24   incarcerated, that was another issue that the board

25   asked him to address.  "As previously noted, this

26   inmate has done every self-help program available to

27   him and some that were not.  There are no other

26

1    programs this inmate needs to continue if the end

2    result is to further explore the underlying causes of

3    his commitment offense, that task has been completed."

4    Okay.  And finally, on page six under number three it

5    says, "inmate Opalec has programmed very well.  His

6    behavior has been exceptional in prison and there does

7    not appear to be any specific reason for continued

8    incarceration."  That's it.

9        **DEPUTY COMMISSIONER SMITH:**  Thank you.  With

10   regard to your parole plans and we'll refer back to the

11   board report January of 06'.  It indicates that you

12   would reside with your mother and I'm going to

13   apologize in advance for mispronouncing her last name.

14   There is certainly no disrespect intended.  But Soledad

15   Demopolis.

16       **INMATE OPALEC:**  That's correct.

17       **ATTORNEY RUTLEDGE:**  That was good.

18       **DEPUTY COMMISSIONER SMITH:**  Thank you.  And in

19   the board report it indicates that she resides in the

20   Philippines.  However, a letter that I'll address in

21   more detail, which you provided today, indicates that

22   she lives in Linwood California.

23       **INMATE OPALEC:**  (inaudible) there in the

24   Philippines at this time.  They went for a vacation.

25       **DEPUTY COMMISSIONER SMITH:**  Because the board

26   report is dated -- oh there on vacation in the

27   Philippines.

27

1          **INMATE OPALEC:**  Yes.

2          **DEPUTY COMMISSIONER SMITH:**  So they --

3          **INMATE OPALEC:**  The support letter was sent from

4     the Philippines.  If you look at the envelope, here, it

5     was mailed in the Philippines.

6          **DEPUTY COMMISSIONER SMITH:**  Okay.  But they

7     reside in Linwood California.

8          **INMATE OPALEC:**  Yeah, along with my sister.

9          **DEPUTY COMMISSIONER SMITH:**  Okay.  And then with

10    regard for employment, indicates that you'd work for

11    your aunt.

12         **INMATE OPALEC:**  Yes.

13         **DEPUTY COMMISSIONER SMITH:**  Concordia Seballe

14    (phonetic).

15         **INMATE OPALEC:**  Seballe.

16         **DEPUTY COMMISSIONER SMITH:**  Seballe who operates

17    an import/export shop in the Philippines.

18         **INMATE OPALEC:**  That's correct.

19         **DEPUTY COMMISSIONER SMITH:**  So my question is,

20    an it is that if your plan is to reside with your

21    mother and stepfather in Linwood California, which is

22    where they reside.

23         **INMATE OPALEC:**  No that's not correct sir.  My

24    parole plans is to return to the Philippines.

25         **DEPUTY COMMISSIONER SMITH:**  Okay.  And you would

26    reside with your aunt and uncle?

27         **INMATE OPALEC:**  That's correct.

28

1        **DEPUTY COMMISSIONER SMITH:**  Okay.  So the board

2   report would indicate that you reside with your mother

3   is incorrect.

4        **INMATE OPALEC:**  That was before they retired to

5   the Philippines.  See that board you were -- the

6   reports you were referring to was done 2004.

7        **DEPUTY COMMISSIONER SMITH:**  No, it's January

8   2006.

9        **ATTORNEY RUTLEDGE:**  They copied the information

10  from 2004.  Is that correct?

11       **DEPUTY COMMISSIONER SMITH:**  And the letter is

12  dated June 2006 and the letter she says that she

13  resides in the city of Linwood with her husband.

14       **INMATE OPALEC:**  That's correct.

15       **ATTORNEY RUTLEDGE:**  He's going to live with his

16  aunt and uncle in the Philippines.

17       **INMATE OPALEC:**  I'm not living with my mother

18  though.  I will be residing with my aunt and uncle.

19       **DEPUTY COMMISSIONER SMITH:**  Okay.  So the letter

20  that we have from your mother and your stepfather

21  offering you residence we can discount.

22       **ATTORNEY RUTLEDGE:**  Well that's if, you know,

23  some boards have told him in the past that in case INS

24  doesn't you know for some reason he can't get to the

25  Philippines right away he's got to have like a back up

26  plan.  So he's gotten that, however, his parole plan is

27  to reside with his aunt and uncle.  Is that correct?

29

1          **INMATE OPALEC:**  That's correct.

2          **DEPUTY COMMISSIONER SMITH:**  Okay.  So it

3   indicated that the letter is dated June of 2006 and

4   indicating that your mother and your stepfather live in

5   Linwood and writes a letter that indicates that they

6   will support you both financially and emotionally.  The

7   other letter is also dated June 2006, the same date,

8   June 11th, and it's written by your aunt and uncle,

9   Concordia and Aldentio (phonetic)

10         **INMATE OPALEC:**  Aldentio.

11         **DEPUTY COMMISSIONER SMITH:**   Seballe S-E-B-A-L-

12  L-E.  It indicates they are writing in support of their

13  nephew.  They offer support financially and emotionally

14  so that you can become an asset to the community and

15  that they manage their own import/export business and

16  that they would provide you with a job with that

17  business as well as housing, financial support,

18  emotional support and guidance.  What kind of a job are

19  they offering you?

20         **INMATE OPALEC:**  I would be working in the RNR.

21         **DEPUTY COMMISSIONER SMITH:**  Doing what?

22         **INMATE OPALEC:**  Well you know, packing stuff,

23  shipping it out and receiving it.

24         **DEPUTY COMMISSIONER SMITH:**  Now something that I

25  noticed about these letters, do you know who wrote

26  them?

27         **INMATE OPALEC:**  The other one my aunt and the

30

1   other one is my mother.

2       **DEPUTY COMMISSIONER SMITH:**  Okay, I know who

3   signed them, I'm asking who wrote them because with the

4   exception of the middle paragraph, one which has to do

5   with your mother and husband being retired and the

6   other having to do with your aunt and uncle managing

7   their own import/export business, the letters are

8   virtually identical.

9       **INMATE OPALEC:**  You see what you guy's have to

10  understand is English is not our -- English is our

11  second language.  You know, the language is very

12  limited you know.  So they might have just made almost

13  the same because they didn't know how to express

14  themselves in a different way.

15      **DEPUTY COMMISSIONER SMITH:**  Okay.  I can

16  certainly understand and accept that.

17      **INMATE OPALEC:**  Thank you.

18      **DEPUTY COMMISSIONER SMITH:**  We send out what are

19  known as 3042 notices.  Those are letters that go out

20  to the various criminal agencies that were involved in

21  your commitment offense.  We didn't receive any

22  responses back from those agencies.  Now we do have

23  Mr. Turley present representing the Los Angeles County

24  District Attorney's Office and will be participating in

25  the hearing in a short time.  Is there anything before

26  we return to Commissioner Davis; is there anything else

27  that we should be aware of regarding your parole plans?

31

1          **INMATE OPALEC:**  No.

2          **DEPUTY COMMISSIONER SMITH:**  All right.  Thank

3    you.  Commissioner.

4          **PRESIDING COMMISSIONER DAVIS:**  I am curious

5    about one thing.  I understand the process of the back

6    up plan now, the issuing of it.  In the United States

7    is there a plan for employment in the United States

8    also?

9          **INMATE OPALEC:**  I didn't have a -- I did not

10   make a plan because I have an immigration hold and it's

11   impossible for me to stay here in the states with that

12   immigration hold.  I can assure you that I will be

13   deported.

14         **PRESIDING COMMISSIONER DAVIS:**  And that's really

15   your desire also is to go back to the Philippines?

16         **INMATE OPALEC:**  Yes.

17         **PRESIDING COMMISSIONER DAVIS:**  So even if they

18   were, whatever, the hold were not there that would be

19   your desire to go back regardless.

20         **INMATE OPALEC:**  That's correct.

21         **PRESIDING COMMISSIONER DAVIS:**  Let me clarify

22   one thing.  On the gang issue because I noticed that in

23   another report and I'd be going back to the --

24   (inaudible) supplemental report, supplemental report --

25         **ATTORNEY RUTLEDGE:**  Excuse me.  I would lodge an

26   objection to these reports.  Here's the thing, I've

27   looked through Title 15.  I don't see any authority for

32

1    the DA to submit reports that go in his C File.
2    There's a letter submitted by Diane Fasoni (phonetic)
3    at their office sending a bunch of reports in and put
4    this in his C File.  There is no authority for that.
5    There's no review system to decide like I said if there
6    aren't more supplemental reports that this information
7    was done not to be true.  The reports aren't even
8    signed.  So I would call that unreliable information
9    and illegal and I would ask the board not to even read
10   it, don't put it into the record.  There is no basis
11   for it.

12        **PRESIDING COMMISSIONER DAVIS:**  Well it might
13   have been prudent to wait until I asked the question
14   before you objected because what I'm going to use the
15   report for is to simply get some clarification.  And
16   that is that the report itself indicates that you
17   belong to a different gang, to the Long -- let's see,
18   it says I checked with the Long Beach Police Department
19   and confirmed that -- did you also have a nickname by
20   the name of Sneaky?

21        **INMATE OPALEC:**  No.

22        **PRESIDING COMMISSIONER DAVIS:**  No.  Okay.  So
23   this is somebody else.  Because this -- well it's also
24   a known member of the Long Beach Local Boys.  So this
25   part isn't you.

26        **INMATE OPALEC:**  No, that's one of my crime
27   partners.

33

1          **PRESIDING COMMISSIONER DAVIS:**  Okay.  All right.

2   So that's not you.  All right.  Well that clarifies

3   that then.  You were about 20 years old at the time

4   this offense was committed.

5          **INMATE OPALEC:**  That's correct.

6          **PRESIDING COMMISSIONER DAVIS:**  Were you one of

7   the older members of the gang?

8          **INMATE OPALEC:**  Yeah, one of the older.

9          **PRESIDING COMMISSIONER DAVIS:**  So it wouldn't be

10  an issue that you were trying to impress anyone or

11  anything with your participation in this gang.  Is that

12  an accurate statement or not?

13         **INMATE OPALEC:**  I was influenced.

14         **PRESIDING COMMISSIONER DAVIS:**  By who?

15         **INMATE OPALEC:**  By the rest of my homeboys.

16         **PRESIDING COMMISSIONER DAVIS:**  So you weren't

17  really a leader of the group.

18         **INMATE OPALEC:**  No.

19         **ATTORNEY RUTLEDGE:**  Are you -- are we getting

20  into the commitment offense?

21         **PRESIDING COMMISSIONER DAVIS:**  No.  I'm just

22  talking about gang activities you know.

23         **ATTORNEY RUTLEDGE:**  Okay.

24         **PRESIDING COMMISSIONER DAVIS:**  Do you have a

25  thought as to why you became involved with  the gangs

26  originally?

27         **INMATE OPALEC:**  Originally was when I came from

34

1   the Philippines I didn't know anybody when I started

2   going to school.  I didn't know anybody here.  It was

3   like my first day of school I met these other guys you

4   know.  But at the time I didn't know they were gang

5   members.  So I'm like you know, I'm having problems to

6   adjust you know because of that language barrier.  The

7   United States a whole lot different than what I was

8   used to you know.  And I guess it was the sense of

9   belonging that pulled me into these guys.  That's the

10  best explanation that I can come up with.

11          **PRESIDING COMMISSIONER DAVIS:**  Okay.  You've

12  been actively involved in AA or NA?

13          **INMATE OPALEC:**  NA.

14          **PRESIDING COMMISSIONER DAVIS:**  NA?

15          **INMATE OPALEC:**  And AA.

16          **PRESIDING COMMISSIONER DAVIS:**  And what steps

17  have you found to be most helpful for you?

18          **INMATE OPALEC:**  Step 11.

19          **PRESIDING COMMISSIONER DAVIS:**  Which is what?

20          **INMATE OPALEC:**  Solitude, prayer and meditation

21  to improve conscious contact with God as we understand

22  him.

23          **PRESIDING COMMISSIONER DAVIS:**  And how has that

24  helped you?

25          **INMATE OPALEC:**  It keeps me focused on my daily

26  tasks you know.  Because meditation helps me to be

27  aware of how my action is because everything starts

35

1    from the mind.  If I was aware of what I was thinking
2    and my actions it would be a lot better for me and my
3    people around me, and the people around me.

4            **PRESIDING COMMISSIONER DAVIS:**  Now what's your
5    plan on how to avoid becoming reengaged in gang
6    activity or any sorts of criminal activity if you were
7    to receive a date?

8            **INMATE OPALEC:**  I'm just -- I just made that
9    decision that I'm through with the gang you know.  It
10   just -- I believe that when a man says he's done doing
11   something it can be done.  You know, and that's what I
12   want to do.

13           **PRESIDING COMMISSIONER DAVIS:**  All right.  Any
14   other questions Commissioner?

15           **DEPUTY COMMISSIONER SMITH:**  No I don't have any
16   questions.  But in response to the counsels comment
17   regarding the information in the board report that you
18   addressed.  It's important to know that the board has
19   no jurisdiction with regard to what goes into the C
20   File or what doesn't.

21           **ATTORNEY RUTLEDGE:**  I understand that.  But it's
22   unreliable.

23           **DEPUTY COMMISSIONER SMITH:**  Well, but any
24   information that has been deemed to be appropriate to
25   be in the C File or the board report by the Department
26   of Corrections, which is outside the authority of the
27   board is available for the board to review just as it

1   is for the inmate to review or for you to review.

2       **ATTORNEY RUTLEDGE:**  So you'd review anything as

3   long as it's in there, you're going to consider it

4   relevant or --

5       **DEPUTY COMMISSIONER SMITH:**  Well we may or may

6   not.  We'll make that decision depending on a whole

7   number of factors.  But the fact that it's been

8   included in the C File of itself doesn't make it

9   irrelevant.  It makes it available to be considered.

10       **ATTORNEY RUTLEDGE:**  I would disagree but thank

11   you.

12       **DEPUTY COMMISSIONER SMITH:**  And I would add to

13   that that if there's anything in the C File that

14   Mr. Opalec or any other inmate doesn't think is

15   appropriate to be in the C File, during the review of

16   the C File prior to the board hearing then they can 602

17   that information and request that it be removed.

18       **ATTORNEY RUTLEDGE:**  All right.

19       **DEPUTY COMMISSIONER SMITH:**  So there is a

20   procedure.  So I wanted to answer the objection.

21       **ATTORNEY RUTLEDGE:**  Well can I just add though

22   that he doesn't have attorney representation at the

23   time he reviews his C File and how we even get the

24   probation report and that kind of stuff in is because

25   it's been reviewed by the court.  So anything sent into

26   the C File with no kind of filter -- I mean, I just

27   think it's suspect and he didn't even know that he had

37

1   that right.  He's not advised of that you know.  And

2   the DA should know they don't have the authority to put

3   stuff in the C File.  I think it's unethical for them

4   to do it.

5        **DEPUTY COMMISSIONER SMITH:**  And we're not going

6   to beat this to death.  The DA doesn't put anything in

7   the C File.

8        **ATTORNEY RUTLEDGE:**  But they send it and they

9   ask for it to be done.

10       **DEPUTY COMMISSIONER SMITH:**  They send it and

11  then it's the decision of the Department of Corrections

12  and Rehabilitation to whether it goes in the C File or

13  not.

14       **ATTORNEY RUTLEDGE:**  So if they get away with it

15  it's okay.

16       **DEPUTY COMMISSIONER SMITH:**  If Mr. Opalec or any

17  other inmate has an issue with what's in the C File,

18  when they do their review, which they have a right to

19  do, they can question the inclusion of that information

20  with their correctional counselor.  That is an option

21  that they have and if there not satisfied with the

22  correctional counselors response they can 602 the

23  inclusion of that material.  So there are steps in

24  place for an inmate to have documents in the C File

25  removed that they don't think are appropriate.

26       **PRESIDING COMMISSIONER DAVIS:**  All right.  Does

27  the district attorney have any questions?

1          **DEPUTY DISTRICT ATTORNEY TURLEY:**  Given the

2     inmates refusal to discuss the underlying offense, no

3     questions.

4          **PRESIDING COMMISSIONER DAVIS:**  All right.

5          **PRESIDING COMMISSIONER DAVIS:**  Ms. Rutledge.

6          **ATTORNEY RUTLEDGE:**  No questions.

7          **PRESIDING COMMISSIONER DAVIS:**  Closing.

8          **DEPUTY DISTRICT ATTORNEY TURLEY:**  I think that

9     it's of paramount importance that the record always

10    include accurate statement of the facts, the underlying

11    facts in the offense.  And I appreciate Commissioner

12    Smith's explanation as to how items are received into

13    the C File and how they may be used.  I'd like to make

14    it clear with respect, I intent to read from the

15    sheriff's reports that are here.  But before I do that

16    I want to make it clear that there's a letter in the

17    file dated February 2nd, 1999 from Diane Fasoni and it's

18    a letter to the board of prison terms.  And it says

19    that this inmate had a hearing November 5th and at that

20    hearing the board requested the enclosed police report

21    to be available for the next hearing.  And then she

22    says that that's included, that that's included in the

23    mailing.  The next page is an affidavit and it says

24    that your client has obtained the information from

25    those that have knowledge of said offenses, whose

26    reports are attached here to incorporate by reference.

27    He's reviewed each of these written reports and

1    statements.  They were prepared by persons known to you

2    client to be law enforcement officers and others.

3    These reports and statements consist of 13 pages.

4    These reports and statements contain information from

5    victim's, witnesses, and others concerning commission

6    of criminal offense.  And it goes on it's an affidavit

7    saying know who these people are it's signed by a

8    court.

9           **ATTORNEY RUTLEDGE:**  Signed by the court did you

10   say?

11          **DEPUTY DISTRICT ATTORNEY TURLEY:**  Yes.

12          **ATTORNEY RUTLEDGE:**  What court?

13          **ATTORNEY RUTLEDGE:**  Compton Judicial District,

14   says judge in this report Compton Judicial District

15   dated 10/20/1990.  It should be in your file.  And so I

16   think that while is far above the standard that's

17   required for something to be placed in the file.  That

18   these documents are rightfully there and they exceed

19   the standard in many ways.  I think that the factual

20   statement included in the previous board report and

21   read by the chair here is accurate but I believe that

22   it is -- it's not really complete, as complete as it

23   should be.  I am reading from page two of nine from the

24   sheriff's report.  The investigating officer writes;

25   "we then responded to go to David Polito's (phonetic)

26   house.  To contact him regarding inmate, knocked on the

27   door.  He refers him to Mr. Polito.  And say as I

40

1   talked with the three I saw that suspect Opalec was

2   becoming very nervous about our conversation.  I asked

3   suspect Opalec if he knew why I was there and he

4   replied yes, I think so.  I then asked him to come

5   outside with me so that we could talk in private.  I

6   told the suspect that I knew that he and the other

7   suspects were in the car that did the shooting in

8   Carson.  I further told him that the guy that did the

9   shooting was the front passenger of the car and that I

10  also knew his name.  I then asked the suspect if he

11  could tell me the shooters name.  The suspect looked

12  down and started to cry.  After a few seconds the

13  suspect then said, I was the one in the passenger seat.

14  I shot the gun."  I think that that's relevant and it's

15  not included in the previous factual statement.  Then

16  on page six of the same document the investigator

17  writes, "All of the suspects were interviewed.  Asked

18  me if they killed anyone on the night of this incident.

19  The suspects all admitted to one, going to the park for

20  the purpose of discussing a retaliation shooting.  Two,

21  planning the shooting with each other and the use of a

22  backup car.  Three, preparing for the shooting by

23  arming themselves.  Four, driving to the location for

24  the purpose of committing the shooting.  Five,

25  committing the shooting.  Six, returning to the park

26  and discussing the shooting.  Due to the above, it's

27  obvious that all the suspects conspired with each other

41

1    for the purpose of committing murder of a rival gang

2    member." I think that those facts adds greatly to a --

3    are crucial to an understanding of this underlying

4    offense. And they make it clear to me that this

5    particular inmate by his own statement, his own

6    admission was a shooter. One of the reasons of the

7    report is necessary when in essence it's important for

8    it to be included in the file is that with respect to

9    suspect Opalec, his offense was resolved by a plea on

10    his part so of course there's no court transcript. And

11    I would submit that the most reliable information

12    provides details about the underlying offense, indeed

13    comes from the investigating officer from the sheriff's

14    department that was involved in the investigation and

15    the apprehension of this group of young men. So the

16    offense was carefully planned, carefully executed,

17    carefully carried out and it was done so with an intent

18    to inflict deadly force on people. Unfortunately, the

19    boy was all to familiar with the adverse affects of

20    gang activity. And the victim's of gang activity are

21    the almost infinite victim's extend far beyond those

22    individuals who were shot or shot at. They extend far

23    beyond those who care about those who might have been

24    shot or shot at. The victims extend beyond Mr.

25    Opalec's family who I would have to assume from what we

26    see here, were distraught by the fact that he had

27    chosen to engage himself in this kind of activity. And

42

1   the victim's include people who are afraid to drive the

2   streets of their own neighborhood, people who are

3   afraid to walk the sidewalks of their own neighborhood

4   and I needn't recount for this board how the cancer of

5   gang activity affects all of our lives.  And the costs

6   are extracted from all of us.  This serious offense has

7   serious consequences not just for the inmate but for

8   all of us.  And based upon the underlying offense and

9   apparently Mr. Opalec's continued participation or

10  involvement in gang activity.  That he be commended for

11  his disciplinary free time in prison.  We recognize

12  that that's a commendable effort.  Hopefully it will

13  lead toward a time when he's suitable for parole but I

14  would submit that that time is not yet and would

15  request that at this time he be given a denial.  Thank

16  you very much.

17         **DEPUTY COMMISSIONER SMITH:**  Thank you.

18         **PRESIDING COMMISSIONER DAVIS:**  All right.

19  Ms. Rutledge.

20         **ATTORNEY RUTLEDGE:**  Thank you.  At this time I'm

21  going to ask that the comments that the people read

22  into the record be stricken and here's why the

23  information that they read to the panel about this.

24  This is an affidavit written out by somebody who didn't

25  do the reports.  Somebody who says that I just knew

26  these were officers.  Well any police report we're

27  going to think it's probably from officers.  Nothing in

43

1   that document makes it any more reliable and we don't
2   even know who signed it, this affidavit. We can't --
3   the signature is illegible but it was signed 16 years
4   ago. It's a joke trying as to say -- give it any more
5   credibility. The police report as the people well know
6   are not -- would not be admissible in a court of law
7   because they are prepared in anticipation of
8   litigation. These comments, there's no recordings to
9   back it up. There's no signed confession. This is
10  what an officer put in his words and he said that all
11  these people used the same exact words or what don't
12  even know what every individual said. It's a summary
13  and it's unreliable. So I'm going to make that request
14  at that this time.

15          **PRESIDING COMMISSIONER DAVIS:** And I'm going to
16  deny the request.

17          **ATTORNEY RUTLEDGE:** Thank you. All I have to
18  say about this case, it speaks for itself. I could
19  only make things worse by talking any more about it but
20  this man, there is absolutely no risk. He poses
21  absolutely no unreasonable risk to society. He has a
22  very specific thorough psych report that's favorable
23  and it notes that the previous one was favorable. And
24  I would add that this man has explains, a young man
25  came to this country and that's where the gang
26  association started. He wasn't in gangs in the
27  Philippines and when he got to prison he made a

44

1   conscious decision, you know, this isn't the way his

2   life was going to go.  He's never had a rules

3   violation.  He has no family members in gangs.  There

4   is nothing to connect him to any gangs other than when

5   he came in the institution he had committed a gang

6   offense.  And I don't know if they keep carrying that

7   over because there's nothing to disprove that or

8   perhaps because no one has asked him to do debriefing

9   because no one probably cares what his gang is doing

10  because it's not like you said, a big operation.  So

11  that's no fault of his own.  Aside from that

12  documentation and the commitment offense, since he's

13  been locked up he's had no gang affiliation.  He's not

14  a risk.  His psych report clearly said there's no

15  reason for him to remain incarcerated.  And I would ask

16  that the parole board give him a date.  Thank you.

17          **DEPUTY COMMISSIONER SMITH:**  Thank you.

18          **PRESIDING COMMISSIONER DAVIS:**  Sir now is your

19  opportunity to address the panel directly and tell us

20  why you believe you are suitable for parole.

21          **INMATE OPALEC:**  I just want to say to

22  Mr. Assunto (phonetic) and Mr. Curmen as well as their

23  family that I'm really, really sorry for the pain and

24  suffering I caused them.  When I committed this crime I

25  did not think about the consequences of my action and

26  people got hurt because of that.  And I'm sorry about

27  it you know.  I know there is nothing I can do about it

45

1   you know, to alleviate the pain and the suffering I

2   caused them.  But the one thing I can do is to change

3   myself and I believe I have done that.  You know,

4   during my past hearing I was told by the commissioner

5   (inaudible) that I was very close to getting a parole

6   date.  She said it's to get my parole plans in the

7   Philippines straighten out which I did and I have that

8   with me today.  I have a job and place to live in the

9   Philippines and a loving family and relatives that are

10  waiting for me up there.  And I just wish you guys

11  would give me a chance.  Thank you.

12          **PRESIDING COMMISSIONER DAVIS:**  All right.

13          **DEPUTY COMMISSIONER SMITH:**  Thank you.

14          **PRESIDING COMMISSIONER DAVIS:**  We'll now recess

15  for deliberation.

16                      **R E C E S S**

17                      --oOo--

18

19

20

21

22

23

24

25

26

27

46

1            **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                      **D E C I S I O N**

3        **DEPUTY COMMISSIONER SMITH:**  Back on

4    record.  Everyone previously identified is back

5    in the hearing room.

6        **PRESIDING COMMISSIONER DAVIS:**  This is in

7    the matter of Roderic Opalec.  The CDC number is

8    H-33214.  The panel reviewed all information

9    received from the public and relied on the

10   following circumstances in concluding the

11   prisoner is not suitable for parole and would

12   pose an unreasonable risk of danger to society or

13   a threat to public safety if released from

14   prison.  We've come to this conclusion first and

15   for most by the commitment offense.  That the

16   offense was carried out in an especially callous

17   manner.  There were multiple victims attacked and

18   one was injured in the same instance.  The

19   offense was carried out in a manner, which

20   demonstrates an exceptional disregard for human

21   suffering.  The motive for the crime was trivial

22   in relation to the offense.  These conclusions

23   are drawn from the statement of facts where in

24   the prisoner together with his crime partners

25   chose to participate in the retaliation against a

26   rival gangs.  You were convicted of attempted

27   **RODERIC OPALEC H-33214   DECISION PAGE 1   7/12/06**

. 47

1    murder with a firearm.  And again the nature of
2    the crime, you are indeed fortunate that other's
3    were not injured or killed.  We do note on the
4    positive side that you have no previous record
5    and that you have no discipline what so ever.
6    Which again, is an exceptional accomplishment.
7    (inaudible).  Psychological report of 2004 by
8    Doctor Gleason is supportive.  And we note that
9    you have appropriate parole plans for the
10   Philippines or first and for most that you have
11   an INS Hold.  And that you do have appropriate
12   plans in the Philippines for work and residence
13   with your aunt and uncle and that you have
14   residential plans with your mother and stepfather
15   in the United States but you still need to
16   develop some sort of employment plans should you
17   remain in the United States.  We note that in
18   regard to the 3042 notices, the District Attorney
19   from Los Angeles County is here in person by
20   representative and does oppose parole.  Never the
21   less we do want to commend you for several
22   things.  First and for most is the no discipline.
23   I don't think I've seen that before frankly.   I
24   don't think that I have ever seen anyone whose
25   been instituted to not even get a 128.  So
26   congratulations.  For your 1997 attainment of
27   **RODERIC OPALEC H-33214   DECISION PAGE 2   7/12/06**

1    your GED, for your vocational paint and

2    decorating class, for your laudatory chronos, for

3    NA, your laudatory chronos for Healing the Angry

4    Heart and your inmate Employability Program and

5    the Ways to Happiness by Criminon. As well as

6    your participation in the Buddhist meditation

7    class and your work as a machine operator with

8    excellent work reports. These positive aspects

9    however do not outweigh the factors for

10    unsuitability. And this is a one-year denial.

11    The panel remains -- or the panel recommends that

12    you remain disciplinary free, that as available

13    that you continue with your self help and that

14    you contact your counselor about meeting with the

15    gang lieutenant to review the gang validation.

16    There is a way and I will let Commissioner Smith

17    elaborate on this but there may be a way you

18    should be able to get that removed if it's not

19    accurate. And that you continue to earn positive

20    chronos and this panel will order a new -- or

21    will recommend a new psychological report to be

22    completed prior to the next hearing as well.

23    Commissioner Smith.

24        **DEPUTY COMMISSIONER SMITH:** My suggestion

25    would be that you contact your counselor and ask

26    to speak with one of the officers assigned to the

27    **RODERIC OPALEC H-33214   DECISION PAGE 3   7/12/06**

49

1   gang unit. It may not be a lieutenant but one of

2   the officers assigned to the gang unit. And

3   indicate that the document called the 812 has

4   continued to validate you as gang member and

5   you'd like to address that validation with the

6   hopes of having it removed from the C File. And

7   then are different steps that vary depending on

8   gang units and institutions and that kind of

9   thing to what steps people go through. But if

10  you don't do that it's going to continue on. We

11  have no reason not to believe what you're telling

12  us, that you're no longer involved but as long as

13  that validation you know continues, we have to

14  accept it as being factual. I strongly recommend

15  that you attend to that.

16      **PRESIDING COMMISSIONER DAVIS:** All right.

17  Again, we wish you best of luck. Stay on the

18  right path and you're doing well. Anything else?

19  We are adjourned.

20               **A D J O U R N M E N T**

21                    --oOo--

22

23  **PAROLE DENIED ONE YEAR**
                                    NOV  **9** 2006
24  **THIS DECISION WILL BE FINAL ON** _____

25  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26  **DATE, THE DECISION MODIFIED.**

27  **RODERIC OPALEC H-33214 DECISION PAGE 4  7/12/06**

50

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, SUE GERDES, a duly designated transcriber,

NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare

and certify under penalty of perjury that I have

transcribed tape(s) which total one in number and cover

a total of pages numbered 1 - 49, and which recording

was duly recorded at CORRECTIONAL TRAINING FACILITY,

SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT

PAROLE CONSIDERATION HEARING OF RODERIC OPALEC, CDC NO.

H-33214, ON JULY 12, 2006, and that the foregoing pages

constitute a true, complete, and accurate transcription

of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party

in the above-mentioned matter and have no interest in

the outcome of the hearing.

Dated October 12, 2006, at Sacramento,

California.


_____
SUE GERDES
TRANSCRIBER
NORTHERN CALIFORNIA COURT
REPORTERS

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA
LIFF PRISONER HEARING DECISION FACE SHEET

| | Records Use Only |
|---|---|
| [ ] PAROLE GRANTED - (YES) | |
|    CDC: Do not release prisoner before | Parole Release Date |
|       Governor's review | YR   MO   DAY |
| ☑ PAROLE DENIED - (NO) *1 year please on year 06* | Attach Prison Calculation Sheet |

[ ] AGREED UNSUITABLE (Attach 1001A Form) FOR:_____ YEAR(S)
[ ] HEARING POSTPONED/REASON:_____

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**

[ ] No more 115's or 128A's   ☑ Stay discipline free
[ ] Work to reduce custody level  [ ] Learn a trade*   ☑ Earn positive chronos
☑ Get self-help*   [ ] Get therapy*   [ ] Get a GED*

[ ] Recommend transfer to _____
☑ Other *Firm up parole plans – letters of support*
   *These programs are recommended if they are offered at your prison and you are eligible/able to participate.

| Penal Code 3042 Notices | DATE: | 10-Dec-04 |
|---|---|---|

| Commitment Offense(s) | _____ 187, 12022.5 | MURDER W/USE F'ARM |
|---|---|---|
| | Code(s) | Crime(s) |
| | _____ TA009295 | 5 |
| | Case #(s) | Count #(s) |

| Date Inmate Came to CDC 5/1/92 | Date Life Term Began 10/10/92 | Minimum Eligible Parole Date 10/10/99 |
|---|---|---|
| [ ] Initial Hearing | [ X ] Subsequent (Hearing No.) 4 | Date of Last Hearing _____ |

| CDC Representative | | |
|---|---|---|
| Attorney for Prisoner | Address | |
| D.A. Representative | County | LOS ANGELES |

This form and the Board's decision at the end of the hearing is only <u>proposed</u> and NOT FINAL. <u>It will not become final until it is reviewed.</u>

| Chair | *Carol Daly* | Date | 1-28 |
|---|---|---|---|
| Panel Member | *W M Bean* | Date | 05 |
| Panel Member | | Date | |

OPALEC RODERIC   H-33214   CTF-SOLEDAD   DATE:   1/28/05 CAL:   Jan-05

1    **CALIFORNIA BOARD OF PRISON TERMS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER MCBEAN:**  All right,

4    we're back on record.

5    **PRESIDING COMMISSIONER DALY:**  Okay.  The

6    Panel has reviewed all of the information received

7    from the public and relied on the following

8    circumstances in concluding the prisoner is not

9    suitable for parole and would pose an unreasonable

10   risk of danger to society or a threat to public

11   safety if released from prison.  Mr. Opalec, we

12   were very, very impressed with you today and we had

13   a lot of discussion.  And when we give a date, we

14   want to make sure that we have everything all lined

15   up so when this goes forward, there aren't a lot of

16   (inaudible).  I'm going to tell you what it is that

17   we think you need to do today for when you come

18   back.  And are you also aware that even if we give

19   you a date and it goes over to the Governor, that

20   he does not have a final say-so, because this is an

21   attempt murder and not a murder case.  So even if

22   he were to reverse it -- and I know there's really

23   strong feelings about gangs -- problems, because of

24   the big issue that they are in any jurisdiction.

25   And so if he did not think that you should be out

26   on the streets, he would still have to refer it

27   **RODERIC OPALEC   H-33214   DECISION PAGE 1   1/28/05**

61

1   back to the Board.  So the Panel member who is

2   sitting on your Panel (inaudible) would be the one

3   that would argue to the other Commissioners at a

4   Board meeting as to why they felt you were suitable

5   for parole at this time.  And then it would be all

6   of the members voting on your release date.  And

7   so, to have everything lined up is extremely

8   important at this time.  And so, do you hear what

9   I'm saying?  Do you understand?

10       **INMATE OPALEC:**  Well, I understand.

11       **PRESIDING COMMISSIONER DALY:**  Where your

12  parole suitability, whose hands it really lies in?

13       **INMATE OPALEC:**  Well, it lies in your

14  hands.

15       **PRESIDING COMMISSIONER DALY:**  And the other

16  Commissioners --

17       **INMATE OPALEC:**  Yes.

18       **PRESIDING COMMISSIONER DALY:**  -- if the

19  Governor were to send it back and say he disagrees

20  with the findings.  So I want to make sure that you

21  understand that.  And the offense, of course, was

22  quite callous.  (Inaudible) because (inaudible) to

23  what was going to happen.  And there were many

24  victims that could have been hit.  One was -- you

25  know, two were shot at and one was hit.  It could

26  have been more and you were just very lucky that

27  **RODERIC OPALEC   H-33214   DECISION PAGE 2   1/28/05**

62

1    nobody was killed.  Otherwise, you would probably

2    be living your life forever here.  It was

3    calculated because you formed a plan to go back

4    over there and do the retaliation.  Discussion was

5    at the park.  You agreed to be the shooter.  You

6    agreed to sit in the front seat.  So, it was quite

7    a calculated crime.  And that is often the case

8    with gang retaliation shootings with gang members.

9    And the offense was carried out in a manner that

10   showed a total disregard for human suffering.  No

11   thought was given to the fact if you did hit

12   somebody (inaudible).  And the motive for the crime

13   was extremely trivial in relation to the offense,

14   in that the whole reason for this shooting was gang

15   warfare and retaliation.  These conclusions are

16   drawn from the Statement of Facts, wherein the

17   prisoner came from the Philippines (inaudible)

18   caught up in joining the gang of the Long Beach

19   Local Boys, which was the gang members that were of

20   the same ethnicity.  And one of their members had

21   been shot by the Scott Royal Brothers gang and so

22   they decided to go back and retaliate.  In doing

23   so, both the prisoner and the -- another gang

24   member (inaudible) fired weapons at (inaudible)

25   Royal gang.  The (inaudible) had a handgun.  He

26   claimed to have fired two shots with the handgun

27   **RODERIC OPALEC   H-33214   DECISION PAGE 3   1/28/05**

63

1    but he did not hit the person he was shooting at.

2    His crime partner in the other car used a shotgun

3    and did wound one of the gang members.  No one died

4    as a result of the injuries.  In looking at your

5    background, you really had no criminal background.

6    And until you came to the United States and became

7    involved in the gang issues was when you had

8    started using some drugs, marijuana,

9    methamphetamines (inaudible).  (Inaudible) of the

10    record that you had experimented with cocaine, so

11    we didn't really talk about that.  Your prior

12    criminality, you've been arrested once for a

13    burglary and that was dropped.  So, most of your

14    unstable social history came after you joined the

15    gang members and were running with them and that's

16    when you were involved in the things that led you

17    to where you are.  But you had a stable upbringing,

18    a stable social life in the Philippines, where you

19    were raised by your grandmother.  The prisoner

20    actually continued with his self-help, in involving

21    yourself in programs and you need to continue to do

22    that.  I'm really impressed, because you do have

23    two completed vocations and I think you have been

24    doing all of the things that you should while you

25    are incarcerated to make yourself suitable for

26    parole.  And you've completed both of those, good

27    **RODERIC OPALEC   H-33214   DECISION PAGE 4   1/28/05**

64

1    vocations.  You've been working in PIA Wood since

2    '93.  You have a card that says that you would be

3    employable, would give you preference.  You've been

4    involved in a number of self-help, so I would just

5    encourage you to continue your involvement in self-

6    help.  And your attorney mentioned that you were

7    attending church.  We didn't really talk about that

8    and I don't know what services you're attending,

9    but I don't know if you could get a letter from the

10   people that run the services to indicate that you

11   do attend services and how often you attend and

12   everything.  So, that's another source of a support

13   letter that you could get.  You have really

14   excellent work reports.  The psychiatric,

15   psychological report, dated 12/7 of '04 by

16   Dr. Gleason is a very, very supportive report, as

17   are your other -- your other psychiatric reports.

18   Your parole plans, and here's where I want to talk

19   to you, about your parole plans.  When I look, you

20   have a letter of support from you mom and your

21   stepfather in Long Beach, that you could come and

22   live there.  Although, it doesn't say anything

23   about whether or not they could find you a job or

24   what you would be doing.  You didn't make any

25   inquiries as to where you might be able to go to a

26   substance abuse program or what kind of counseling

27   **RODERIC OPALEC  H-33214  DECISION PAGE 5  1/28/05**

65

1    you might be able to get when you're released

2    there.  That needs to be a part of your parole

3    plan, because you do have a history of marijuana,

4    using that and experimenting.  Even though you

5    haven't used drugs all this time in prison, you

6    were on the street.  And going back out into

7    society, keeping away from gangs and keeping away

8    from drugs, they're rampant more than ever on the

9    streets.  So we need to know what kind of support

10   you're going to have in place, you know, to get to

11   counseling, to (inaudible).  So check with your mom

12   and find out where those substance abuse groups

13   are, AA or NA, where they are around where they

14   live and when you -- where you can go to the

15   meetings.  And I don't know if they would be able

16   to find you employment or anything.  But your

17   choice, your only choice is to go back to the

18   Philippines.  And what we're concerned about, the

19   letter from your aunt and uncle, you have a place

20   to live and they're going to allow you to work

21   there.  But when we asked you what kind of support

22   groups and help that you're going to find there,

23   you really didn't know.  You don't know what you're

24   going to be doing for them and you don't have any

25   idea what you're going to be making.  And I think

26   that you really need to communicate very frequently

27   **RODERIC OPALEC   H-33214   DECISION PAGE 6   1/28/05**

66

1    with your aunt and your uncle to see if they can be

2    a little bit more defining about what your job is

3    going to be and what they're going to offer you.

4    And I asked you about your family in the

5    Philippines and you said that you had lots. But it

6    would really be extremely important, to show the

7    Board that you're going to be successful there, if

8    you could get letters from your family members over

9    there saying that they are going to support you and

10   stand by you. Now, I don't know what your culture

11   is in the Philippines, with you going back, having

12   been in prison and so, I don't know if your whole

13   family is going to embrace you or not. And the

14   only way that we would know about that would be if

15   we had letters of support. So that's probably the

16   weakest thing that we have right now, are support

17   letters and your -- possibly places you could work,

18   where you could go for counseling and help in Los

19   Angeles. And more importantly, what kind of

20   support and what is available to you in the

21   Philippines. So, you need to do a lot of writing

22   (inaudible), okay? And figure out what programs

23   are going to be there for you.

24            **INMATE OPALEC:** Thank you. Can I say

25   something about that?

26            **PRESIDING COMMISSIONER DALY:** Okay, just a

27   **RODERIC OPALEC  H-33214  DECISION PAGE 7  1/28/05**

67

1  minute, until I finish reading this.  The hearing

2  Panel notes that 3042 notices indicate an

3  opposition to a finding of parole suitability from

4  the District Attorney from Los Angeles, who was

5  here today.  But I think when you listen to her

6  statement, she also feels that you're really,

7  really close and gave a lot of recognition to you

8  for the program that you've been doing and your

9  honesty and everything here today.  And I think

10  that was also her concern, as to exactly what kind

11  of support you're going to have in either place.

12  So, I talked about all of the things you should be

13  commended for.  You've been in PIA Wood since '93.

14  You have your GED, on top of the schooling that you

15  had while you were in the Philippines.  And you

16  have two completed vocations.  You have been

17  steadily involved in AA and NA.  You've taken a

18  couple of the FEMA courses, Inmate Employability

19  Program, Fatherhood (inaudible) Training, the

20  Impact Program, Crim-Anon, you're currently in,

21  Salesmanship class in '01 and indicated that you

22  are attending church.  And you get excellent work

23  reports and you've had absolutely no disciplinary

24  write-ups, either 115s or 128(a)s.  So this is

25  going to be a one year denial and we just ask that

26  you remain disciplinary free and continue to

27  **RODERIC OPALEC  H-33214  DECISION PAGE 8  1/28/05**

68

1    participate in as much self-help as you can.  You
2    need to get busy and communicate with all of your
3    family to try and get your support letters in.  And
4    we'll see you in one year.  Do you understand what
5    (inaudible)?

6            **INMATE OPALEC:**  Yes.

7            **PRESIDING COMMISSIONER DALY:**  Okay.

8            **DEPUTY COMMISSIONER MCBEAN:**  (Inaudible.)

9            **PRESIDING COMMISSIONER DALY:**  Yes.  And was
10   there something you wanted to say?

11           **INMATE OPALEC:**  Yeah, I just wanted to ask
12   if it -- if that's required by the Board of Prison
13   Terms, for me to involve myself in Alcoholics
14   Anonymous --

15           **PRESIDING COMMISSIONER DALY:**  Yes.

16           **INMATE OPALEC:**  -- out there?

17           **PRESIDING COMMISSIONER DALY:**  Yes.  It
18   would be ordered as part of your parole.

19           **INMATE OPALEC:**  No.  Does it -- does it
20   require for me to be found suitable though?

21           **ATTORNEY TARDIFF:**  You mean, under
22   suitability factors?

23           **INMATE OPALEC:**  Under suitability factors.

24           **PRESIDING COMMISSIONER DALY:**  Yes.  Yes, it
25   requires -- you have to be found suitable by this
26   Panel to put everything into motion for you to get
27   **RODERIC OPALEC   H-33214   DECISION PAGE 9   1/28/05**

69

1    released.

2        **ATTORNEY TARDIFF:**  I'll answer him,

3    Commissioner, when we get out.

4        **PRESIDING COMMISSIONER DALY:**  Okay.  And so

5    what I've told you is what this Panel -- we want to

6    make sure that we have a strong argument when it

7    goes forward.  And there's a little bit of work

8    that you need to do on your parole plans, okay?

9    You -- I can't tell you (inaudible).

10       **INMATE OPALEC:**  (Inaudible.)

11       **PRESIDING COMMISSIONER DALY:**  Okay?

12       **INMATE OPALEC:**  Yeah.

13       **PRESIDING COMMISSIONER DALY:**  Okay.  Did

14   you have something you wanted to say?

15       **DEPUTY COMMISSIONER MCBEAN:**  Well, yes, I

16   do.  Mr. Opalec, I don't want you to be discouraged

17   about this decision today.  We think that you're

18   really close to a date and we recognize all of the

19   positive things that you've done.  And so I think

20   it's really important for you to keep your eye on

21   the ball over the next year, to pay attention to

22   the things that the Board is asking you to do.  And

23   you know, there's not that much left for you to do,

24   except that you've just got to tie up some loose

25   ends here and make sure you don't get any 115s.

26   Make sure you continue to involve yourself in self-

27   **RODERIC OPALEC   H-33214   DECISION PAGE 10   1/28/05**

70

1    help, as much as possible.  You know, and it varies

2    from one institution to the next, what's available.

3    But whatever is available, you know, get yourself

4    involved and make sure you get chronos for

5    everything that you've done so that you have -- you

6    get full credit for everything that you've done

7    when you reappear next year.  I want to wish you

8    the best of luck.  Thank you.

9                          --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED ONE YEAR**

24    **THIS DECISION WILL BE FINAL ON:** _____MAY 28 2005_____.

25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **RODERIC OPALEC   H-33214   DECISION PAGE 11    1/28/05**

# EXHIBIT "B"

**DEPT.**

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

Date: 4-24-92

| | | | |
|---|---|---|---|
| HONORABLE: VICTORIA CHAVEZ | JUDGE | M JOHNSON | , Deputy Clerk |
| J GRULKOWSKI | Deputy Sheriff | C ROAN | , Reporter |
| | | | (Parties and counsel checked if present) |

| | |
|---|---|
| TA009295 | Counsel for , DISTRICT ATTY. BY |
| PEOPLE OF THE STATE OF CALIFORNIA | Plaintiff   E HUNTER   DEPUTY |
| VS | |
| | Counsel for |
| OPALEC, RODERIC | Defendant  R YANES 987.2 , PUBLIC DEFENDER BY |
| | DEPUTY |

NATURE OF PROCEEDINGS  PROBATION AND SENTENCE        (Boxes checked if order applicable)

PROBATION DENIED. SENTENCE AS INDICATED BELOW.
Whereas the said defendant having.............**BEEN**.............duly......**FOUND**.........................................................
guilty in this court of the crime of **ATTEMPTED MURDER, IN VIOLATION OF SECTION 664/187(a)PC A FELONY
AS CHARGED IN COUNT 3 OF THE INFORMATION, THE ALLEGATION THAT IN THE COMMISSION AND
ATTEMPTED COMMISSION OF THE ABOVE OFFENSE, SAID DEFENDANT, BENEDICT BATO, WITH ALLEGATION
OF PRINCIPAL ARMED WITH A FIREMAN PURUANT TO SECTION 12022.5(a)PC. IS TRUE**

It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the
State Prison.   **LIFE PLUS 3 YEARS , PLUS 3 YEARS PURSUAMNT TO SECTION 1202225(a)PC.**

☐ Defendant is given credit for..........**843**................days in custody (includes__**281**__ days good time/work time).
It is further Ordered that the defendant be remanded into the custody of the Sheriff of the County of Los Angeles
and delivered by him into the custody of the Director of Corrections at the California State Institution
   ☒ for Men at Chino, California
   ☐ for Women at Frontera, California
   ☐ ............................................................................

ENTERED

4-27-92
**JAMES DEMSPEY**
COUNTY CLERK
AND CLERK OF THE
SUPERIOR COURT

☐ Remaining count(s) dismissed in interests of justice.
☐ Bail exonerated.

2  76J405A [REV. 7-02] 7-82
   C-109

**JUDGMENT**

OK'D TO GO S/W NOTED
APR 2 9 1992 / FORM CR 291

**REPORT – INDETERMINATE SENTENCE,**
**OR OTHER SENTENCE CHOICE** ENTERED INTO ORIG

H 33214

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ____ LOS ANGELES
COURT I.D. ____ BRANCH ____ SOUTH CENTRAL
1 9 0 1 3, ____ 2232582 AK

PEOPLE OF THE STATE OF CALIFORNIA versus
DEFENDANT: OPALEC, RODERIC          ☒ PRESENT     CASE NUMBER (S)
AKA:                                 ☐ NOT PRESENT  TA009295 - A
                                                              - B
REPORT OF: ☐ DEATH SENTENCE         AMENDED                   - C
           ☒ INDETERMINATE SENTENCE REPORT ☒                  - D
           ☐ OTHER SENTENCE CHOICE                   √        - E

| DATE OF HEARING (MO) (DAY) (YR) | DEPT. NO | JUDGE | CLERK |
|---|---|---|---|
| 4-24-92 | SCB | VICTORIA CHAVEZ | M MONSON |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| C ROAM | B HUNTER 987.2 | R YANES 987.2 | X-1419607 |

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES (OR ALTERNATE FELONY/MISDEMEANORS)

☐ ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT ____ (NUMBER OF PAGES)

| COUNT | CODE | SECTION NUMBER | CRIME | | DATE OF CONVICTION | | | CONVICTED BY | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | MO | DAY | YEAR | | | |
| 5 | PC | 664/187(a) | ATTEMPTED MURDER | 90 | 4 | 24 | 92 | | | X |
| | | | | | | | | | | |
| | | | | | | | | | | |

ENHANCEMENTS (charged and found true) TIED TO SPECIFIC COUNTS (mainly in the § 12022-series) including WEAPONS, INJURY, LARGE AMOUNTS OF CONTROLLED SUBSTANCES, BAIL STATUS, ETC.:
For each count list enhancement; horizontally. DO NOT LIST enhancements charged but not found true or stricken under § 1385. DO NOT LIST TIME imposed
For indeterminate terms, report enhancements and time imposed for them on the abstract.

| Count | Enhancement | Y/N | Enhancement | Y/N | Enhancement | Y/N | Enhancement | Y/N | Enhancement | Y/N |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 | 12022.5(a) | YES | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

ENHANCEMENTS charged and found true FOR PRIOR CONVICTIONS OR PRIOR PRISON TERMS (mainly § 667-series) and OTHER.
List all enhancements based on prior convictions or prior prison terms charged and found true. If 2 or more under the same section, repeat it for each enhancement (e.g., if 2 non-violent prior prison terms under §667.5(b) list § 667.5(b) 2 times. DO NOT LIST enhancements not found true. Also enter here any enhancement not provided for in space 2. DO NOT LIST TIME imposed.
For indeterminate terms, report enhancements and time for them on the abstract.

| Enhancement | Y/N | Enhancement | Y/N | Enhancement | Y/N | Enhancement | Y/N | Enhancement | Y/N |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| Enhancement | | Enhancement | | Enhancement | | Enhancement | | Enhancement | |

☐ Defendant was sentenced TO DEATH on counts ____

☒ Defendant was sentenced to State Prison for an indeterminate term:

  A. ☒ For LIFE, or a term such as 15 or 25 years to life, WITH POSSIBILITY OF PAROLE on counts ____ 5

  B. ☐ For LIFE WITHOUT the possibility of parole on counts ____

  C. ☐ For other term prescribed by law on counts ____ (Life Terms are on "A" and "B.")

☐ Counts ____ are alternate felony/misdemeanors and were DEEMED MISDEMEANORS.

  A term in jail ☐ was ☐ was not ordered.

☐ For counts ____ the defendant was placed on FELONY probation.

  A. (1) ☐ Sentence pronounced and execution of sentence was suspended; or

    (2) ☐ Imposition of sentence was suspended.

  B. Conditions of probation included ☐ Jail Time ☐ Fine

☐ Other dispositions

  A. ☐ Defendant was committed to California Youth Authority.

  B. ☐ Proceedings suspended, and defendant was committed to California Rehabilitation Center.

  C. ☐ Proceedings suspended, and defendant was committed as a Mentally Disordered Sex Offender.

  D. ☐ Proceedings suspended, and defendant was committed as mentally incompetent.

1: PURSUANT TO ARTICLE VI, SECTION 6 OF THE CALIFORNIA CONSTITUTION AND SECTION 68505 OF THE GOVERNMENT CODE, THE CHIEF JUSTICE REQUIRES THAT EACH SUPERIOR COURT SHALL COMPLETE THIS FORM FOR EACH INDETERMINATE SENTENCE TO STATE PRISON OR SENTENCE CHOICE OTHER THAN STATE PRISON.

2: FOR DEATH SENTENCE OR INDETERMINATE SENTENCE, ABSTRACT OF JUDGMENT MUST ALSO BE PREPARED. IT IS NOT SENT TO THE ADMINISTRATIVE OFFICE OF THE COURTS (AOC).

3: IF DEFENDANT IS SENTENCED ON BOTH DETERMINATE AND INDETERMINATE COUNTS, FORM DSL 290 OR 290.1 MUST BE PREPARED AND SENT TO AOC AS WELL AS THIS FORM (AND AN ABSTRACT FOR INDETERMINATE COUNTS THAT IS NOT SENT TO AOC).

| S SIGNATURE | DATE |
|---|---|
| | 4-27-92 |

**REPORT – INDETERMINATE SENTENCE**

2 TRL/MOT     SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| Date | APRIL 24,1992 | | | | DEPT. SCB | |
|---|---|---|---|---|---|---|
| HONORABLE: | VICTORIA CHAVEZ | JUDGE | M JOHNSON | | | Deput |
| | J GRULKOWSKI | Deputy Sheriff | C ROAM | | | Repor |

CASE NO. TA009255          (Parties and counsel checked if present)

PEOPLE OF THE STATE OF CALIFORNIA     Counsel for People:
                                      DEPUTY DISTRICT ATTY:    G. HUNTER ✓
VS
02 OPALEC RODERIC ✓
                                      Counsel for Defendant:
CHARGE  182.1 01CT 664/187.A 01CT                    R YANES 987.2 ✓

(BOX CHECKED IF ORDER APPLICABLE)

NATURE OF PROCEEDINGS     TRIAL    5/10         REM                              1-25-

31 ☐ _____ IS SWORN AS THE ENGLISH/_____ INTERPRET
32 ☐ OATH FILED PER SECTION 68560 GOVERNMENT CODE.
33 ☐ DUE TO CONFLICT OF INTEREST, PUBLIC DEFENDER RELIEVED. PURSUANT TO SECTION 987.2 PENAL CODE/31000 GOVERNM
      CODE ALTERNATE DEFENSE COUNSEL,_____ IS APPOINTED.
34 ☐ ON PEOPLE'S MOTION, AMENDMENT TO/AMENDED INFORMATION FILED/DEEMED FILED/INFORMATION AMENDED BY
      INTERLINEATION/AS FOLLOWS:_____

35 ☐ ON_____ MOTION, CASE A_____ CONSOLIDATED INTO CASE A_____
      _____ AS COUNT(S)_____ THEREOF. SEE CASE A_____ FOR FURTHER PROCEEDINGS.
36 ☐ MOTION PURSUANT TO SECTION 995 PENAL CODE GRANTED/DENIED/WITHDRAWN/CONTINUED TO _____
37 ☐ MOTION PURSUANT TO SECTION 1538.5 PENAL CODE CALLED FOR HEARING ☐ MOTION SUBMITTED PER STIPULATION 41 BELOW
38 ☐ DEFENDANT ADVISED OF CONSTITUTIONAL RIGHTS AND EFFECT OF PRIOR CONVICTIONS: WAIVES RIGHTS; ADMITS PRIOR(S) I
39 ☐ CAUSE IS CALLED FOR TRIAL.     ☐ CAUSE SUBMITTED PER STIPULATION 41 BELOW.
40 ☐ DEFENDANT PERSONALLY AND ALL COUNSEL WAIVE TRIAL BY JURY and Court COURT ACCEPTS WAIVER(S).
   41 ☐ By stipulation of defendant and all counsel issue is submitted on the testimony contained in the transcript of the proceedings had at the prelimi
        hearing, subject to this court's rulings, with each side reserving the right to offer additional evidence and all stipulations entered into at the prelimi
        hearing be deemed entered into in these proceedings. It is further stipulated that all exhibits received or marked for indentification at the preliminary I
        ing are received in evidence and marked for indentification in these proceedings, bearing the same number as used in the preliminary hearing, subje
        this court's rulings. People's exhibit _____ (Preliminary Transcript) admitted into evid
        by reference._____
   42 ☐ Defendant advised and personally waives his right to confrontation of witnesses for the purpose of further cross-examination, and waives privi
        against self-incrimination. Defendant advised of possible effects of plea on any alien/citizenship/probation/parole status.
43 ☐ THE COURT STATES IT HAS READ AND CONSIDERED THE TRANSCRIPT OF THE PRELIMINARY HEARING.
44 ☐ _____
      _____
      _____
45 ☐ ALL SIDES REST. COUNSEL WAIVE ARGUMENT/ARGUE AND CAUSE IS SUBMITTED.
46 ☐ MOTION PURSUANT TO SECTION 1538.5 PENAL CODE GRANTED/DENIED/WITHDRAWN/CONTINUED TO _____
47 ☐ COURT FINDS DEFENDANT NOT GUILTY.
48 ☐ COURT FINDS DEFENDANT GUILTY AS CHARGED TO SECTION(S)_____
      IN COUNTS(S) _____ ☐ LESSER INCLUDED/RELATED OFFENSE.
49 ☐ PRE-TRIAL CONFERENCE/TRIAL SETTING HELD/OFF CALENDAR/CONTINUED TO_____
50 ☐ ☐ THE DEFENDANT  ☐ THE PEOPLE     ANNOUNCE(S) READY FOR TRIAL.
51 ☐ ON PEOPLE'S/DEFENDANT'S/COURT'S MOTION, TRIAL/MOTION(S) IS SET/CONTINUED TO/REMAINS/TRAILED TO_____
      AT_____ A.M. IN DEPT._____ REASON:_____
52 ☐ FURTHER CONTINUANCES WILL NOT BE GRANTED.
53 ☐ DEFENDANT PERSONALLY AND ALL COUNSEL WAIVE TIME FOR TRIAL. PLUS_____ DAYS
54 ☐ CAUSE TRANSFERRED TO DEPT._____ ☐ FORTHWITH ☐ ON _____ AT_____ A.M. FOR_____
55 ☐ DEFENDANT/WITNESS(ES) ORDERED TO RETURN ON ABOVE DATE:_____
56 ☐ DEFENDANT PERSONALLY WITHDRAWS PLEA OF NOT GUILTY TO COUNT(S) _____5_____ REARRAI
57 ☐ PLEADS GUILTY/NOLO CONTENDERE, WITH CONSENT OF DISTRICT ATTORNEY AND APPROVAL OF COURT TO VIOLATION
      OF SECTION(S) 664 / 187 Penal Code  admits prior Ser C.
      allegation _____ IN COUNT(S) ___5____ ☐ LESSER INCLUDED/RELATED OFFI
58 ☐ DEFENDANT REFERRED TO PROBATION DEPARTMENT.  ☐ DEFENDANT WAIVES TIME FOR SENTENCE.
      PROBATION AND SENTENCE HEARING SET _____ AT _____ A.M. IN DEPARTMENT _____
      INCLUDING  ☐ DISPOSITION OF COUNT(S) _____ REMAINING
      ☐ DETERMINATION OF PRIORS ALLEGED/DEGREE/ARMED/USE/GREAT BODILY INJURY ALLEGATION(S)
59 ☐ DEFENDANT WAIVES PROBATION REFERRAL. REQUESTS IMMEDIATE SENTENCE. (SEE SENTENCE BELOW/SEE ATTACHED SH
60 ☐ FURTHER ORDER AS FOLLOWS:_____
      _____

61 ☐ THE SHERIFF IS ORDERED TO ALLOW THE DEFENDANT _____ TELEPHONE CALLS AT DEFENDANT'S OWN EXPE.
62 ☐ DEFENDANT FAILS TO APPEAR WITH/WITHOUT SUFFICIENT EXCUSE.
63 ☐ BAIL, IF POSTED, FORFEITED/O.R. REVOKED. BENCH WARRANT ORDERED ISSUED/REISSUED/AND HELD UNTIL _____
      ☐ NO BAIL     ☐ BAIL FIXED AT $_____  WARRANT FE
64 ☐ DEFENDANT APPEARING. BENCH WARRANT ORDERED RECALLED/QUASHED ☐ RECALL NO_____ WRITTEN ☐ ABSTRACT FI
65 ☐ UPON PAYMENT OF $_____ COSTS BEFORE_____ AND FILING OF REASSUMPTION: ORDER OF
66 ☐ _____ FORFEITING BAIL IS TO BE VACATED AND BAIL REINSTATED.
67 ☐ REASSUMPTION FILED/COSTS PAID (RECEIPT NO. _____ )ORDER OF _____ FORFEITING BAIL VACATED. BAIL REINSTAT
   ☐ DEFENDANT'S MOTION FOR RELEASE ON O.R./REDUCTION OF BAIL IS GRANTED/DENIED/SET/CONTINUED TO/_____
      REASON:_____
      BAIL RESET AT $_____
      ☐ BAIL     ☐ BAIL EXONERATED  ☐ BOND NO._____
      ☐ O.R.     ☐ O.R. DISC     ☐ IN CUSTODY OTHER MATTER    MINUTES ENTERED

3 P&S **4-24-9** SUPERIO... OURT OF CALIFORNIA, COUNTY OF L... ...NGELES    DEPT. **SCB**

NORABLE: *VICTORIA CHAVEZ*    JUDGE    Deputy Sheriff    *M JOHNSON*    Deputy Clerk

*J GRULKOWSKI*    *C ROAM*    Reporter

(Parties and counsel checked if present)

*TA no. 9295*

PEOPLE OF THE STATE OF CALIFORNIA    Counsel for People:

vs    DEPUTY DISTRICT ATTY:    *E. HUNTER*

*OL OPSLGC, RODERIC*    Counsel for Defendant:    *R. YANES, PR?.*

*664/187.A 01er*

X _____    (BOX CHECKED IF ORDER APPLICABLE)

E OF PROCEEDINGS    *R&S*    *Ren*    *1-25-90*

☐ _____ IS SWORN AS THE ENGLISH/ _____ INTERPRETER

☐ PUBLIC DEFENDER APPOINTED, D.P.D. _____ OATH FILED PER SECTION 68560 GOVERNMENT CODE.

☐ DUE TO CONFLICT OF INTERESTS, PUBLIC DEFENDER RELIEVED. PURSUANT TO PENAL CODE SECTION 987.2/GOVERNMENT CODE SECTION 31000 ALTERNATE DEFENSE COUNSEL _____ IS APPOINTED.

☐ CRIMINAL PROCEEDINGS ADJOURNED/RESUMED.

☐ DEFENDANT ORDERED DELIVERED TO DEPARTMENT OF CORRECTIONS PER SECTION 1203.03 PENAL CODE.

☐ ON _____ MOTION, PROBATION AND SENTENCE HEARING/FURTHER PROCEEDINGS CONTINUED TO _____

☐ AT _____ A.M. IN DEPT. _____ SUPPLEMENTAL PROBATION REPORT/PROGRESS REPORT ORDERED

☐ DEFENDANT PERSONALLY AND ALL COUNSEL WAIVE TIME FOR SENTENCING. ☐ DEFENDANT ORDERED TO RETURN.

☒ PROBATION DENIED / P... ... SENTENCE IMPOSED AS FOLLOWS:

☒ IMPRISONED IN STATE PRISON FOR ☐ TERM PRESCRIBED BY LAW ☒ TOTAL OF *LIFE plus 3* YEARS *5* MONTHS

☐ COURT SELECTS THE ___ *LIFE* ___ TERM of ... ... BASE TERM IS TO COUNT ___ *5* ___

☒ PLUS ___ *3* ___ YEARS/M... ...D PURSUANT TO SECTION *12-22-?* OF THE *PENAL* CODE

☐ PLUS _____ AS INDICATED BELOW:

☐ COMMITTED TO CALIFORNIA YOUTH AUTHORITY. THE TERM OF IMPRISONMENT TO WHICH THE DEFENDANT WOULD HAVE BEEN SENTENCED PURSUANT TO SECTION 1170 PENAL CODE IS _____ YEARS

☐ IMPRISONED IN LOS ANGELES COUNTY JAIL FOR TERM OF _____ DAYS

☐ FINED IN SUM OF $ _____ PLUS ADDITIONAL FINE OF $ _____ (11372.5 HEALTH & SAFETY CODE)

TOTAL FINE OF $ _____ PLUS $ _____ ASSESSMENT AND SURCHARGE (1464 P... ...CG...

BE PAID TO COUNTY CLERK. ☒ PAY RESTITUTION FINE IN SUM OF $ *100.0?* PURSUANT TO SECTION 13967(a?)

GOVERNMENT CODE PAYABLE TO RESTITUTION FUND

☐ SENTENCE IS SUSPENDED.

☐ PROBATION GRANTED FOR A PERIOD OF _____ YEARS ☐ PROBATION IS TO BE WITHOUT FORMAL SUPERVISION.

☐ DIVERSION GRANTED PER SECTION 1000.1 PENAL CODE FOR PERIOD OF _____ YEARS/MONTHS

☐ DEFENDANT PERSONALLY AND ALL COUNSEL WAIVE TIME FOR TRIAL

1  ☐ ___ SPEND FIRST _____ DAYS IN COUNTY JAIL _____ ☐ ROAD CAMP OR HONOR FARM RECOMMENDED!

2  ☐ ___ ☐ WORK FURLOUGH PROGRAM RECOMMENDED. ☐ NOT TO BE ELIGIBLE FOR COUNTY PAROLE

☐ FINED IN SUM OF $ _____ PLUS ADDITIONAL FINE OF $ _____ (11372.5 HEALTH & SAFETY CODE) FOR A

TOTAL FINE OF $ _____ PLUS $ _____ ASSESSMENT AND SURCHARGE (1464 P.C. & 76000GC), TO

BE PAID TO PROBATION OFFICER IN SUCH MANNER AS HE SHALL PRESCRIBE.

3  ☐ ___ MAKE RESTITUTION OF $ _____ TO THE VICTIM/RESTITUTION FUND PURSUANT TO SECTION 1203.04

PENAL CODE IN SUCH MANNER AS THE PROBATION OFFICER SHALL PRESCRIBE. ☐ TOTAL AMOUNT OF RESTITUTION TO

INCLUDE _____ % SERVICE CHARGE AS AUTHORIZED BY SECTION 1203.1 P.C.

☐ PAY RESTITUTION FINE IN SUM OF $ _____ PURSUANT TO SECTION 13967(a) GOVERNMENT CODE PAYABLE TO

PROBATION DEPARTMENT IN SUCH MANNER AS THEY PRESCRIBE. ☐ SAID FINE TO BE STAYED WHILE DEFENDANT PAYS RESTITUTION

AND IF RESTITUTION IS PAID IN FULL, STAY SHALL BE PERMANENT.

4  ☐ ___ MINIMUM PAYMENT OF FINE/RESTITUTION TO BE $ _____

5  ☐ ___ NOT DRINK ANY ALCOHOLIC BEVERAGE AND STAY OUT OF PLACES WHERE THEY ARE THE CHIEF ITEM OF SALE.

6  ☐ ___ NOT USE OR POSSESS ANY NARCOTICS, DANGEROUS OR RESTRICTED DRUGS OR ASSOCIATED PARAPHERNALIA, EXCEPT WITH VALID

PRESCRIPTION, AND STAY AWAY FROM PLACES WHERE USERS CONGREGATE.

7  ☐ ___ NOT ASSOCIATE WITH PERSONS KNOWN BY YOU TO BE NARCOTIC OR DRUG USERS OR SELLERS.

8  ☐ ___ SUBMIT TO PERIODIC ANTI-NARCOTIC TESTS AS DIRECTED BY THE PROBATION OFFICER. SUCH TESTING TO BE SUSPENDED WHILE THE

DEFENDANT IS IN CUSTODY, IS HOSPITALIZED, OR IS IN A RESIDENTIAL DRUG TREATMENT PROGRAM APPROVED BY PROBATION

OFFICER.

9  ☐ ___ HAVE NO BLANK CHECKS IN POSSESSION. NOT WRITE ANY PORTION OF ANY CHECKS. NOT HAVE BANK ACCOUNT UPON WHICH YOU

MAY DRAW CHECKS.

10  ☐ ___ NOT GAMBLE OR ENGAGE IN BOOKMAKING ACTIVITIES OR HAVE PARAPHERNALIA THEREOF IN POSSESSION, AND NOT BE PRESENT IN

PLACES WHERE GAMBLING OR BOOKMAKING IS CONDUCTED.

11  ☐ ___ NOT ASSOCIATE WITH _____

12  ☐ ___ COOPERATE WITH PROBATION OFFICER IN A PLAN FOR _____

13  ☐ ___ SUPPORT DEPENDENTS AS DIRECTED BY PROBATION OFFICER.

14  ☐ ___ SEEK AND MAINTAIN TRAINING, SCHOOLING OR EMPLOYMENT AS APPROVED BY PROBATION OFFICER.

15  ☐ ___ MAINTAIN RESIDENCE AS APPROVED BY PROBATION OFFICER

16  ☐ ___ SURRENDER DRIVER'S LICENSE TO CLERK OF COURT TO BE RETURNED TO DEPARTMENT OF MOTOR VEHICLES.

17  ☐ ___ NOT DRIVE A MOTOR VEHICLE UNLESS LAWFULLY LICENSED AND INSURED.

18  ☐ ___ NOT OWN, USE OR POSSESS ANY DANGEROUS OR DEADLY WEAPONS.

19  ☐ ___ SUBMIT PERSON AND PROPERTY TO SEARCH OR SEIZURE AT ANY TIME OF THE DAY OR NIGHT BY ANY LAW ENFORCEMENT OFFICER.

WITH OR WITHOUT A WARRANT.

20  ☐ ___ OBEY ALL LAWS, ORDERS, RULES AND REGULATIONS OF THE PROBATION DEPARTMENT AND OF THE COURT.

☐ DEFENDANT GIVEN TOTAL CREDIT FOR *843* DAYS IN CUSTODY. ( *562* DAYS ACTUAL CUSTODY AND *281* DAYS GOOD TIME/WORK TIME

☐ SENTENCE/COUNTS TO RUN CONSECUTIVELY TO/CONCURRENTLY WITH _____

☐ STAY OF EXECUTION OF _____ GRANTED TO _____

☐ ON MOTION OF PEOPLE, COUNTS _____ DISMISSED IN FURTHERANCE OF JUSTICE.

☐ COURT ADVISES DEFENDANT OF HIS APPEAL/PAROLE RIGHTS.

☐ "NOTICE RE CERTIFICATE OF REHABILITATION AND PARDON" GIVEN TO DEFENDANT.

☐ DEFENDANT TO PAY COSTS OF PROBATION SERVICES IN AMOUNT OF $ _____

☐ COURT FINDS THAT DEFENDANT DOES NOT HAVE THE PRESENT ABILITY TO PAY COSTS OF INCARCERATION/LEGAL SERVICES RENDERED/

PROBATION SERVICES RENDERED.

☐ DEFENDANT IS REFERRED TO TREASURER/TAX COLLECTOR FOR FINANCIAL EVALUATION.

☐ FURTHER ORDER AS FOLLOWS/ADDITIONAL CONDITIONS OF PROBATION:

_____

_____

_____

_____

☐ SHERIFF IS ORDERED TO ALLOW DEFENDANT _____ PHONE CALLS AT DEFENDANT'S OWN EXPENSE

☐ DEFENDANT FAILS TO APPEAR WITH/WITHOUT SUFFICIENT EXCUSE.

☐ BAIL IF POSTED, FORFEITED/O.R. REVOKED. BENCH WARRANT ORDERED ISSUED/REISSUED AND HELD UNTIL _____

☐ NO BAIL/BAIL FIXED AT $ _____

☐ DEFENDANT APPEARING BENCH WARRANT ORDERED RECALLED/QUASHED ☐ RECALL NO. _____ WRITTEN ☐ ABSTRACT FILED

ATE OF CALIFORNIA                                                    .. ARTMENT OF CORRECTIONS.

GAL STATUS

| C NUMBER | ALPHA ID | NAME | | | TERM STARTS | ETHNIC |
|----------|----------|------|---|---|-------------|--------|
| H-33214 | | OPALEC, Roderic | | | 05-01-92 | Fil. |

| X. RELEASE DATE | | | MIN. ADJ RELEASE DATE GT CR LOST/AT LARGE/BAIL | PAROLE PERIOD |
|-----------------|---|---|--------------------------------|---------------|
| ) Be Determined | MEPD: 10-10-99 | | | 05 Years |

BASE TERM ____ Life ____ +ENHANCEMENTS ____ 03-00 ____ =TOTAL TERM Life + 03-00

GOOD TIME CREDITS AVAILABLE (2931 PC) (PC ___ 21 ___ BC ___ 63 ___ ) = 84

PRE PRISON CREDITS:    CASE NO. LA TA009295 ____.

HEARINGS

INIT: ~~09/98~~
LIFE TERM STARTS:
10-10-1992
  Subt #1 14/2000
  Subt 2 7/2003

|  |  |
|---|---|
| 2900.5 PC | 562 |
| 1202.03 PC | |
| 2900.1 PC | |
| CRC | |
| MENTAL HEALTH | |
| 4019 PC | 281 |
| 2931 PC | |
| POST SENTENCE | 06 |

TOTAL PRE PRISON CREDITS (DAYS) ____ 849 ·

EGISTRATION REQUIRED PER __ 8296 __    3058 6

| ATE EC'D | CO. CASE NO. | CT. | CODE & OFFENSE | TYPE WPN | DATE OF OFFENSE | SENTENCE DATE |
|----------|--------------|-----|----------------|----------|-----------------|---------------|
| ONTROLLING PRINCIPAL AND CONSECUTIVE (INCLUDING ENHANCEMENT) OFFENSE(S): | | | | | | |
| )5-01-92 | LA TA009295 | 05 | P187 Att Murder 1st (Life) P12022.5(A) Use | | 09-24-90 | 04-24-92 |

DEFENSE ATTORNEY: R. Yanes
INVESTIGATING AGENCY:  Los Angeles County Sheriff's Office

| NAME | OPALEC | H-33214 | LPU | 06-21-92 | LSC:rb |
|------|--------|---------|-----|----------|--------|

CDC 188C(1/81)

## SOCIAL FACTORS DATED 07/21/92

**PARENTS:**     Name     Age     Occupation     Address & Phone #
Marte Dimapilis (step)     Custodian     827 Silva St.
Long Beach, CA
(310) 428-4899

Soledad Dimapilis     Custodian     Same as above


**SIBLINGS:**
Rosemarie Dimapilis

--------------------------------------------------------------------
**MARRIAGES:**  Name     Date     Status     Address & Phone #
None

**NOT LEGALIZED**
None

**CHILDREN:**  Name     Age     Living With     Address & Phone #
None
--------------------------------------------------------------------
**ANY FAMILY FELONY ARREST HISTORY:**
Name     Relationship     Offense(s)     Disposition
None
--------------------------------------------------------------------
**RELIGION:**     **DRIVER'S LICENSE # & STATUS:**     **SOCIAL SECURITY #:**
Catholic     A3646008     Expires 1992     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

**USUAL OCCUPATION:**     **Last Employer**     **Address & Phone #**
Electrical Assembler     Robinson Helicopter     Torrance, CA

**HOME ADDRESS:**  **Street**     **City  &**     **County/State/ZIP**     **Phone #**
827 Silva St.     Long Beach     CA     90805     428-4899

**NAME & RELATIONSHIP of closest relative living at this home address.**
Parents

**CDC NUMBER:**     **LAST NAME:**     **INSTITUTION:**     **DATE:**
H33214     OPALEC     CCI/RC     7/21/92

EB/jd

## INSTITUTIONAL STAFF RECOMMENDATION SUMMARY DATED 07/21/92

### I/M NAME:  OPALEC, RODERIC     I/M NO:  H33214

**SOURCES OF REPORT:**  Los Angeles County Probation Officer's Report dated 5/24/91, CLETS printout dated 5/4/92, case conference with housing unit officer of 7/6/92, and personal interview of 7/6/92.

**CONFIDENTIAL INFORMATION:**  None on file.

**HOLDS/DETAINERS:**  Active USINS hold, Philippians.

**MEDICAL/DENTAL:**  Full duty and camp.

**PSYCHIATRIC/PSYCHOLOGICAL:**  No referral indicated.

**WORK SKILLS:**  Electrical assembler

**NARCOTICS/DRUGS/ALCOHOL:**  Marijuana and methamphetamines.

**ESCAPE HISTORY:**  None in file and Inmate claims none.

**ARSON HISTORY:**  None in file and Inmate claims none.

**SEX-RELATED OFFENSES:**  None in file and Inmate claims none.

**ACADEMIC/VOCATIONAL:**  Intelligence test scores reflect a grade placement level of 6.9 and a Raven I.Q. of 94.

**CASE WORK FOLLOW-UP:**  Review FBI and CII printouts when available, and adjust classification score accordingly.

EB/jd

**EVALUATION:**

Opalec is a 22-year-old Filipino first termer, committed to CDC from Los Angeles County for the offense of Attempted Murder resulting in a LIFE plus seven (7) year sentence. The essence of the committing offense is that he and other members of the Long Beach Local Boys discussed and agreed to shoot members of the Scotts Royal Brothers Gang. Subsequently they shot at members of the rival gang and struck victim Emery Curamen. He was apprehended as the result of an investigation. Sentence was rendered as the result of a plea. It is noted that the current commitment is the sole reason for his present incarceration.

Available information reflects that Opalec has no known juvenile criminal history. His adult criminal history consists of the instant offense.

During the interview, he was cooperative and answered all questions as directed. It is the opinion of this counselor that he can function in a mainline setting consistent with his classification score. Thus far, during processing through CCI-III, he has experienced no disciplinary actions. Management problems are not anticipated at this time. He was ordered to pay restitution per Los Angeles County.

**RE-ENTRY PLANS:** N/A

## TRANSFER

**CLASSIFICATION SCORE:** 52                    **CUSTODY LEVEL:** IV

**INSTITUTION RECOMMENDATION:** CAL-IV/FOL-IV

**CCF:** Ineligible, due to instant offense.

**AMITY RIGHTURN:** Ineligible, due to classification score.

**RESTITUTION CENTER:** Ineligible, due to instant offense and sentence length.

**REASON FOR OUT-OF-LEVEL PLACEMENT:** N/A

**CORRECTIONAL COUNSELOR:** E. BURTON, CCI-I

**SUPERVISOR'S RECOMMENDATION:** J. HARRIS, CC-II(A);  CCI-IV/CAL-IV

**I/M NAME:** OPALEC, RODERIC  **I/M NUMBER:**  H33214  **DATE:**  07/21/92

EB/jd

**CCI-III RC**

# EXHIBIT "C"

COURT COPY SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

PROBATION OFFICER'S REPORT

REPORT SEQUENCE NO 1

| DEFENDANT S NAME(S) | COURT | JUDGE | COURT CASE NO |
|---|---|---|---|
| RODERIC VILLESIS OPALEC | SC-K | SIMPSON | TA009295-02 |

| ADDRESS (PRESENT/RELEASE) | HEARING DATE | DEFENSE ATTY | PROSECUTOR |
|---|---|---|---|
| 827 SILVA ST. LONG BEACH, CA 90805   428-4899 | 6-06-91 | YANES | |

| BIRTHDATE | AGE | SEX | RACE | DPO | AREA OFFICE | PHONE NO |
|---|---|---|---|---|---|---|
| 12-09-69 | 21 | MALE | FILIPINO | | | |

| CITIZENSHIP STATUS | DRIVER S LICENSE-EXP DATE | | | |
|---|---|---|---|---|
| | A 3646008 | BIAS | SO CENTRAL | 213/ 603-7909 |

| PROBATION NO | CII NO | BOOKING NO | TYPE REPORT |
|---|---|---|---|
| X- 1419607 | AO9387894 | 2232382 | ___ Probation and sentence |

| DAYS IN JAIL THIS CASE | CUSTODY STATUS/RELEASE DATE | X Pre-Conviction (131.3 CCP) |
|---|---|---|
| ☒ ESTIMATED ☐ VERIFIED 238 DAYS | JAIL | ___ Post sentence ___ Diversion (Specify) _____ |

## PRESENT OFFENSE: LEGAL HISTORY

CHARGED with the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)

CT I:   182.1 PC (CONSPIRACY, FELONY)

CT II:  664/187(A) PC (ATTEMPTED MURDER, FELONY)

CONVICTED of the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)

N/A

PRE-PLEA REPORT

| CONVICTED BY | DATE OF CONVICTION/REFERRAL | COUNT(S) CONTINUED TO P & S FOR DISPOSITION |
|---|---|---|
| N/A | 5-20-91 | N/A |

| PROPOSED PLEA AGREEMENT | SOURCES OF INFORMATION |
|---|---|
| N/A | N/A |

| DATE(S) OF OFFENSE | TIME(S) |
|---|---|
| | |

| DEFENDANT: ☐ N-A | ☐ SENTENCED TO STATE PRISON/COUNTY JAIL ON CASE ____ | HOLD/WARRANTS |
|---|---|---|
| (SEE PRIOR RECORD SECTION) ☐ ON PROBATION | ☐ PENDING PROBATION VIOLATION   ☐ PENDING NEW CASE | ☐ YES ☒ NO |
| ☐ ON PAROLE-REMAINING TIME ____ | | |

## RECOMMENDATION:

☐ PROBATION   ☒ DENIAL   ☐ DIAGNOSTIC STUDY   ☐ CYA   ☐ OTHER _____

☐ COUNTY JAIL   ☐ 707.2 WIC

☒ STATE PRISON   ☐ 1203.03 PC

CRT 28B-Prob. 1950 Rev. E 85/8 87

| | PRESENT OFFENSE:<br>(CONTINUED) | SOURCES OF INFORMATION (this page)<br>RAP SHEET | | | |
|---|---|---|---|---|---|

| ARREST DATE | TIME | BOOKED AS | OFFENSE | LOCATION OF ARREST | ARRESTING AGENCY |
|---|---|---|---|---|---|
| 10-11-90 | | RODERIC OPALEC | 664/187(A)PC | | LASO |

| CO-DEFENDANT(S) | CASE NO. | DISPOSITION |
|---|---|---|
| ARTHUR FONTILEA<br>BENJAMIN OBRIQUE<br>BENEDICT BATO<br>ANDERSON SIMANGAN<br>ALEXANDRO CAYAMANO | SAME<br>SAME | SAME<br>SAME |

**ELEMENTS AND RELEVANT CIRCUMSTANCES OF THE OFFENSE:**

THE DEFENDANT AND CO-DEFENDANTS WERE ARRESTED FOR CONSPIRACY TO COMMIT MURDER AND ATTEMPTED MURDER.

THERE IS NO OTHER INFORMATION AVAILABLE BECAUSE THE DISTRICT ATTORNEY'S FILE AND ARREST REPORT WERE NOT MADE AVAILABLE.

-2- (OPALEC)

76P725B—Prob. 19SC (Rev. 8/85)  8/87

| VICTIM: | SOURCES OF INFORMATION (this page) | | |
|---|---|---|---|
| NAME | COUNT(S) | | |
| INJURY: PROPERTY LOSS (TYPE / COST / ETC.) | | | |
| INSURANCE COVERAGE | | | |
| LOSS: ☐ YES ☐ NO | ESTIMATED LOSS | RESTITUTION ALREADY MADE | APPLIED FOR VICTIM RESTITUTION FUND ☐ UNK  ☐ YES  ☐ NO |

**VICTIM STATEMENT:**

THERE IS NO INFORMATION REGARDING VICTIM'S STATEMENT BECAUSE THE DISTRICT ATTORNEY'S FILE AND ARREST REPORT WERE NOT MADE AVAILABLE.

| RESTITUTION | TOTAL NUMBER OF VICTIMS | ESTIMATED LOSS TO ALL VICTIMS | VICTIM(S) NOTIFIED OF P&S HEARING ☐ YES  ☐ NO |
|---|---|---|---|
| DOES DEFENDANT HAVE INSURANCE TO COVER RESTITUTION: ☐ YES  ☐ NO | | INSURANCE COMPANY NAME/ADDRESS/TELEPHONE NO. | |

-3-  (OPALEC)                    _____ VICTIM LIST CONTINUES NEXT PAGE

76P725B-Prob. 19SC (Rev 6/85)  8-87

1  PRIOR RECORD:

SOURCES OF INFORMATION (this page)
L.A. COUNTY PROBATION; L.A. COUNTY SHERIFF;
JDS (5-22-91) AND DEFENDANT

3  AKA'S:  "SPADE"; DENNIS LUBAG MAGTIBAY

4  JUVENILE HISTORY:

5  THERE IS NO JUVENILE HISTORY AVAILABLE.

6  ADULT HISTORY:

7  THE ABOVE SOURCES SHOW NO PRIOR CRIMINAL CONVICTIONS.

8  THE DEFENDANT DENIED ANY CRIMINAL CONVICTIONS.

29  -4- (OPALEC)

76P725B—Prob 195C  Rev 6 851  8 87

1  PERSONAL HISTORY:

SOURCES OF INFORMATION (this page)

DEFENDANT AND INTERESTED PARTIES

3  SUBSTANCE ABUSE:

4  _____ No record, indication, or admission of alcohol or controlled substance abuse.

5  _____ Occasional social or experimental use of _____ acknowledged.

6  _X_ See below: Indication / admission of significant substance abuse problem.

7  Referred to Narcotic Evaluator ☐ Yes ☒ No          _____ Narcotic Evaluator's report attached

Additional information

10         DEFENDANT  DENIED  THE  USE  OF  ANY  ILLEGAL  DANGEROUS

11  DRUGS AND REPORTED THAT HE DOES NOT HAVE A DRINKING PROBLEM.

26  PHYSICAL / MENTAL / EMOTIONAL HEALTH:

27  _X_ No indication or claim of significant physical/mental/emotional health problem.

28  _____ See below:  Indication / claim of significant physical/mental/emotional health problem.

-5- (OPALEC)
76P725B— Prob. 195C (Rev 5-85) 8-87

| PERSONAL HISTORY: (CONTINUED) | SOURCES OF INFORMATION (this page) DEFENDANT AND INTERESTED PARTIES | | |
|---|---|---|---|

| RESIDENCE | TYPE RESIDENCE HOUSE | LENGTH OF OCCUPANCY 3 YRS | MORTGAGE/RENT NONE | RESIDES WITH/RELATIONSHIP PARENTS AND SISTER |
|---|---|---|---|---|
| RESIDENTIAL STABILITY LAST FIVE YEARS GOOD | | CAME TO STATE / FROM 1987/PHILIPPINES | | CAME TO COUNTY / FROM |

Additional information

| MARRIAGE / PARENTHOOD | MARITAL STATUS SINGLE | NAME OF SPOUSE / PRESENT COHABITANT NONE |
|---|---|---|
| LENGTH OF UNION N/A | NO. OF CHILDREN THIS UNION | SUPPORTED BY |
| NO. PRIOR MARRIAGES / COHABITATIONS NONE | NO. OF CHILDREN THESE UNIONS | SUPPORTED BY |
| NO. OF OTHER CHILDREN NONE | SUPPORTED BY | |

Additional information

FORMAL EDUCATION:
          DEFENDANT GRADUATED FROM HIGH SCHOOL AND BALIAUG COLLEGE IN THE PHILIPPINES. HE COMPLETED SIX MONTHS OF ELECTRONIC TECH COURSES AT EDISON TECHNICAL COLLEGE IN CARSON AND PLANS TO EARN A BACHELOR'S DEGREE IN ELECTRICAL ENGINEERING.

   -6- (OPALEC)

76P7268—Prob. 19SC (Rev. 6/85)  8/87

PERSONAL HISTORY:
(CONTINUED)

SOURCES OF INFORMATION (this page)

DEFENDANT AND INTERESTED PARTIES

| EMPLOYMENT STATUS | ☐ EMPLOYED ☒ UNEMPLOYED | REFERRED TO WORK FURLOUGH ☐ YES ☒ NO | EMPLOYER AWARE OF PRESENT OFFENSE ☒ N/A   ☐ YES   ☐ NO |
|---|---|---|---|
| PRESENT/LAST EMPLOYER / ADDRESS / PHONE ROBINSON HELICOPTER TORRANCE, CA | OCCUPATION ELECTRICAL ASSEMBLER | PERIOD OF EMPLOYMENT 7 MOS. LAST WORKED WHEN ARRESTED IN PRESENT OFFENSE | GROSS MONTHLY WAGE $1250 |
| ☐ VERIFIED    ☐ UNVERIFIED | EMPLOYMENT STABILITY LAST 5 YEARS FAIR | TYPES OF PREVIOUS EMPLOYMENT SAME | |

Additional information

DEFENDANT REPORTS THAT HE WORKED APPROXIMATELY 14 MONTHS AS AN ELECTRICAL ASSEMBLER FOR MAGNUS BECK IN COMPTON. DEFENDANT INDICATED THAT HE GOT LAID OFF TWO MONTHS BEFORE HIS ARREST IN THE PRESENT OFFENSE.

| FINANCIAL STATUS | INCOME STABILITY MARGINAL | | NET MONTHLY INCOME NONE | |
|---|---|---|---|---|
| PRIMARY INCOME SOURCE FAMILY | SECONDARY INCOME SOURCE(S) NONE | | EST. TOTAL ASSETS $1000 | EST. TOTAL LIABILITIES NONE |

MAJOR ASSETS / ESTIMATED VALUE

1979 MUSTANG FORD VALUED AT $1000

MAJOR LIABILITIES / ESTIMATED AMOUNT (MONTHLY)

NONE

Additional information

GANG ACTIVITY    ☐ YES    ☐ NO          Name of Gang ___(CONTINUED PAGE 8)___

-7- (OPALEC)

76P725B—Prob 155C (Rev. 6 85) 8 87

1 | GANG ACTIVITY:  (CONTINUED)

2 |         DEFENDANT INDICATED THAT HIS ATTORNEY REQUESTED THAT
3 | HE NOT RELATE ANY INFORMATION REGARDING THIS.

4 | PERTINENT PERSONAL HISTORY:

5 |         THE    DEFENDANT    WAS    REARED    BY    HIS    MATERNAL
6 | GRANDPARENTS IN THE PHILIPPINES.   THE DEFENDANT'S FATHER ORLANDO
7 | OPALEC CURRENTLY RESIDES IN THE PHILIPPINES.    THE DEFENDANT IS
8 | CURRENTLY RESIDING WITH HIS STEPFATHER AND MOTHER MARTE AND SOLEDAD
9 | (VILLESIS) DIMARIMIS RESPECTFULLY.   DEFENDANT'S STEPFATHER AND  HIS
10 | MOTHER ARE CUSTODIANS FOR LONG BEACH UNIFIED SCHOOL DISTRICT.

-8- (OPALEC)

76C692G — PROB. 5A

DEFENDANT'S STATEMENT:

DEFENDANT DID NOT SUBMIT A WRITTEN STATEMENT. ORALLY THE DEFENDANT STATES THAT HE PLANS TO RETURN TO WORK AND COLLEGE WHEN HE IS RELEASED FROM CUSTODY. DEFENDANT STATES THAT HE WILL CONTINUE TO RESIDE WITH HIS PARENTS AND WILL STAY OUT OF TROUBLE.

INTERESTED PARTIES:

MARTE DIMARIMIS, DEFENDANT'S STEPFATHER, REPORTED THAT THE DEFENDANT HAS NEVER BEEN A PROBLEM IN THE HOME SETTING, BUT INDICATED THAT HE MAY HAVE USED DRUGS A SHORT WHILE A COUPLE OF YEARS AGO. MR. DIMARIMIS INDICATED THAT THE DEFENDANT IS A NON-VIOLENT INDIVIDUAL AND WILL BE WELCOMED BACK TO THEIR HOME SETTING WHEN HE IS RELEASED FROM CUSTODY.

LAKEWOOD SHERIFF'S DEPUTIES REPORTED THAT DEFENDANT WAS ARRESTED FOR BURGLARY, FEBRUARY 10, 1990, BUT THAT CASE WAS A DISTRICT ATTORNEY REJECT. THEY REPORTED NO OTHER CONTACT WITH THE DEFENDANT.

EVALUATION:

PRESENT OFFENSE REVEALS THAT THE DEFENDANT SHOULD BE CONSIDERED A THREAT TO THE COMMUNITY IF HE IS CONVICTED OF IT.

DEFENDANT WAS COOPERTIVE DURING INTERVIEWS WITH HIM, HAS ADEQUATE COMMUNITY TIES AND STRONG FAMILY TIES. IT APPEARS THAT THE DEFENDANT HAS NEVER HAD A PROBLEM SECURING GAINFUL EMPLOYMENT AND SHOULD BE ABLE TO RETURN TO HIS EMPLOYMENT AND TO

-9- (OPALEC)

76C692G - PROB 5A

1  COLLEGE WHEN HE IS RELEASED FROM CUSTODY.  PRESENT OFFENSE APPEARS

2  TO BE A SITUATIONAL ISOLATED INCIDENT AS THE DEFENDANT HAS NO PRIOR

3  DIFFICULTY WITH THE AUTHORITIES.

4                    SENTENCING CONSIDERATIONS:

5             THE SERIOUS NATURE OF THE ALLEGED CRIME REVEALS THAT

6  THE DEFENDANT IS PROBABLY NOT ELIGIBLE FOR A GRANT OF FORMAL

7  PROBATION AND THE COURT MUST DECIDE HIS ELIGIBILITY.

8             CIRCUMSTANCES IN AGGRAVATION:

9             1. THE CRIME INVOLVED GREAT VIOLENCE.

10            MITIGATING CIRCUMSTANCES:

11            1. THE DEFENDANT HAS NO PRIOR RECORD.

12            2. THE DEFENDANT APPEARS TO BE INELIGIBLE BUT IF HE
                 WAS ELIGIBLE PROBATION MAY HAVE BEEN RECOMMENDED.
13

14            WHEN    CONSIDERING    STATE    PRISON    THE    MITIGATING

15  CIRCUMSTANCES SUGGESTS THE LOW-BASE TERM.

16  RECOMMENDATION:

17            IT IS RECOMMENDED THAT IF THE DEFENDANT IS CONVICTED

18  THAT PROBATION BE DENIED AND THE DEFENDANT BE SENTENCED TO STATE

19  PRISON WITH PRE-IMPRISONMENT CREDIT OF 238 DAYS PLUS GOOD TIME;

20  THAT THE COURT ORDER DEFENDANT TO PAY A RESTITUTION FINE OF $200 AS

21

22

23

       -10- (OPALEC)

76C6920 – PROB. 5A

1  PROVIDED IN SUBDIVISION (A) OF SECTION 13967 OF THE GOVERNMENT

2  CODE.

3  RESPECTFULLY SUBMITTED,

4  BARRY J. NIDORF
   PROBATION OFFICER

5

6  BY

7  CHESTER BIAS, DEPUTY
   SOUTH CENTRAL AREA OFFICE

8  (213) 603-7909

9  READ AND APPROVED:

                                    I HAVE READ AND CONSIDERED THE
10                                  FOREGOING   REPORT   OF   THE
                                    PROBATION OFFICER.
11
   GARY TEMPIA, SDPO
12
   (SUBMITTED 5-24091)
13 (TYPED 5-31-91)                  JUDGE OF THE SUPERIOR COURT
   CB:TXRX:JC (8)
14
               IF PROBATION IS GRANTED, IT IS RECOMMENDED THAT THE
15
16 COURT DETERMINE DEFENDANT'S ABILITY TO PAY COST OF PROBATION

17 SERVICES PURSUANT TO SECTION 1203.1B PENAL CODE. COST OF

18 PRESENTENCE INVESTIGATION AND PRESENTENCE REPORT - $412.00 COST OF

19 SUPERVISION - $28.00 PER MONTH.

20

21

22

23

   -11- (OPALEC)

76C692G - PROB. 5A

# EXHIBIT "D"

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
**(REVISED AUGUST 1998)**
**PAROLE CONSIDERATION HEARING**
**DECEMBER 2004 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**DECEMBER 7, 2004**

This is the fourth psychological evaluation for the Board of Prison Terms on inmate Roderick Opalec, CDC# H-33214. This report is the product of a personal interview, conducted on 12/07/04, as well as a review of his Central file and unit health record.

## PSYCHOSOCIAL ASSESSMENT

**I.    IDENTIFYING INFORMATION:**

Inmate Opalec is currently a 35-year-old, single, Filipino male. His stated religious affiliation is Catholic. There were no unusual physical characteristics noted, and he no longer uses any aliases or nicknames.

**II.    DEVELOPMENTAL HISTORY:**

Inmate Opalec is an only child who was raised by his grandparents in the Philippines after his parents separated. He denied any history of birth defects, abnormalities of developmental milestones, any history of cruelty to animals or a history of arson, any significant child medical history, childhood history of physical or sexual abuse as either a perpetrator or a victim.

**III.    EDUCATIONAL HISTORY:**

Inmate Opalec completed the equivalency of about the ninth grade in the Philippines. In the tenth grade, he dropped out. He came to the United States when he was about 18 years old. He attended a technical school and studied electronics. He completed his GED in 1997 while incarcerated at Lancaster.

**IV.    FAMILY HISTORY:**

Inmate Opalec had very little contact with his father. His mother immigrated to America and remarried. When the inmate came to the United States in 1987, he lived with his mother and stepfather.

**V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**

Inmate Opalec stated that he is a heterosexual male. He denied any history of high-risk sexual behavior or sexual aggression.

OPALEC        H-33214        CTF-CENTRAL        12/07/04        gmj

OPALEC, RODERICK
CDC NUMBER: H-33214
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

## VI.  MARITAL HISTORY:

Inmate Opalec has never been married, and has no children.

## VII.  MILITARY HISTORY:

The inmate denied any history of military service.

## VIII.  EMPLOYMENT/INCOME HISTORY:

Unusual for this age of an incarcerated young man, this inmate started working
after he quit school, and that was at the age of 18, when he had two jobs. He was
working as an electronic assembler, and he also did the same job at a different
place. One job he had for two years, and the second job he had for a year and a
half.

## IX.  SUBSTANCE ABUSE HISTORY:

Inmate Opalec started using marijuana at the age of 16 approximately twice a
week, and then from the age of 18 on, he had been using methamphetamines on
weekends.

In terms of self-help since his incarceration, he has now attended Alcoholics
Anonymous Narcotics Anonymous for 12 years. He has completed the Victims'
Impact Program. He has completed the Fatherhood Program. He has completed a
class in business, another class in FEMA, and he is currently finishing a segment
of self-help called Criminon.

## X.  PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Opalec has no prior diagnosis of any psychiatric illness. He denied any
history of medical or psychiatric hospitalizations, any history of serious
accidents or head injuries, any history of suicidal behavior, or a history of seizures
or other neurological conditions. He is currently taking medication for high blood
pressure.

## XI.  PLANS IF GRANTED RELEASE:

When inmate Opalec is given a parole date, he states that he will be deported back
to the Philippines. In this case, he has planned to work at his aunt's grocery store,
and live with family members there. The inmate believes he will do well on
parole.

OPALEC        H-33214        CTF-CENTRAL        12/07/04        gmj

OPALEC, RODERICK
CDC NUMBER: H-33214
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

## CLINICAL ASSESSMENT

### XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Opalec appears younger than his stated age of 40. He was appropriately
dressed and groomed. He was coherent, cooperative, calm, and alert throughout
the interview. His speech, flow of thought, and affect were all within the normal
range. His intellectual functioning was estimated to be within the average to
above average range. There was no evidence of a mood or thought disorder. His
judgment appeared to be intact. He showed good insight into his commitment
offense.

### CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):

| | |
|---|---|
| **AXIS I:** | No contributory clinical disorder. |
| **AXIS II:** | No contributory personality disorder. |
| **AXIS III:** | No contributory physical disorder. |
| **AXIS IV:** | Long-term incarceration. |
| **AXIS V:** | Current GAF = 80. |

When given a release date, this inmate's prognosis for the ability to maintain his
current mental status in the community upon parole is excellent.

### XIII.  REVIEW OF LIFE CRIME:

In this section, pertinent information specifically requested by the Board of Prison
Terms will be addressed. The BPT form 1000A, section 11, part three, states as
follows:

"The panel's belief that the prisoner's current mental health is an important
issue."

In the new, full evaluation, the panel requests that the clinician specifically
address the following:

a.      The prisoner's violence potential in the free community.

b.      The significance of alcohol and drugs as it related to the commitment
offense, and an estimate of the prisoner's ability to refrain from use and
abuse of same when released.

c.      The extent to which the prisoner has explored the commitment offense,
and come to terms with the underlying causes.

d.      The need for further therapy programs while incarcerated.

These issues will be addressed in that same order.

OPALEC, RODERICK
CDC NUMBER: H-33214
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

In the Board's last transcript, on line 25, it states that the previous board report by
Dr. Gamard was not supportive of this inmate's release.

This was due to the fact that Dr. Gamard wrote in his estimation under
Assessment of Dangerousness, 14-b, that if released to the community, his
violence potential was estimated to be no more than somewhat higher than the
average citizen within the community. Dr. Gamard is being literal, and this is my
belief system, because Dr. Gamard is not performing this evaluation.

It is my belief that this language was used to convey how any ethical and
responsible clinician would judge any person who has been to prison when
compared to someone in the community who has never been prison. When you
put those two side to side, one would have to say that the person who has been to
prison is a somewhat higher risk. This does not mean that there are researchable,
historical, or clinical factors which prove out that this inmate is more dangerous
than anyone else within the community.

3-B.    "The significance of alcohol and/or drugs as it relates to the commitment
offense, and an estimate of the prisoner's ability to refrain from the use or
abuse of same when released."

Inmate Opalec has attended 12 years of Alcoholics Anonymous and
Narcotics Anonymous. He has been incarcerated for 14 years. He has
never received so much as a 128. He has truly been a model prisoner. The
idea that he could return to the use of alcohol and drugs, as is anybody
else, is up to him. However, history and length of time of sobriety coupled
with a lack of disciplinary or other issues that would lead one to believe
that this is still a problem leads this clinician to believe it is a situation
which has been thoroughly thought through, and is no longer an issue.

3-D.    "The extent to which the prisoner has explored the commitment offense
and come to terms with the underlying causes."

At this point, I will discuss what would normally be the section, Review of
Life Crime. As written in previous reports, inmate Opalec states that he
came from the Philippines, he was 17 years old, and he had problems
adjusting to a different culture and a different language. He didn't speak
English, and the only other kids that were his age and from his culture
were these kids who were in a gang. The inmate states that he was trying
to fit in. Additionally, he had a new stepfather, and his parents were not
aware of the extent that his friends were involved in this gang. When his
parents did find out, he stated they were very disappointed, because his
mother had brought him to this country to have a better life.

One other issue which lends credence to this inmate's story is the fact that
he held jobs—he held two different jobs at the very young age of 18, and

OPALEC          H-33214          CTF-CENTRAL          12/07/04          gmj

OPALEC, RODERICK
CDC NUMBER: H-33214
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

besides the commitment offense, he has no criminal history. Since he has been arrested for this crime and incarcerated, he has no criminal history, no disciplinaries.

In the last Board of Prison Terms report, on page two in the transcript, lines 13 and 14, it states that this inmate did not luckily, and he very much understands luckily, but no one was hurt in this crime. The inmate has explored on a deep level the factors which led to the commitment offense, and those were, specifically, his developmental age, the adjustment problems of moving from the Philippines, the need to belong, and his desire for these guys to like him. This is very insightful on the part of the inmate. He understands that it was wrong. He understood that it was wrong very soon after the crime. There is no other causes that need exploration.

3-E.    "The need for further therapy programs while incarcerated." As previously noted, this inmate has done every self-help program available to him, and some that were not. There are no other programs this inmate needs to continue if the end result is to further explore the underlying causes of his commitment offense, that task has been completed.

XIV.    **ASSESSMENT OF DANGEROUSNESS:**

A.    Since the last Board of Prison Terms report, this inmate has continued to be disciplinary-free during his entire incarceration. Therefore, it is believed that he would pose less than an average risk for violence when compared to this level II inmate population.

B.    If released to the community after 14 years, other clinical and historical factors, this inmate's violence potential is now estimated to be no more than the average citizen within the community at this time.

C.    The inmate's only significant risk factor would be a return to the use of amphetamines or marijuana, or a return to any type of gang affiliation.

XV.    **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**

1.    This inmate is competent and responsible for his behavior. He has the capacity to abide by institutional standards, and has done so during his entire incarceration period.

2.    This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following parole.

OPALEC, RODERICK
CDC NUMBER: H-33214
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX

3.      Inmate Opalec has programmed very well.  His behavior has been
        exceptional in prison, and there does not appear to be any specific reason
        for continued incarceration.

*M. E. Gleason, Ph.D.*

M. E. Gleason, Ph.D., FSICPP
Staff Psychologist
Board Certified Diplomate, Forensic Psychology
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

MEG/gmj

D:  12/07/04
T:  12/10/04

*D:\Word Files\BPT - 2004\BPT REPORT - GLEASON, MARTHA  PH.D..doc*

OPALEC          H-33214          CTF-CENTRAL          12/07/04          gmj

**MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
JULY 2002 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD
APRIL 10, 2002**

Inmate Roderic Opalec, CDC# H-33214, was seen for a mental
health evaluation for the Board of Prison Terms by W.
Gamard, Ph.D., Staff Psychologist at CTF, on 11/17/00 for
the November 2000 Lifer Calendar.

According to the instructions given to Wardens and Health
Care Managers by Steven Cambra, Jr. (CDC), and G. Lewis
Chartrand, Jr. (BPT) in September 1998, once a mental health
evaluation is completed in the new format (revised in August
1998), a new evaluation is not necessary when an inmate
appears before the Board of Prison Terms unless the BPT has
filed a BPT 1000A request for a new report.

Since there is no BPT 1000A request on file, a mental health
evaluation was not conducted at this time.

*Bill Z——, Ph.D.*

**B. ZIKA, Ph.D.
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD**

BZ/gmj

D:  04/10/02
T:  04/10/02

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
NOVEMBER 2000 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
NOVEMBER 17, 2000

This is the third psychological evaluation for the Board of
Prison Terms on inmate Roderic Opalec, CDC# H-33214.  This
report is the product of a personal interview, conducted on
11/17/00, as well as a review of his Central file and unit
health record.

### PSYCHOSOCIAL ASSESSMENT

I.    **IDENTIFYING INFORMATION:**

Inmate Opalec is a 30-year-old, single, Filipino male.
His stated religious affiliation is Catholic.  There
were no unusual physical characteristics noted.  He has
gone by the nickname of "Spade."

II.   **DEVELOPMENTAL HISTORY:**

Inmate Opalec is an only child who was raised by his
grandparents in the Philippines.  He denied any history
of birth defects or abnormalities of developmental
milestones, any history of cruelty to animals or a
history of arson, any significant childhood medical
history, or a childhood history of physical or sexual
abuse as either a perpetrator or a victim.

III.  **EDUCATIONAL HISTORY:**

Inmate Opalec completed the equivalency of about the
ninth grade in the Philippines.  In the equivalent of
tenth grade, he dropped out.  He came to the United
States when he was about 18.  He went to technical
school and studied electronics.  He eventually
completed his GED while incarcerated.

IV.   **FAMILY HISTORY:**

Inmate Opalec had very little contact with his father.
His mother had immigrated to America and remarried.
When he came to the United States in 1987, he lived
with his mother and his stepfather.

OPALEC        H-33214        CTF-NORTH        11/30/00        gmj

OPALEC, RODERIC
CDC NUMBER:  H-33214
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Opalec stated that he is a heterosexual male.
He denied any history of sexual aggression.

VI.    MARITAL HISTORY:

Inmate Opalec has never been married and denies having
any children.

VII.    MILITARY HISTORY:

The inmate denied any history of military service.

VIII.    EMPLOYMENT/INCOME HISTORY:

Prior to his incarceration, inmate Opalec worked as an
electrical assembler for two jobs--the first job for
two years, and the second job for one and a half years.

IX.    SUBSTANCE ABUSE HISTORY:

Inmate Opalec started using cannabis at the age of 16
twice a week, and from age 18 on he used
methamphetamines rather regularly on weekends.  He has
been attending Alcoholics Anonymous and Narcotics
Anonymous most of the time during his incarceration.

X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Opalec has no prior diagnoses of any psychiatric
illness.  He denied any history of medical or
psychiatric hospitalizations, any history of serious
accidents or head injuries, a history of suicidal
behavior, or a history of seizures or other
neurological conditions.  He is currently taking no
medications.

XI.    PLANS IF GRANTED RELEASE:

Should inmate Opalec be given a parole date, he states
that he expects that he will be deported back to the
Philippines, in which case he would work at his aunt's
grocery store and live with family members there.

OPALEC, RODERIC
CDC NUMBER:  H-33214
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

## CLINICAL ASSESSMENT

### XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Opalec appeared his stated age of 30.  He was
appropriately dressed and groomed.  He was coherent,
cooperative, calm and alert.  His speech, flow of
thought and affect were all within the normal range.
His intellectual functioning was estimated to be within
the average range.  There was no evidence of a mood or
thought disorder.  His judgment appeared to be intact.
He showed good insight into his commitment offense.

### CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:      Amphetamine Dependence, in institutional
             remission.
AXIS II:     No Contributory Personality Disorder.
AXIS III:    No Contributory Physical Disorder.
AXIS IV:     Incarceration.
AXIS V:      GAF = 80.

If given a release date at this time, this inmate's
prognosis for being able to maintain his current
mental state in the community upon parole is excellent.

### XIII. REVIEW OF LIFE CRIME:

Inmate Opalec described the circumstances surrounding
his commitment offense.  He states that he was very
young, not thinking right, and got involved with the
wrong crowd.  He states that he takes full
responsibility for his actions.  He regrets getting
carried away with identifying with the pressures of a
gang.

He accepts that, although he admits to shooting
at an enemy gang member in a drive-by shooting, that
even though no one was killed, there was one man of the
two fired at who was injured.  He understands that the
penalty for drive-by shootings is very severe.  He
admits that the shooting was premeditated, that the
enemy gang had shot at their gang, and that they wanted
to get even.

This inmate appears to have matured considerably since
his age at the time of the crime and has become

OPALEC, RODERIC
CDC NUMBER:  H-33214
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

adequately insightful, not only of his own deficits,
but to the causality of criminal behavior and, in
particular, this crime.

XIV. ASSESSMENT OF DANGEROUSNESS:

A.  This inmate has not received any CDC-115 violations
during his entire incarceration.  Therefore, it is
felt that he would pose a less than average risk
for violence when compared to this Level II inmate
population.

B.  If released to the community, his violence
potential is estimated to be no more than somewhat
higher than the average citizen in the community.

C.  His only significant risk factors which would be a
precursor to violence for this inmate would be a
return to amphetamine abuse and dependence, or a
return to gang affiliation.

XV. CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.  This inmate is competent and responsible for his
behavior.  He has the capacity to abide by
institutional standards and has done so during his
incarceration period.

B.  This inmate does not have a mental health disorder
which would necessitate treatment either during
his incarceration period or following parole.

C.  This inmate has programmed very well and his
behavior has been very good in prison.

_William Gamard, PhD_

WILLIAM GAMARD, Ph.D.
Clinical Psychologist
Correctional Training Facility, Soledad

WG/gmj

D:  11/17/00
T:  11/30/00

OPALEC        H-33214        CTF-NORTH        11/30/00        gmj

# EXHIBIT "E"

## LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
## JANUARY 2006 CALENDAR

**OPALEC, RODERIC**                                                        **H33214**

## I.    COMMITMENT FACTORS:

**A.**    **Life Crime:** Attempted Murder 1st, PC 187 (a) With Deadly Weapon (handgun), PC 12022.5(a) Count 5, Los Angeles County Case Number TA009292. Sentence: Life plus an enhancement of three years. MEPD: 10/10/99. Date received into CDC: 5/1/92. Victims: Caesar Jacinto, age 19 years, and Emery Curamen, age 18 years.

1.    **Summary of Crime:** On 9/24/90, Opalec, along with co-defendants Cayamonda, Simangun, Fontilea, Obrique and Bato, all of whom were members of the Long Beach Loco Boy's, agreed to retaliate against members of the Scott Royal Brothers gang. The group split up into two vehicles and drove to Carson City, California. Two members of the Scott Royal brothers were fired upon 23421 South Main Street in Carson City. The two victims were not killed in the drive-by attack. There is no documentation as to the seriousness of their injuries in the POR. (POR page 2-7).

2.    **Prisoner's Version:** Remains the same as indicated in his previous report. Opalec stated that he has nothing further to add.

3.    **Aggravating/Mitigating Circumstances:**

a.    **Aggravating Factors:**
- The manner in which the crime was committed created a potential for serious injury to persons other than the victim of the crime. The crime involved a drive-by shooting with the Loco Boy's gang and the Scott Royal Beach gang.
- During the commission of the crime the prisoner had a clear opportunity to cease but instead continued. Opalec fired two shots at the victim (Bato).

b.    **Mitigating Factors:** The inmate has no prior arrest history.

**B.**    **Multiple Crime(s):**

LIFE PRISONER EVALUATI═══ ═EPORT                                          2
SUBSEQUENT PAROLE CO═══ ═ERATION HEARING
JANUARY 2006 CALENDAR

   1.  **Summary of Crime:** N/A.

   2. **Prisoner's Version:** N/A.


## II. PRECONVICTION FACTORS:

  **A.** **Juvenile Record:** There is no juvenile record noted.

  **B.** **Adult Convictions and Arrests:** Opalec's criminal record consists of a 2/10/90
   arrest for Burglary, which the District Attorney rejected.

  **C.** **Personal Factors:** Opalec is the only child born on 12/9/69, to Soledad
   Dimapolis (mother) and Orlando Opalec. Opalec's father whom he has had no
   contact with, resides in the Philippines. Opalec came to the United States in 1987
   from the Philippines, where he had been living with his grandparents. In the
   United States, Opalec resided with his mother and step-father who both worked as
   custodians for the Long Beach Unified School District at the time of his arrest. No
   other family members are noted as having been in trouble with the law
   enforcement or the court system. Opalec states that he completed the 10th grade in
   the Philippines and completed six months of the Electrical Technician course at
   Edison Technology College in Carson, California. Opalec was laid off for two
   months prior to the instant offense. He had been working for Magnus Beck in
   Compton as an electrical assembler. He has never been married and has fathered
   no children. His prior drug use consists of marijuana and cocaine. Gang affiliation
   is noted as Long Beach Satalas with an aka of "Spade". The instant offense
   involved Opalec and members of the Long Beach Locos. There is no history of
   sexual deviation, mental disorder or medical problems. Opalec has had no
   criminal record prior to the instant offense. (Source Document: POR pages 6-7;
   ISRS, 128 dated 5/4/19, Psychiatric Evaluation dated 10/11/95).


## III. POSTCONVICTION FACTORS:

  **A.** **Special Programming/Accommodations:** None.

  **B.** **Custody History:** Opalec remained at CTF in the general population with
   Medium A custody. He is currently assigned to the PIA as Machine Operator in
   Shop 4.

  **C.** **Therapy and Self-Help Activities:** Opalec continues his participation in the
   Alcoholics Anonymous program.

  **D.** **Disciplinary History:** Opalec has remained disciplinary free during his entire
   incarceration.

    **E.**    **Other:** On 3/22/05, Opalec appeared before The Board of Prison Terms the BPT made the following decisions/recommendations: They denied parole for one year and recommended that he remain disciplinary free, continue his participation in self help programs and obtain support letters.

## IV.   FUTURE PLANS:

    **A.**    **Residence:** If parole is granted, Opalec wishes to reside with his mother, Soledad Dimapolis who lives at:
Coastal Home Subdivision
Munting Mapino
Naic Cavite, P.I. (No Phone).

    **B.**    **Employment:** Opalec stated that Concordia V. Seballe has offered him employment at the "Tins Metals for Export" Shop, letter dated 6/15/04. The address is,
Bo. Road Tayuman
Bi Nango Nan Rizal
Philippines.

    **C.**    **Assessment:** Opalec has remained disciplinary free during his entire incarceration. He has his GED and completed two vocations.

## V.   USINS STATUS: Opalec has an active USINS hold, #A41159616.

## VI.   SUMMARY:

    **A.**    Prior to release the prisoner could benefit from: remaining disciplinary free, continuing self-help programs, and earning positive chronos.

    **B.**    This report is based upon an interview with the prisoner on 9/8/05, lasting approximately 30 minutes, and a complete review of his Central File lasting approximately 2 hours.

    **C.**    Opalec was afforded an opportunity to examine his Central File on 9/18/05 per the Olsen Decision. On 9/8/05, he reviewed his Central File.

    **D.**    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JANUARY 2006 CALENDAR

4

J. Palmer                                    9/22/05
                                             Date
Correctional Counselor I


R. Leach,                                    9/22/05
                                             Date
Correctional Counselor II


R. Pope,                                     9-22-05
Facility Captain                             Date


D. S. Levorse,                    (dPc      9-23-05
                                             Date
Classification and Parole Representative

BOARD OF PRISON TERMS
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT                                    STATE OF CALIFORNIA

☐    DOCUMENTATION HEARING

☒    PAROLE CONSIDERATION HEARING

☐    PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 1/7/05 to 9/7/05 (Present) | | | **PLACEMENT:** He remained at CTF and housed among the general population. **CUSTODY:** Medium A. **VOC. TRAINING:** None. **ACADEMICS:** Opalec enrolled in the Criminon West U.S. (Correspondence Course Way to Happiness), and completed lessons 1-10. He received grades of 100%, dated 11/19/03, 1/5/04, 2/16/04, and 3/26/04. On 6/18/05, he completed the "Way to Happiness" course and received a certificate. Opalec completed 2 courses Animals in Disaster, Awareness and Preparedness and Animals in Disaster, Community Planning. He received certificates dated 3/15/04. **WORK RECORD:** He remained assigned to the PIA as a Machine Operator and received satisfactory to exceptional work grades for his performance, per CDC 101's dated 10/1/03, 1/1/04, 4/1/04, 7/1/04, 4/1/05 and 7/1/05. Supervisory comments: Opalec does an excellent job! He is a very good worker, and is very helpful in other areas. **GROUP ACTIVITIES:** Opalec received several 128-B chronos for attending the Alcoholics Anonymous Program from April-June of 2004; one of three meetings for the 4th Quarter of November 2004; the 1st Quarter of 2005 (January, February, March); and two out of three meetings for the 1st Quarter of January through March 2005, per CDC chronos dated 1/18/05, 2/15/05, 3/15/05, and 4/18/05. He attended a Monday Narcotics Anonymous Central B Group for the 2nd Quarter (April, May, June 2005), per 128-B dated 6/28/05. **PSYCH. TREATMENT:** None. **PRISON BEHAVIOR:** He has remained disciplinary free during his entire incarceration. **OTHER:** None. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | DATE 9/22/05 |
|---|---|---|

| OPALEC, RODERIC | H33214 | CTF-SOLEDAD | JAN/2006 |

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING                                   **ADDENDUM**

☐  PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 5/04 to Present | | | **PLACEMENT:** CTF. <br> **CUSTODY:** Medium A. <br> **VOC. TRAINING:** None. <br> **ACADEMICS:** None. <br> **WORK RECORD:** Assigned to PIA Wood Products. <br> **GROUP ACTIVITIES:** None. <br> **PSYCH. TREATMENT:** None. <br> **PRISON BEHAVIOR:** Remained positive. <br> **OTHER:** None. |

CORRECTIONAL COUNSELOR'S SIGNATURE                                                     DATE

*M. Rului* CCI                                                                          1-6-05

OPALEC, RODERIC              H33214                     CTF-SOLEDAD

SENT TO I/M ON ___1⸱7⸱05___

BPT 1004 (REV 7/86)

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT          **ADDENDUM**

M. Rubio          1-6-05
_____          _____
M. Rubio                         Date
Correctional Counselor I

L.A. Baker, CCI(A)     1-6-05
_____          _____
J. L. Sareli                     Date
Correctional Counselor II

J.L. Clancy          1-6-05
_____          _____
J.L. Clancy                      Date
Facility Captain

D.S. Levorse  C&PR    1-6-05
_____          _____
D.S. Levorse                     Date
Classification and Parole Representative

OPALEC, RODERIC          H33214          CTF-SOLEDAD

BPT 1004 (REV 7/86)

# EXHIBIT "F"



# CRIMINON

"There is no person alive who cannot make a new beginning."
– *The Way to Happiness*

*Does hereby certify that*

## Roderick Opalec

*Has satisfactorily attained the requirements necessary and is hereby awarded a Certificate of Completion of*

# The Way To Happiness Course

*This* 18 *day of* June 20 05

*Certificate #* 8136

*Tracie J.*
Extension Course Supervisor

*Bob Veach*
**CRIMINON** Executive Director

Trademark 2000
CRIMINON® is a TRADEMARK owned
by The Association For Better Living
And Education and is used with its permission

The Way To Happiness is a Trademark owned by
The L. Ron Hubbard Library and is used with its permission
© 2000 The Way To Happiness Foundation
All Rights Reserved. · Printed In USA



*Certificate of Completion*

*Awarded to:*

**R. Opalec**

*On this 23rd day of February 2006 for faithfully completing the "Healing For The Angry Heart" video series in*

# ANGER MANAGEMENT

*He has acquired the skills through practical biblical insights to deal with heart issues, discovered the secret to being heard, learned to release guilt, trust again and break habit cycles.*

Judge C. Lindsey
Protestant Chaplain
CTF Triplex Facility

Richard Mireles
Education Deacon
CTF Central Chapel

NAME and NUMBER   OPALEC, RODERICK, H33214 _____  Housing  ED-036U   CDC-128B (Rev. 4/74)

Inmate OPALEC has successfully completed the third phase of our **Inmate Employability Program**, "Finding Employment: The First Step for the Ex-Offender to Making it on the Outside." In addition to reviewing issues related to "Reengaging in Society" and "The Four Phases of Community Reentry," he has now received instructions on job searching while incarcerated, interview tips, networking to find employment, and accessing community resources related to finding employment. With employment being a prerequisite for parole, it is paramount for ex-offenders to have the ability to effectively access employment resources. With the completion of this phase of our program, inmate OPALEC's chance of finding gainful employment upon release is excellent. He is commended for his diligence and participation in our **Inmate Employability Program.**

Orig:  Central File
cc:    Personnel File
       Inmate
DATE 4/7/2006

**Finding Employment
Inmate Employability Program**

**Laudatory**

*Charlie D. Walker*
Charlie D. Walker
Superintendent I/IEP Coordinator
Prison Industry Authority - CTF
**GENERAL CHRONO**

---

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDC-128-B (Rev.4/74)

**NAME and NUMBER**    **OPALEC, R.**    **H33214**    **ED-036U**

You attended meetings for the Monday NA Central B Group for the 1st Quarter (Jan, Feb, Mar) 2006.
Since you began, you provide service to the Group with your attendance. Through this program, you are shown the tools available to you. By following 'The 12 Steps of Recovery' in your life, you can show your willingness to improve yourself.

Elected Position: None

Original : Central File
      cc: Staff Sponsor
        : Inmate

DATE:    4/10/06

*J. Kramer*
J. Kramer
**Group Staff Sponsor**

**Monday NA Central B  -LAUDATORY CHRONO**

---

**NAME** and **NUMBER**   OPALEC, RODERICK, H33214 _____  Housing  ED-036U   CDC-128B (Rev. 4/74)

Inmate OPALEC has voluntarily participated in three (3) hours of **Inmate Employability Program** video review and dialogue of issues related to Anger Management. These issues include, but are not limited to: violent thinking vs. nonviolent thinking, reducing emotional levels of anger, and identifying the fears that drive anger. Understanding how the "continuum of fear" can lead to violence, and ultimately involvement in the Criminal Justice System. In this video, Carl Reddick, Instructor on Cognitive Programming at the Oregon Police Academy, impresses on participants, strategies to help understand that "anger is an emotion, not a behavior." These strategies, which include evaluating your own belief system, identifying the fears that drive your emotions, determining your place in the world, being personally accountable for your actions, beliefs and behaviors, and owning your own problems, have proven to be corner stones of building productive citizens in society. With these strategies, it is my opinion that inmate OPALEC is now capable of understanding anger. He is commended for his efforts to become a productive citizen.

Orig:  Central File
cc:    Personnel File
       Inmate
DATE April 5, 2006

**Anger Management
Inmate Employability Program**

**Laudatory**

*Charlie D. Walker*
Charlie D. Walker
Superintendent I/IEP Coordinator
Prison Industry Authority - CTF
**GENERAL CHRONO**

Name: **OPALEC, R**    CDC# ⁴33214    **"Tuesday B Group"**    CDC-128-B (Rev. 2/69)

Mr. **OPALEC, R** has been attending the Alcoholics Anonymous Program at the Correctional Training Facility – Central for the quarter of: **July – September 2005**.  MR. **OOPALEC, R** has attended **0 of 3** meetings for the **3rd** quarter. He has shown the ability to relate with the Group and to improve himself by involvement with the group. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous environment.

DATE:    October 12, 2005

K. Reyes
Staff Sponsor, Central

Original:    Central File
    cc:    Inmate
        Sponsor

---

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDC-128-B (Rev.4/74)

**NAME and NUMBER**    **OPALEC, R.**    **H33214**    **ED-036U**

You attended meetings for the Monday NA Central B Group for the 3rd Quarter (July, August, September) 2005. You have actively participated in this Group. You provide service and input to the Group with your attendance. Through this program, you are shown what tools are available to you. By following 'The 12 Steps of Recovery' in your life, you show your willingness to improve yourself.

You have been a participant at CTF since: 09-24-2003
Elected Position: None

J. Kramer
**Group Staff Sponsor**

Original : Central File
    cc: Staff Sponsor
        : Inmate

**DATE:**    10/17/05

**Monday NA Central B  -LAUDATORY CHRONO**

---

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDC-128-B (Rev.4/74)

**NAME and NUMBER**    **OPALEC, R.**    **H33214**    **ED-036U**

You attended meetings for the Monday NA Central B Group for the 4th Quarter (Oct, Nov, Dec)  2005. Since you began, you provide service to the Group with your attendance. Through this program, you are shown the tools available to you. By following 'The 12 Steps of Recovery' in your life, you can show your willingness to improve yourself.

Elected Position: None

J. Kramer
**Group Staff Sponsor**

Original : Central File
    cc: Staff Sponsor
        : Inmate

**DATE:**    1/23/06

**Monday NA Central B  -LAUDATORY CHRONO**

Name: OPALEC, R    CDC# 33214    "Tuesday B Group"    CDC-128-B (Rev. 2/69)

Mr. OPALEC, R has been a member of the Alcoholics Anonymous Program at the Correctional Training Facility – Central for the quarter of: January - March 2005. MR. OPALEC, R has attended 2 of 3 meetings for the 1st quarter. He has shown the ability to relate with the Group and to improve himself by involvement with the group. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous environment.

DATE:    April 18, 2005

Kathy Reyes
Staff Sponsor, Central

Original:    Central File
cc:    Inmate
Sponsor

4/18/05

STATE OF CALIFORNIA    DEPARTMENT OF CORRECTIONS
CDC-128-B (Rev.4/74)

**NAME and NUMBER    OPALEC, R    H33214    ED-036U**

You attended meetings for the Monday NA Central B Group for the 2nd Quarter (April, May, June) 2005. Since you began, you provide service to the Group with your attendance. Through this program, you are shown the tools available to you. By following 'The 12 Steps of Recovery' in your life, you can show your willingness to improve yourself.

You have been a participant at CTF since: 09-24-2003
Elected Position: None

Kramer
Group Staff Sponsor

Original : Central File
cc: Staff Sponsor
: Inmate

DATE:    6/28/05    **Monday NA Central B  -LAUDATORY CHRONO**

Name: OPALEC, R    CDC# H3214    "Tuesday B Group"    CDC-128-B (Rev. 2/69)
CDC# H33214

Mr. OPALEC, R has been a attending the Alcoholics Anonymous Program at the Correctional Training Facility – Central for the quarter of: April - June 2005. MR. OPALEC, R has attended 1 of 3 meetings for the 2ND quarter. He has shown the ability to relate with the Group and to improve himself by involvement with the group. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous environment. No meeting held for the month of May 2005, due to the following: Lockdown, 1st watch status.

DATE:    August 16, 2005

K. Reyes
Staff Sponsor, Central

Original:    Central File
cc:    Inmate
Sponsor

Name: OPALEC    CDC# H-33214    CDC-128-B [Rev. 2/69]

Mr. OPALEC has been a member of the Alcoholics Anonymous Program at the Correctional Training Facility – Central for the quarter of April – June 2004. MR. OPALEC has attended 3of 3 meetings for the 2nd quarter. He has shown the ability to relate with the Group and to improve himself through involvement with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous environment.

DATE:    January 18, 2005

Kathy Reyes
Staff Sponsor, Central

Original:    Central File
cc:    Inmate
    Sponsor

---

Name: Opalec, R    CDC# H33214    "Tuesday B Group"    CDC-128-B (Rev. 2/69)

Mr. Opalec, R has been a member of the Alcoholics Anonymous Program at the Correctional Training Facility – Central for the quarter of November 2004. MR. Opalec, R has attended 1 of 3 meetings for the 4th quarter. He has shown the ability to relate with the Group and to improve himself through involvement with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous environment. No meetings held for the month of October & December, due to the following: Lockdown, 1st Watch Statues or Sponsor illness.

DATE:    February 15, 2005

Kathy Reyes
Staff Sponsor, Central

Original:    Central File
cc:    Inmate
    Sponsor

---

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128-B (Rev.4/74)

**NAME and NUMBER**    **OPALEC, R**    **H33214**    **ED-036U**

You attended meetings for the Narcotics Anonymous **B** Group for the 1st Quarter 2005 (January, February, and March).
You provide service to the Group with your attendance. Through this program, you are shown the tools available to you. By following "The 12 Steps of Recovery" in your life, you can show your willingness to improve yourself.

J. Kramer

J. Kramer
NA Staff Sponsor
CTF-Central Facility

Original : Central File
cc: Staff Sponsor
: Inmate

GENERAL CHRONO

EXHIBIT "G"

Court of Appeal, Second Appellate District, Div. 2 - No. B200537
**S159881**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re RODERIC OPALEC on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

MAR 1 2 2008

Frederick K. Ohlrich Clerk

_____
Deputy

Moreno, J., was absent and did not participate.

**GEORGE**
_____
Chief Justice

# EXHIBIT "H"

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

COURT OF APPEAL - SECOND DIST.

**F I L E D**

JAN - 3 2008

JOSEPH A. LANE _____ Clerk

J. GUZMAN _____ Deputy Clerk

In re

RODERIC OPALEC

on

Habeas Corpus.

B200537

(Super. Ct. No. BH004400)

(Steven R. Van Sicklen, Judge)

**O R D E R**

THE COURT:

The court has read and considered the petition for writ of habeas corpus, filed July 16, 2007, and the informal response filed by the Attorney General on December 21, 2007. The petition is denied.

BOREN, P.J.            DOI TODD, J.            ASHMANN-GERST, J.

Roderic Opalec
CDC:H-33214
Correctional Training Facility
P.O. Box 689 / East Dorm 64-Low
Soledad, CA 93960


Case Number B200537
Division 2

In Re:
Roderick Opalec
On
Habeas Corpus

# Exhibit "I"

# *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

**DEPT 100**

| Date: | MAY 16, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

|  |
|---|
| (Parties and Counsel checked if present) |

BH004400
In re,
RODERIC OPALEC,
    Petitioner,
On Habeas Corpus

Counsel for Respondent:

Nature of Proceedings:  ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's Writ of Habeas Corpus filed on December 8, 2006. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

Petitioner was received in the Department of Corrections on October 10, 1992 after a conviction for attempted murder with use of a firearm. He was sentenced to seven years to life plus three years. His minimum parole eligibility date was October 10, 1999. The record reflects that at the time of the offense, petitioner was a member of a gang. On September 24, 1990, petitioner and five fellow gang members decided to retaliate against members of a rival gang. They drove two vehicles to Carson, CA, where they found the two victims who were members of the rival gang. They shot at the two victims, injuring one.

The Board found petitioner unsuitable for parole after a parole consideration hearing held on July 12, 2006. Petitioner was denied parole for one year. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on his commitment offense.

The Court finds that there is some evidence to support the board's finding that "the motive for the crime is inexplicable or very trivial in relation to the offense" (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) "To fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily present." (*In re Scott* (2004) 119 Cal.App.4th 871, at 893). Petitioner and his crime partners planned a drive-by shooting as retaliation against a rival gang. The Board was justified in finding that gang rivalry is a materially less significant motive than those which conventionally drive people to attempt to murder others.

The Board's determination of unsuitability is also supported by some evidence that "multiple victims were attacked, injured or killed in same or separate incidents." " (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) Although no one was killed in the drive-by shooting, two men were attacked when petitioner and his crime partners fired on them. One of the victims was injured.

1

| Minutes Entered |
|---|
| 05-16-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | MAY 16, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004400
In re,
RODERIC OPALEC,
Petitioner,
On Habeas Corpus

Counsel for Respondent:

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A copy of the petition is sent to the Office of the Attorney General.

A true copy of this minute order is sent via U.S. Mail as follows to the following parties:

Roderic Opalec
H-33214
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0689

Department of Justice
Office of the Attorney General of the State of California
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

THE DOCUMENT TO WHICH THIS CERTIFICATE IS
ATTACHED IS A FULL, TRUE, AND CORRECT COPY
OF THE ORIGINAL ON FILE AND OF RECORD IN
MY OFFICE.
JUL 0 2 2007
ATTEST

JOHN A. CLARKE, Executive Officer/Clerk of the
Superior Court of the State of California for the County
of Los Angeles
By _____, Deputy
JOSEPH M. PULIDO, S.C.C.
233219

2

Minutes Entered
05-16-07
County Clerk

| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES** | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | ~~CONFORMED COPY~~<br>OF ORIGINAL FILED<br>Los Angeles Superior Court<br><br>JUL 0 2 2007 |
| PLAINTIFF/PETITIONER:<br><br>RODERIC OPALEC | John A. Clarke, Executive Officer/Clerk<br>By _____, Deputy<br>Joseph M. Pulido |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004400 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time
☐ Order to Show Cause
☐ Order for Informal Response
☐ Order for Supplemental Pleading

☑ Order re: Writ of Habeas Corpus
☐ Order
☐ Order re:
☑ Copy of Petition for Writ of Habeas Corpus for the Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

July 2, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
        Joseph M. Pulido

Roderic Opalec
H-33214
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0689

Department of Justice
Office of the Attorney General of the State of California
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

Roderick Opalec, H-33214
Correctional Training Facility
P.O. Box 689 / East Dorm 64-Low
Soledad, CA. 93960-0689



RETURN RECEIPT REQUESTED

LEGAL MAIL

PRIORITY
MAIL
UNITED STATES POSTAL SERVICE
www.usps.com



U.S. POSTAGE
PAID
TORRANCE, CA
90503
MAY 22, 08
AMOUNT

$10.50
00076305-06

UNITED STATES
POSTAL SERVICE

0000        94102

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS. FOLD AT DOTTED LINE

**CERTIFIED MAIL**

7007 2680 0001 6678 0651

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division
450 Golden Gate Ave. / P.O. Box 36060
San Francisco, CA.
94102-3483